EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re:<br><br>Informe de la Comisión Especial para evaluar la nota de pase de las reválidas de derecho general y derecho notarial | 2022 TSPR 74<br><br>209 DPR ____ |

Número del Caso: EC-2022-03

Fecha: 9 de junio de 2022

Materia: Informe de la Comisión Especial para evaluar la nota de pase de las reválidas de derecho general y derecho notarial

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re:*

Informe de la Comisión Especial     EC-2022-03
para evaluar la nota de pase de
las reválidas de derecho general
y derecho notarial

RESOLUCIÓN

En San Juan, Puerto Rico, a 9 de junio de 2022.

La encomienda que este Tribunal delega en la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía y la Notaría (Junta Examinadora) es del más alto interés público. El objeto de una examinación, como lo es el Examen de la Reválida, es garantizarle a la ciudadanía que cuando buscan los servicios de un abogado o abogada, ese profesional del Derecho esté cualificado(a) para defender sus intereses. Después de todo, son estos profesionales del Derecho en quienes las personas depositan su confianza en los momentos más vulnerables de sus vidas. Las personas buscan un abogado y abogada para vindicar sus derechos y privilegios; garantizar su paz individual o comunitaria; para asegurar la estabilidad familiar, social o económica; obtener remedios a agravios; salvaguardar su propiedad y lo más preciado, proteger su libertad. Incluso, el desarrollo económico y la seguridad de los negocios depende en muchas instancias de la gestión competente de un abogado o abogada. Por tal razón, los profesionales del Derecho —como funcionarios y funcionarias del Tribunal— ya sea del sector público o privado, los que ejercen como litigantes, adjudicadores, asesores, en fin, en todas sus facetas, deben ser examinados y examinadas sobre el conocimiento adquirido al momento que recién completan sus estudios de *Juris Doctor*. Contar con

profesionales del Derecho competentes, y que posean la capacidad mínima para ejercer su profesión, es esencial para evitar la desestabilización del Sistema de Justicia y una erosión continua de la confianza de la ciudadanía en el Sistema de Justicia, como garante de los derechos del Pueblo de Puerto Rico.

Los exámenes de admisión a la profesión legal que administra la Junta Examinadora se someten a evaluaciones continuas para asegurar que cumplen con los más altos estándares reconocidos en la práctica de la psicometría para instrumentos de medición de esta naturaleza. Estas evaluaciones han reflejado consistentemente que los resultados producidos por dichos exámenes son **válidos** y **confiables**, y representan adecuadamente los conocimientos y las destrezas de las personas evaluadas. Este logro ha sido el producto de muchos años de estudio, y de la experiencia y evaluación psicométrica del instrumento que ejecuta la Junta Examinadora.

Independiente de la calidad y confiabilidad del examen, es recomendable la evaluación periódica de la puntuación mínima o nota de pase que debe obtener una persona aspirante para aprobar estos exámenes. Por ello, la Regla 5(5.6.1) del Reglamento para la Admisión de Aspirantes al Ejercicio de la Abogacía y la Notaría, 4 LPRA Ap. XVII-B, expresa que esta puntuación mínima será fijada por este Tribunal de tiempo en tiempo. La evaluación de la nota de pase busca determinar si la puntuación mínima o nota de pase continúa representando la *capacidad mínima* deseada para ejercer la abogacía o la notaría en nuestra jurisdicción.

En atención a lo anterior, este Tribunal determinó analizar si la puntuación mínima actual de 596 puntos ajustados para aprobar los exámenes para ingresar a la abogacía y a la notaría deben modificarse o mantenerse por representar adecuadamente la capacidad mínima esperada en un abogado o una abogada que entra a la profesión. Para responder esa pregunta, se le encomendó al Dr. Chad W. Buckendahl, por conducto de la compañía ACS Ventures, realizar un estudio psicométrico para evaluar de manera empírica el desempeño de los y las aspirantes. El doctor Buckendahl le presentó a la Junta Examinadora un primer informe psicométrico titulado *Conducting a Standard Setting Study for the Puerto Rico Bar Exam and Notary Exam* en el que recomendó considerar disminuir la puntuación mínima para aprobar la Reválida General. Sin embargo, el doctor Buckendahl explicó que, para tomar una determinación final sobre la nota de pase, los rangos que sugirió debían considerarse junto a los factores de política pública que se persiguen en el País en torno al ejercicio de la profesión legal.

Culminada esa fase de la evaluación, el 28 de mayo de 2021 creamos la Comisión Especial para Evaluar la Nota de Pase de las Revalidas de Derecho General y Derecho Notarial (Comisión Especial), con el fin de complementar la evaluación requerida para fijar esta puntuación. *In re: Comisión Especial para evaluar la nota de pase de las revalidas de derecho general y derecho notarial*, 207 DPR 248 (2021). A esos efectos, entre otros asuntos, la Comisión Especial recopiló datos para informar la radiografía del perfil de los egresados de las tres escuelas de derecho en Puerto Rico y su gestión académica-curricular. Utilizando la información y los datos recopilados por la Junta Examinadora, la Comisión Especial le solicitó al doctor Buckendahl trabajar un segundo informe psicométrico en el que se evaluara de manera empírica el desempeño de los y las aspirantes entre 2010 a 2020. En cumplimiento, el doctor Buckendahl entregó un segundo informe psicométrico titulado *Puerto Rico Bar Examination Applicant Comparability Evaluation 2010-2020*. **En este segundo informe psicométrico se concluyó que las personas examinadas en el 2020 no estaban igualmente preparadas para el examen de reválida si se compara con la población de personas examinadas anteriormente. Toda estos hallazgos y recomendaciones se consignan en el Informe Final que preparó la Comisión Especial.**

Tras recibir el Informe final de la Comisión Especial, **se reafirma el valor del instrumento que se utiliza para medir la capacidad mínima deseada para ser un profesional del derecho, el cual utiliza métodos psicométricos y de calibración comparables a los empleados en otras jurisdicciones de los Estados Unidos conforme a la *National Conference of Bar Examiners*. Igualmente, se valida la calidad de la información que se obtiene a través de los exámenes para la admisión al ejercicio de la profesión.**

Según se detallará a continuación, **resolvemos que la *capacidad mínima* a la que hemos hecho referencia está mejor representada en la actualidad en la puntuación de 569 puntos ajustados en la Reválida General, lo que significa una disminución de la puntuación mínima hoy requerida. En cuanto a la Reválida Notarial la puntuación mínima permanecerá inalterada en 596 puntos ajustados. Estas notas de pase se mantendrán inalteradas hasta que otra cosa disponga este Tribunal.** No obstante, se acoge la recomendación de la Comisión Especial a los fines de que, en la medida posible, estas deben revisarse cada diez (10) años. A continuación, se incluye un trasfondo histórico pertinente y se resumen las conclusiones y recomendaciones de la Comisión Especial.

I.

En 1998, este Tribunal, en virtud de su poder inherente para reglamentar el ejercicio de la profesión legal en nuestra

jurisdicción y de conformidad con lo dispuesto en la Ley Núm. 17 de 10 de junio de 1939, según enmendada, conocida como Ley del Ejercicio de la Abogacía y del Notariado, 4 LPRA secs. 721-742, adoptó el Reglamento para la Admisión de Aspirantes al Ejercicio de la Abogacía y la Notaría (Reglamento), 4 LPRA Ap. XVII-B. Este cuerpo reglamentario regula todo lo relacionado a los procesos de confección, administración y corrección de los exámenes de admisión al ejercicio de la abogacía y la notaría. Según se desprende del propio Reglamento, "[l]os propósitos principales de los exámenes de [r]eválida [g]eneral y [n]otarial serán evaluar la capacidad del aspirante para analizar problemas jurídicos y medir las destrezas y conocimientos mínimos para el ejercicio de la profesión de la abogacía y la notaría; todo ello mediante la aplicación de las normas y los principios de conocimientos fundamentales en la profesión dentro de las distintas áreas del Derecho que son objeto del examen". 4 LPRA Ap. XVII-B, R. 5(5.1.1).

En ese sentido, en el examen de admisión al ejercicio de la abogacía, el y la aspirante deberá abordar cualquier interrogante que se le formule —sujeto al contenido de las Tablas de Especificaciones que publica la Junta Examinadora— entre las materias siguientes: derecho constitucional, derecho administrativo, derecho penal, procedimiento criminal, derecho probatorio (evidencia), derechos reales, obligaciones y contratos (contratos especiales), derecho hipotecario y registral, derecho de familia, derecho de sucesiones, responsabilidad civil extracontractual (daños y perjuicios), procedimiento civil, y ética y responsabilidad profesional. 4 LPRA Ap. XVII-B, R. 5(5.4.1). Igual proceder se exige en el examen de admisión al ejercicio de la notaría, el cual podrá incorporar cualquier materia de la Reválida General. *Id.*, R. 5(5.4.2).

A tono con lo antes expuesto, la Regla 5(5.6.1) del precitado Reglamento, 4 LPRA Ap. XVII-B, dispone que la puntuación mínima o nota de pase para aprobar los exámenes de admisión a la profesión legal en Puerto Rico "será establecida por el [Tribunal Supremo de Puerto Rico] de tiempo en tiempo con la recomendación y el consejo de la Junta [Examinadora], y será notificada a los aspirantes conforme con lo dispuesto en [la Regla 8(8.1.1)(c) de este Reglamento]".[1] La Regla 5(5.5.1), *supra*, establece, además, que "[l]as puntuaciones crudas de los exámenes se ajustarán

---

[1] La Regla 8(8.1.1), en su parte pertinente, reza como sigue:

"La Junta hará que se publiquen en un (1) periódico de circulación diaria general en Puerto Rico con cargo al presupuesto del Tribunal, los siguientes avisos:
[…]
(c) un aviso sobre la puntuación mínima para aprobar cada examen de reválida que ha de publicarse antes de la administración de cada examen de reválida". 4 LPRA XVII-B.

científicamente, de forma que las preguntas de cada uno de los exámenes mantengan, entre sí y respecto de los exámenes anteriores, un grado similar de dificultad. Para ello, la Junta [Examinadora] utilizará un método de evaluación y de medición científicamente reconocido".

Así, cualquier alteración o modificación que haga este Tribunal a la puntuación mínima o nota de pase para aprobar los mencionados exámenes, se dará en el marco de la *capacidad mínima* que debe poseer toda persona que aspire a ejercer la profesión legal; no solo para entender en las materias del examen, sino para identificar y fundamentar problemas o controversias de naturaleza jurídico-legal y para generar conclusiones y soluciones lógicas. Así también, deberá considerar el método de evaluación y medición científicamente reconocido, que permite que se ajusten las puntuaciones crudas de los exámenes en cuestión.

De conformidad con lo anterior, a inicios de 1985 le encomendamos al Dr. Stephen P. Klein que realizara un estudio —desde el punto de vista psicométrico— dirigido a determinar cuál debía ser la puntuación mínima o nota de pase para aprobar los exámenes de admisión al ejercicio de la abogacía y la notaría en nuestra jurisdicción en aquel entonces.[2]

Para realizar el mencionado estudio, el doctor Klein configuró unos paneles de abogados y abogadas admitidos(as) al ejercicio de la profesión legal para que evaluaran una muestra de las respuestas que los y las aspirantes dieron a las preguntas de discusión durante los exámenes de reválida para esas fechas. Tras analizar las referidas respuestas, el grupo de panelistas las organizó según la calidad relativa de cada una. Con ello, el doctor Klein aplicó los métodos psicométricos de rigor y recomendó la puntuación de 590 como la nota mínima para aprobar los exámenes de admisión al ejercicio de la abogacía y la notaría.

Tras varios años de estudios comparados y de evaluar los exámenes subsiguientes aplicando un método y análisis similares al destacado, el doctor Klein recomendó utilizar la puntuación de 596 puntos ajustados como la puntuación mínima o nota de pase para aprobar los exámenes de admisión a la profesión legal que se administrarían en los años siguientes. Esta es la puntuación que fijamos finalmente mediante Resolución de 21 de enero de 1994. Véase *Resolución* del Tribunal Supremo de Puerto Rico de 21 de enero de 1994.

---

[2] El Dr. Stephen P. Klein completó estudios doctorales en psicología industrial. Comenzó a trabajar para la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía y la Notaría (Junta Examinadora) en 1982. Culminó su función como psicómetra de la Junta en septiembre del 2014 por razones de salud. Para leer el obituario del Dr. Stephen Klein, véase https://www.legacy.com/us/obituaries/latimes/name/stephen-klein-obituary?id=8375946.

Luego de completar los estudios, que se destacaron anteriormente, y de fijar la nota de pase, la Junta Examinadora, se ha dado a la tarea —en las pasadas décadas— de monitorear esta puntuación tras finalizar la corrección en cada examen de reválida. Véase *In re: Comisión Especial para evaluar la nota de pase de las reválidas de derecho general y derecho notarial*, *supra*. Periódicamente se realizan estudios de validez con información interna y externa al examen, con el fin último de examinar si dicho instrumento es adecuado para medir la *capacidad mínima* que deben poseer las personas que aspiran a ejercer la profesión legal. Así también, administrada cada reválida, se evalúa la confiabilidad de los resultados arrojados por dicho instrumento de medición. *Id*.

Ahora bien, además de esta tarea de monitoreo, validación y confiabilidad que ha realizado la Junta Examinadora, hace varios años que, por instrucciones de la Jueza Presidenta Oronoz Rodríguez, "el Poder Judicial ha concretado acciones puntuales ante la discusión que se ha generado sobre la [R]eválida [General], como consecuencia de la notificación que hizo el American Bar Association (ABA) a las facultades de derecho de Puerto Rico referente a su incumplimiento con el [E]stándar de [A]creditación 316". *Id*. Ese estándar estableció nuevos porcentajes y criterios de aprobación en el examen de admisión al ejercicio de la abogacía que debían satisfacer los egresados y las egresadas de las distintas escuelas de derecho, para que estas mantuviesen la acreditación otorgada por dicho organismo. Según quedó aprobado en el 2019, el Estándar de Acreditación 316 de la ABA dispone: "[a]t least 75 percent of a law school's graduates in a calendar year who sat for a bar examination must have passed a bar examination administered within two years of their date of graduation".[3] *Id*.

Consecuentemente, en aras de atender el efecto que pudiera tener en las escuelas de derecho del País la aprobación del Estándar de Acreditación 316 de la ABA, la Junta Examinadora, junto con dichas instituciones educativas, realizó los esfuerzos siguientes:

(1) puso a [la] disposición de las facultades de Derecho aspectos psicométricos de los exámenes, junto a asuntos de confección y corrección de la reválida; (2) compartió la conversión utilizada para la parte de selección múltiple, el método utilizado para calibrar las reválidas, las configuraciones de calibradores y datos sobre dificultad y discriminación de los calibradores;

---

[3] Disponible en https://qa.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/standards/2021-2022/2021-2022-aba-standards-and-rules-of-procedure-chapter-3.pdf.

(3) personal experto de la Junta Examinadora atendió preguntas puntuales sobre la puntuación mínima y máxima de la escala calibrada total, y la fórmula de conversión para la parte de selección múltiple, entre otros aspectos psicométricos; (4) discutió la información referente a estudios que la Junta Examinadora realizó sobre el examen, por ejemplo, el estudio de fatiga en la parte de selección múltiple de la reválida general; y (5) acreditó que, al culminar cada corrección de las reválidas, la Junta Examinadora entrega a las facultades de Derecho las estadísticas sobre los resultados de estos exámenes; los nombres de los aspirantes aprobados por escuela de Derecho; las puntuaciones totales y sus rangos; las preguntas de discusión según su grado de dificultad; la puntuación calibrada promedio en cada parte del examen; la puntuación promedio de los egresados en la parte de selección múltiple, desglosada por materia evaluada; la relación existente entre las puntuaciones totales de los egresados, las puntuaciones en los exámenes de admisión a las escuelas de derecho y el promedio académico; y los resultados del proceso de reconsideración. *Id.*

Adicional a estos esfuerzos conjuntos, se comisionó un estudio a ACS Ventures con la misma metodología que en su día utilizó el Dr. Klein y el cual aborda detenidamente el Informe sometido por la Comisión Especial. En síntesis, el objetivo del estudio fue determinar (1) cuál de las respuestas ofrecidas por las personas examinadas en las preguntas de discusión representaba mejor la capacidad mínima que debe poseer toda persona que aspire a ejercer la profesión legal en nuestra jurisdicción y (2) cuáles preguntas de selección múltiple debía contestar esta persona de forma correcta. Para efectos de ese estudio, la persona aspirante mínimamente cualificada es aquella capaz de mostrar conocimientos, destrezas y habilidades de razonamiento legal, aun cuando cometa algunos errores de juicio y de hechos, entre otros.

En el informe psicométrico titulado *Conducting a Standard Setting Study for the Puerto Rico Bar Exam and Notary Exam* el doctor Buckendahl recomendó considerar disminuir la puntuación mínima para aprobar la Reválida General entre el rango de puntuación de 569 a 575, lo cual tendría el efecto de aumentar el por ciento de pasantía, aproximadamente, a un 41.5% y hasta un 46.4%. Como parte de su análisis el doctor Buckendahl enfatizó que para tomar una determinación final sobre la nota de pase, los rangos que sugirió debían considerarse junto a los factores de política pública que se persiguen en el País en torno al ejercicio de la profesión legal. Tras los hallazgos reportados en el análisis psicométrico realizado por el doctor Buckendahl en el 2021 —

la Junta Examinadora nos informó de la necesidad de evaluar ciertos factores adicionales a los datos estadísticos recopilados, analizados y validados a través de los años.

En consideración a lo anterior —y como adelantamos— el 28 de mayo de 2021, tras examinar ponderadamente toda la información que nos proveyó la Junta Examinadora y transcurridos más de 25 años desde que se implementó la última decisión respecto a la nota de pase, creamos la mencionada Comisión Especial para Evaluar la Nota de Pase de las Reválidas de Derecho General y Derecho Notarial, la cual estaría integrada por el Juez Asociado señor Colón Pérez, como su presidente, la Lcda. Diana Azizi de Arbona, el Lcdo. Juan Marqués Díaz y el Lcdo. Ricardo Ramírez Lugo, como sus comisionados. *Id.* Esta Comisión Especial sería la encargada de recopilar la información que restaba por analizar en cuanto a la puntuación mínima o nota de pase para aprobar los exámenes de admisión a la profesión legal en nuestra jurisdicción. *Id.* En específico, a la Comisión Especial le encomendamos la tarea de evaluar la información relacionada al "perfil de los egresados [y las egresadas] de las [3] escuelas de derecho de Puerto Rico, los parámetros de reclutamiento y admisión utilizados por estas instituciones educativas, las medidas empleadas por estas escuelas durante los estudios conducentes al grado de *Juris Doctor* para evaluar el aprovechamiento académico de estos egresados [y egresadas], los cambios en los currículos académicos, los cursos obligatorios y electivos, y cualquier otra información que la comisión [estimara] necesaria para completar su encomienda".[4] *Id.*

La Comisión Especial inició sus trabajos en junio de 2021. Como parte del plan de trabajo implementó un método de requerimiento de información concerniente a: (1) el perfil (objetivo-cuantitativo) de los egresados y las egresadas; (2) el perfil de la gestión académica-curricular de las tres (3) escuelas de derecho en Puerto Rico; (3) un estudio detenido de informes psicométricos relacionados a estos particulares; (4) junto a cualquier otra información que fuera pertinente.

La Comisión Especial, entonces procedió a realizar un estudio y análisis particularizado e integral de la información y los datos recopilados para responder a la pregunta medular, a saber: ¿debe modificarse la nota mínima para aprobar los exámenes de admisión a la abogacía y la

---

[4] Debemos mencionar que, el 15 de mayo de 1978, este Tribunal creó una Comisión para el Estudio de la Reválida y la Educación Legal en Puerto Rico cuyos trabajos contemplaron asuntos de similar naturaleza a los que hoy nos ocupan. El 16 de enero de 1980 se publicó el informe preparado por esa Comisión. Véase Tribunal Supremo de Puerto Rico, *Informe de la Comisión para el Estudio de la Reválida y la Educación Legal en Puerto Rico*, 16 de enero de 1980.

notaría tomando como criterio rector la *capacidad mínima* que debe poseer toda persona que aspire a ejercer la profesión legal, según la hemos definido?

Parte integral de ese análisis de la Comisión Especial incluyó un segundo informe psicométrico sometido por el doctor Buckendahl. Como parte de ello, se realizaron una serie de análisis estadísticos enfocados en las características de las personas que tomaron el examen de admisión al ejercicio de la abogacía en los años 2010, 2012, 2014, 2016, 2018 y 2020. En el informe titulado *Puerto Rico Bar Examination Applicant Comparability Evaluation 2010-2020* se concluyó: (1) que con relación a los datos empíricos estudiados no surge un patrón claro que explique el declive en el por ciento de aprobación observado en el examen de admisión al ejercicio de la abogacía y (2) que **las personas examinadas en el 2020 no estaban igualmente preparadas para el examen de reválida si se compara con la población de personas examinadas anteriormente.**[5]

Luego de evaluar detenida y cuidadosamente la información y los datos entregados por los expertos en psicometría, la Junta Examinadora, la Escuela de Derecho de la UPR, la Facultad de Derecho de la UIPR y la Escuela de Derecho de la PUCPR, la Comisión Especial arribó a una serie de conclusiones y recomendaciones referentes a la puntuación mínima o nota de pase que se debe requerir para aprobar los exámenes de admisión a la profesión legal en nuestro País. Tras someter el Informe, expresó haber cumplido con la tarea delegada por este Tribunal.

En el Informe de la Comisión Especial —que se aneja a esta *Resolución*— se presenta: (1) un resumen de los principales hallazgos recogidos en un *primer* informe psicométrico comisionado al doctor Buckendahl de ACS Ventures, en el que se evaluó si era necesario modificar la nota de pase de los exámenes de admisión al ejercicio de la profesión legal; (2) un resumen de la información y los datos ofrecidos por la Junta Examinadora a pedido de la Comisión Especial; (3) una radiografía detallada del perfil de los egresados y las egresadas, y de la gestión académica-curricular de las escuelas de derecho en Puerto Rico para los años académicos 2007 al 2017, a la luz de la información provista por estas instituciones educativas a la Comisión Especial;[6] (4) un resumen de los principales hallazgos

---

[5] "The hypothesis that the steady decline in overall pass rate on the Puerto Rico Bar Examination is a result of applicants being less prepared for the examination is supported by the decline in performance on the 14 anchor items administered on every test administration." Apéndice VII del Informe, pág. 643.

[6] Del mencionado Informe, surge que la Comisión Especial acordó con las tres (3) escuelas de derecho que éstas compartirían la información y los datos que se les solicitarían mediante un requerimiento formal para el periodo de los años académicos comprendidos entre 2007 y 2017. Ello, pues,

recogidos en un *segundo* informe psicométrico preparado por el doctor Buckendahl, el cual, a su vez, utiliza la información recopilada por la Junta Examinadora y por la Comisión Especial, y (5) la relación de conclusiones y recomendaciones a las que ha llegado dicha Comisión Especial.

A continuación, se resumen las conclusiones y recomendaciones de la Comisión Especial:

1. El perfil de los egresados y las egresadas de las tres (3) escuelas de derecho en el País, aunque tuvo una reducción mínima, mirado conjuntamente, se mantuvo relativamente similar, excepto el desempeño de egresados y egresadas en el Examen de Admisión a Estudios de Posgrado (EXADEP), el cual disminuyó drásticamente.

2. No ocurrieron cambios significativos en las secuencias curriculares de las tres (3) instituciones académicas de referencia durante el periodo de tiempo evaluado en este Informe. Según la información recopilada por la Comisión Especial, aunque una de las tres escuelas de derecho no exige todas las materias de reválida como requisito de graduación, la mayoría de los y las estudiantes que se gradúan de *Juris Doctor* en nuestra jurisdicción completan todas las materias que se examinan en la Reválida General.

3. Los parámetros de reclutamiento y admisión utilizados por las tres (3) escuelas de derecho en los años académicos bajo estudio fueron similares. En el periodo estudiado dichas instituciones educativas utilizaron principalmente la puntuación obtenida en el EXADEP, el Law School Admission Test (LSAT), junto al índice académico general subgraduado.

   a. Para los años académicos 2007 a 2017 se registró una reducción significativa en la puntuación promedio del examen estandarizado EXADEP para los y las estudiantes de las tres (3) escuelas de derecho. A la fecha, el EXADEP ya no es requisito de admisión.

---

con alta probabilidad, durante este periodo de tiempo evaluado, fue el estudiantado matriculado en las referidas facultades de derecho el que tomó el examen de admisión al ejercicio de la profesión legal que se administró durante los años 2010 y 2020. Además, durante esa década fue que se implementaron nuevos cambios en el formato de exámenes de admisión al ejercicio de la profesión legal y cuando se agudizaron las inquietudes con el por ciento de aprobación.

b. El promedio de índice académico general a nivel subgraduado, si bien con una baja mínima, se mantuvo relativamente estable. Las tres (3) escuelas de derecho comunicaron su interés en aumentar el promedio, toda vez que reconocen su potencial relación con el por ciento de aprobación del examen de admisión al ejercicio de la abogacía.

4. Las medidas empleadas durante los estudios conducentes al grado de *Juris Doctor* para evaluar el aprovechamiento académico en las tres (3) escuelas de derecho bajo estudio se han mantenido y, en ocasiones, ajustado o agudizado para procurar un mejor desempeño del estudiantado.

5. Las iniciativas de las mencionadas instituciones académicas dirigidas a la preparación de los y las aspirantes al ejercicio de la profesión legal se han intensificado en años recientes ante la reducción en el por ciento de aprobación y tras la notificación de la ABA del incumplimiento con el Estándar de Acreditación 316. Así, por ejemplo, en los últimos años las tres (3) escuelas de derecho realizaron algún tipo de esfuerzo por adoptar medidas para el apoyo del estudiantado, entre ellos: crear oficinas de apoyo, brindar repasos o talleres en preparación del examen y administrar exámenes de simulación. Estas iniciativas son de reciente creación, por lo que en estos momentos no se puede evaluar su efectividad.

6. De otra parte, el doctor Buckendahl recomendó la disminución de la puntuación o nota mínima para aprobar la Reválida General dentro del rango de puntuaciones de 569 y 575 puntos ajustados. También recomendó que la puntuación mínima para aprobar la Reválida Notarial esté en el rango de 591 a 599 puntos ajustados. En ambos casos, según el experto, la puntuación final que se fije debe considerar otros factores pertinentes que respondan a elementos de política pública, como, por ejemplo, los niveles de tolerancia en torno a la tipificación de errores de clasificación. Dicho de otro modo, los rangos permiten sopesar el nivel de riesgo tolerable en un margen de error, a saber, las consecuencias de admitir a la profesión alguien que no posea las competencias mínimas.

7. Asimismo, luego de analizar los datos que obran en la Junta Examinadora y los obtenidos por la Comisión Especial, **el doctor Buckendahl concluyó que las personas examinadas recientemente no**

**estaban igualmente preparadas para el examen si se comparan con la población de personas examinadas en años anteriores. Esto es, administrando los mismos ejercicios, los aspirantes al presente no estaban al mismo nivel de preparación de aspirantes que tomaron el examen hace una década.**

8. A pesar de concluirse que los y las aspirantes que son examinados al presente no están igualmente preparados que los examinados anteriormente, la Comisión Especial no identificó con precisión la razón para el descenso en el desempeño de los y las aspirantes al ejercicio de la abogacía en reválidas recientes. Ante esa incertidumbre, la Comisión Especial –en lo relacionado a la tarea que se le encomendó– sugirió adoptar la puntuación más baja dentro del rango recomendado por el doctor Buckendahl en su *primer* Informe Psicométrico, entiéndase, 569 puntos ajustados. Esta determinación sin perjuicio a estudios posteriores que permitan precisar las razones para el descenso aludido.

9. Respecto al examen de admisión al ejercicio de la notaría, la Comisión Especial recomendó que la puntuación mínima o nota de pase para aprobarlo se mantenga en 596 puntos ajustados. Tras los cambios instituidos por este Tribunal para que únicamente los y las aspirantes que hayan aprobado la Reválida General puedan ser admitidos al examen para la Notaría, el por ciento de aprobación de estos aspirantes aumentó sustancialmente. Véase Resolución del Tribunal Supremo de Puerto Rico de 7 de noviembre de 2019, *In re: Enmienda a la Regla 7.1.1 del Reglamento para la Admisión de Aspirantes al Ejercicio de la Abogacía y la Notaría*, 203 DPR 571 (2019).

10. La Comisión Especial informó que su encomienda se limitó a la revisión de la nota de pase. No obstante, —y similar a como ha sido propuesto por la *National Conference of Bar Examiners*, en lo relacionado a los exámenes que ésta confecciona y administra, entiéndase el *Multistate Bar Examination* y el *Uniform Bar Examination*—[7] dicho ente notificó que en el proceso se identificaron reclamos dirigidos a la deseabilidad de revisar, para avalar o variar, distintos componentes de la reválida, a saber:

    a. la estructura y el contenido de los exámenes de admisión al ejercicio de la abogacía.

---

[7] Véase https://nextgenbarexam.ncbex.org/.

Sobre ejemplo de cómo atenderlo, véase el Informe de la Comisión Especial;

b. el valor relativo que se le da a las secciones de selección múltiple y de preguntas de discusión;

c. los cambios en la práctica de la profesión legal en general y

d. el proceso de aprendizaje, la tecnología y su efecto.

Sobre el particular, la Comisión Especial sugirió que se considere implementar un proceso o estructura similar a la que adoptó la *Comisión para el estudio de la Reválida y la Educación Legal en Puerto Rico*, creada el 15 de mayo de 1978. Véase Tribunal Supremo de Puerto Rico, *Informe de la Comisión para el Estudio de la Reválida y la Educación Legal en Puerto Rico*, 16 de enero de 1980.

11. Por último, la Comisión Especial recomendó, que un ejercicio similar al hecho en el Informe que acompaña esta Resolución se realice cada 10 años, no solo para actualizar la información allí recopilada, sino también para monitorear el efecto de las recomendaciones antes enumeradas.

II.

Luego de examinar en detalle el contenido del referido Informe y su apéndice, **este Tribunal, como ya mencionamos, fija en 569 puntos ajustados la puntuación mínima o nota de pase para aprobar la Reválida General y mantiene en 596 puntos ajustados la puntuación mínima o nota de pase para aprobar la Reválida Notarial, hasta que este Tribunal disponga otra cosa.**

**La vigencia de estas notas de pase será efectiva a partir de los exámenes de admisión a la profesión legal que recientemente se administraron en marzo de 2022.**

Se instruye al Director Ejecutivo de la Junta Examinadora a tomar todas las medidas administrativas que sean necesarias para cumplir con lo dispuesto en esta Resolución.

Así las cosas, damos por cumplida la encomienda de la Comisión Especial y agradecemos la labor y aportación de sus miembros que hicieron posible, en un corto período de tiempo, presentar las recomendaciones que propiciaron la determinación que se emite hoy.

Junto con esta *Resolución*, se ordena la publicación del Informe de la Comisión Especial y su apéndice. Se ordena además su traducción al idioma inglés.

Notifíquese a la Lcda. Vivian I. Neptune Rivera, decana de la Escuela de Derecho de la Universidad de Puerto Rico, al Lcdo. Julio E. Fontanet Maldonado, decano de la Facultad de Derecho de la Universidad Interamericana de Puerto Rico, al Lcdo. Fernando Moreno Orama, decano de la Escuela de Derecho de la Pontificia Universidad Católica de Puerto Rico y al Lcdo. Héctor Rodríguez Mulet, director ejecutivo de la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía y la Notaría.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo.


                              Javier O. Sepúlveda Rodríguez
                              Secretario del Tribunal Supremo



ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL SUPREMO

# INFORME DE LA COMISIÓN ESPECIAL
## PARA EVALUAR LA NOTA DE PASE DE LAS REVÁLIDAS DE DERECHO GENERAL Y DERECHO NOTARIAL

13 DE ABRIL DE 2022

## Índice del contenido

I. Introducción: marco jurídico, trasfondo histórico y
los trabajos de la Comisión Especial ........................................................ 3-10

II. Primer informe psicométrico: *Conducting a Standard
Setting Study for the Puerto Rico Bar Exam and Notary Exam* .................... 11-14

III. Informe de la Junta Examinadora de Aspirantes al
Ejercicio de la Abogacía y la Notaría: sobre ajustes
psicométricos, estudios de validación y desempeño de los y las
aspirantes en el examen de admisión al ejercicio de la abogacía ............... 15-28

IV. Informe de las escuelas de derecho en Puerto Rico:
radiografía del perfil de sus egresados y egresadas, y
de la gestión académica-curricular ......................................................... 29

   A. Introducción ................................................................................... 29-32

   B. Radiografía de las escuelas de derecho en Puerto Rico

      1. Escuela de Derecho de la Universidad de Puerto Rico ................ 33-50

      2. Facultad de Derecho de la Universidad Interamericana
         de Puerto Rico ......................................................................... 51-64

      3. Escuela de Derecho de la Pontificia Universidad Católica
         de Puerto Rico ......................................................................... 65-84

   C. Hallazgos globales y primeras impresiones: la suma de las
      tres escuelas de derecho ............................................................... 85-99

V. Segundo informe psicométrico: *Puerto Rico Bar Examination
Applicant Comparability Evaluation 2010-2020* ..................................... 100-103

VI. Conclusiones y recomendaciones ........................................... 104-106

Índice del Apéndice .................................................................... 107-110



## I. INTRODUCCIÓN: MARCO JURÍDICO, TRASFONDO HISTÓRICO Y LOS TRABAJOS DE LA COMISIÓN ESPECIAL

En 1998, el Tribunal Supremo de Puerto Rico, en virtud de su poder inherente para regular el ejercicio de la profesión legal y establecer los requisitos de admisión al ejercicio de esta profesión, de conformidad con lo dispuesto en la Ley Núm. 17 de 10 de junio de 1939, según enmendada, conocida como Ley del Ejercicio de la Abogacía y del Notariado, 4 LPRA secs. 721-742, adoptó el actual *Reglamento para la Admisión de Aspirantes al Ejercicio de la Abogacía y la Notaría* (Reglamento), 4 LPRA Ap. XVII-B. Este cuerpo reglamentario regula todo lo relacionado a los procesos de confección, administración y corrección de los exámenes de admisión al ejercicio de la abogacía y la notaría. Según se desprende del propio Reglamento, "[l]os propósitos principales de los exámenes de [r]eválida [g]eneral y [n]otarial serán evaluar la capacidad del aspirante para analizar problemas jurídicos y medir las destrezas y conocimientos mínimos para el ejercicio de la profesión de la abogacía y la notaría; todo ello mediante la aplicación de las normas y los principios de conocimientos fundamentales en la profesión dentro de las distintas áreas del Derecho que son objeto del examen". 4 LPRA Ap. XVII-B, R. 5(5.1.1).

En ese sentido, en el examen de admisión al ejercicio de la abogacía, el y la aspirante deberá abordar cualquier interrogante que se le formule —sujeto al contenido de las Tablas de Especificaciones que publica la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía y la Notaría— entre las siguientes materias que se examinarán: derecho constitucional, derecho administrativo, derecho penal, procedimiento criminal, derecho probatorio (evidencia), derechos reales, obligaciones y contratos (contratos especiales), derecho hipotecario y registral, derecho de familia, derecho de sucesiones, responsabilidad civil extracontractual (daños y perjuicios), procedimiento civil, y ética y responsabilidad profesional (en conjunto, "materias de la Reválida General" o "materias de reválida"). 4 LPRA Ap. XVII-B, R. 5(5.4.1). Igual proceder se exige



en el examen de admisión al ejercicio de la notaría, el cual podrá incorporar cualquier materia de la Revália General. *Id.*, R. 5(5.4.2).

A tono con lo antes expuesto, la Regla 5(5.6.1) del precitado Reglamento, 4 LPRA Ap. XVII-B, dispone que la puntuación mínima o nota de pase para aprobar los exámenes de admisión a la profesión legal en Puerto Rico "será establecida por el [Tribunal Supremo de Puerto Rico] de tiempo en tiempo con la recomendación y el consejo de la Junta [Examinadora de Aspirantes al Ejercicio de la Abogacía y la Notaría], y será notificada a los aspirantes conforme con lo dispuesto en [la Regla 8(8.1.1)(c) de este Reglamento]".[1] La Regla 5(5.5.1), *supra*, establece, además, que "[l]as puntuaciones crudas de los exámenes se ajustarán científicamente, de forma que las preguntas de cada uno de los exámenes mantengan, entre sí y respecto de los exámenes anteriores, un grado similar de dificultad. Para ello, la Junta [Examinadora de Aspirantes al Ejercicio de la Abogacía y la Notaría] utilizará un método de evaluación y de medición científicamente reconocido".

Así, cualquier alteración o modificación que haga el Tribunal Supremo de Puerto Rico a la puntuación o nota mínima para aprobar los mencionados exámenes, se dará en el marco de la *capacidad mínima* que debe poseer toda persona que aspire a ejercer la profesión legal; no solo para entender en las materias del examen, sino para identificar y fundamentar problemas o controversias de naturaleza jurídico-legal y para generar conclusiones y soluciones lógicas. Así también, deberá considerar el método de evaluación y medición científicamente reconocido, que permite que se ajusten las puntuaciones crudas de los exámenes en cuestión.

---

[1] La Regla 8(8.1.1), en su parte pertinente, reza como sigue:

"La Junta hará que se publiquen en un (1) periódico de circulación diaria general en Puerto Rico con cargo al presupuesto del Tribunal, los siguientes avisos:

.          .          .          .          .          .          .          .

(c) un aviso sobre la puntuación mínima para aprobar cada examen de revália que ha de publicarse antes de la administración de cada examen de revália". 4 LPRA XVII-B.



De conformidad con lo anterior, a inicios de 1985 el Tribunal Supremo de Puerto Rico encomendó al Dr. Stephen P. Klein que realizara un estudio —desde el punto de vista psicométrico— dirigido a determinar cuál debía ser la puntuación mínima o nota de pase para aprobar los exámenes de admisión al ejercicio de la abogacía y la notaría en nuestra jurisdicción en aquel entonces. Reconocidamente, el doctor Klein se había dedicado por mucho tiempo al estudio de estos temas en y fuera de Puerto Rico.[2]

Para realizar el mencionado estudio, el doctor Klein configuró unos paneles de abogados y abogadas admitidos(as) al ejercicio de la profesión legal para que evaluaran una muestra de las respuestas que los y las aspirantes dieron a las preguntas de discusión durante los exámenes de reválida para esas fechas. Tras analizar las referidas respuestas, el grupo de panelistas las organizó según la calidad relativa de cada una. Con ello, el doctor Klein aplicó los métodos psicométricos de rigor y recomendó la puntuación de 590 como la nota mínima para aprobar los exámenes de admisión al ejercicio de la abogacía y la notaría.

El doctor Klein evaluó exámenes subsiguientes aplicando un método y análisis similares al señalado. Así, para septiembre de 1985 identificó que la puntuación mínima o nota de pase para aprobar los exámenes de admisión al ejercicio de la abogacía y la notaría debía ser de 595 puntos ajustados; para marzo de 1986, de 572, y para septiembre de 1986 de 593. Ante esto, el doctor Klein recomendó utilizar la puntuación de 596 puntos ajustados como la puntuación mínima o nota de pase para aprobar los exámenes de admisión a la profesión legal que se administrarían en los años siguientes.

El 29 de enero de 1987 el Tribunal Supremo de Puerto Rico, mediante Resolución, fijó en 596 puntos ajustados la nota mínima para aprobar los

---

[2] El Dr. Stephen P. Klein completó estudios doctorales en psicología industrial. Comenzó a trabajar para la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía y la Notaría (Junta Examinadora) en 1982. Culminó su función como psicómetra de la Junta en septiembre del 2014 por razones de salud. Para leer el obituario del Dr. Stephen Klein, véase https://www.legacy.com/us/obituaries/latimes/name/stephen-klein-obituary?id=8375946.



exámenes de admisión al ejercicio de la abogacía y la notaría que se administrarían desde marzo de 1987 a marzo de 1989. El 21 de enero de 1994 el Máximo Foro judicial local fijó nuevamente en 596 puntos ajustados la nota mínima para aprobar los exámenes de admisión referidos hasta que otra cosa se dispusiera. Véase Apéndice III del Informe, pág. 43.

Luego de completar los estudios antes aludidos y de establecer la nota de pase en 596 puntos ajustados, la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía y la Notaría (Junta Examinadora), finalizada la corrección en cada examen de reválida, se dio a la tarea en las pasadas décadas de monitorear esta puntuación. Véase Apéndice I del Informe, págs. 4-6. Periódicamente se realizan estudios de validez con información interna y externa al examen, con el fin último de examinar si dicho instrumento es adecuado para medir la *capacidad mínima* que deben poseer las personas que aspiren a ejercer la profesión legal. Véase Apéndice III del Informe, págs. 53-103. Así también, administrada cada reválida, se evalúa la confiabilidad de los resultados arrojados por dicho instrumento de medición. Véase Apéndice I del Informe, págs. 4-5.

Ahora bien, además de esta tarea de monitoreo, validación y confiabilidad que ha realizado la Junta Examinadora, hace varios años que, por instrucciones de la Jueza Presidenta del Tribunal Supremo de Puerto Rico, Hon. Maite D. Oronoz Rodríguez, "el Poder Judicial ha concretado acciones puntuales ante la discusión que se ha generado sobre la [R]eválida [General], como consecuencia de la notificación que hizo el American Bar Association (ABA) a las facultades de derecho de Puerto Rico referente a su incumplimiento con el [E]stándar de [A]creditación 316". Apéndice I del Informe, pág. 5. Ese estándar estableció nuevos porcentajes y criterios de aprobación en el examen de admisión al ejercicio de la abogacía que debían satisfacer los egresados y las egresadas de las distintas escuelas de derecho, para que estas mantuviesen la acreditación otorgada por dicho organismo. Según quedó aprobado en el 2019, el Estándar de Acreditación 316 de la American Bar Association (ABA) dispone: "[a]t least 75



percent of a law school's graduates in a calendar year who sat for a bar examination must have passed a bar examination administered within two years of their date of graduation".[3] *Id.*

Consecuentemente, en aras de atender el efecto que pudiera tener en las escuelas de derecho del País la aprobación del Estándar de Acreditación 316 de la ABA, la Junta Examinadora, junto con dichas instituciones educativas, realizó los esfuerzos siguientes:

> (1) puso a [la] disposición de las facultades de Derecho aspectos psicométricos de los exámenes, junto a asuntos de confección y corrección de la reválida; (2) compartió la conversión utilizada para la parte de selección múltiple, el método utilizado para calibrar las reválidas, las configuraciones de calibradores y datos sobre dificultad y discriminación de los calibradores; (3) personal experto de la Junta Examinadora atendió preguntas puntuales sobre la puntuación mínima y máxima de la escala calibrada total, y la fórmula de conversión para la parte de selección múltiple, entre otros aspectos psicométricos; (4) discutió la información referente a estudios que la Junta Examinadora realizó sobre el examen, por ejemplo, el estudio de fatiga en la parte de selección múltiple de la reválida general; y (5) acreditó que, al culminar cada corrección de las reválidas, la Junta Examinadora entrega a las facultades de Derecho las estadísticas sobre los resultados de estos exámenes; los nombres de los aspirantes aprobados por escuela de Derecho; las puntuaciones totales y sus rangos; las preguntas de discusión según su grado de dificultad; la puntuación calibrada promedio en cada parte del examen; la puntuación promedio de los egresados en la parte de selección múltiple, desglosada por materia evaluada; la relación existente entre las puntuaciones totales de los egresados, las puntuaciones en los exámenes de admisión a las escuelas de derecho y el promedio académico; y los resultados del proceso de reconsideración. Apéndice I del Informe, págs. 5-6.

No obstante, como resultado de las inquietudes que todavía manifestaban la Decana y los Decanos de las 3 escuelas de derecho en Puerto Rico, así como por los hallazgos reportados en determinado análisis psicométrico —el cual

---

[3] Disponible en [2021-2022 ABA Standards and Rules of Procedure for Approval of Law Schools Chapter 3 (americanbar.org)](americanbar.org).



abordaremos con detenimiento más adelante—, a inicios del 2021 la Junta Examinadora informó al Tribunal Supremo de Puerto Rico la necesidad de evaluar ciertos factores adicionales a los datos estadísticos recopilados, analizados y validados a través de los años, para que de esa forma se tuviera la mayor cantidad de elementos necesarios que permitieran determinar si, además de las medidas ya concretadas, procedía modificar la puntuación mínima o nota de pase para aprobar los exámenes de admisión a la abogacía y la notaría.

El 28 de mayo de 2021, tras examinar ponderadamente toda la información que le proveyó la Junta Examinadora y transcurridos más de 25 años desde que se implementó la última decisión respecto a la nota de pase, el Tribunal Supremo de Puerto Rico determinó crear la Comisión Especial para Evaluar la Nota de Pase de las Reválidas de Derecho General y Derecho Notarial (Comisión Especial). Véase Apéndice I del Informe, págs. 6-7. Esta Comisión Especial sería la encargada de recopilar la información que restaba por analizar en cuanto a la puntuación o nota mínima para aprobar los exámenes de admisión a la profesión legal en nuestra jurisdicción. *Id.* En específico, a la Comisión Especial se le encomendó la tarea de evaluar la información relacionada al "perfil de los egresados [y las egresadas] de las [3] escuelas de derecho de Puerto Rico, los parámetros de reclutamiento y admisión utilizados por estas instituciones educativas, las medidas empleadas por estas escuelas durante los estudios conducentes al grado de *Juris Doctor* para evaluar el aprovechamiento académico de estos egresados [y egresadas], los cambios en los currículos académicos, los cursos obligatorios y electivos, y cualquier otra información que la comisión [estimara] necesaria para completar su encomienda".[4] *Id.*, pág. 7.

---

[4] Debemos mencionar que, el 15 de mayo de 1978, el Tribunal Supremo de Puerto Rico creó una Comisión para el Estudio de la Reválida y la Educación Legal en Puerto Rico cuyos trabajos contemplaron asuntos de similar naturaleza a los que hoy nos ocupan. El 16 de enero de 1980 se publicó el informe preparado por esa Comisión. Véase Tribunal Supremo de Puerto Rico, *Informe de la Comisión para el Estudio de la Reválida y la Educación Legal en Puerto Rico*, 16 de enero de 1980.



A raíz de todo lo antes esbozado, la Comisión Especial se conformó e inició sus trabajos en junio de 2021. Para ello, esta Comisión Especial implementó un método de requerimiento de información concerniente al perfil (objetivo-cuantitativo) de los egresados y las egresadas, y al perfil de la gestión académica-curricular de las 3 escuelas de derecho en Puerto Rico, así como de estudio detenido de informes psicométricos relacionados a este particular junto a cualquier otra información que fuera pertinente. La Comisión Especial, entonces, procedió a realizar un estudio y análisis particularizado e integral de la información y los datos recopilados para responder a la pregunta medular, a saber: ¿debe modificarse la nota mínima para aprobar los exámenes de admisión a la abogacía y la notaría tomando como criterio rector la *capacidad mínima* que debe poseer toda persona que aspire a ejercer la profesión legal, según la hemos definido?

Con ese propósito, este Informe presenta: (1) un resumen de los principales hallazgos recogidos en un *primer* informe psicométrico comisionado al Dr. Chad W. Buckendahl, en el que se evaluó si era necesario disminuir o modificar la nota de pase de los exámenes de admisión al ejercicio de la profesión legal; (2) un resumen de la información y los datos ofrecidos por la Junta Examinadora a pedido de la Comisión Especial; (3) una radiografía detallada del perfil de los egresados y las egresadas, y de la gestión académica-curricular de las escuelas de derecho en Puerto Rico, a la luz de la información provista por estas instituciones educativas a la Comisión Especial; (4) un resumen de los principales hallazgos recogidos en un *segundo* informe psicométrico preparado por el Dr. Chad W. Buckendahl, el cual, a su vez, utiliza la información recopilada por la Junta Examinadora y por esta Comisión Especial, y (5) la relación de conclusiones y recomendaciones a las que ha llegado esta Comisión Especial.[5]

---

[5] En el presente Informe se recoge la información y los datos recibidos por la Comisión Especial, contenidos en el Apéndice, que constituye la fuente oficial. En la eventualidad de que el traslado



Apoyado en estos hallazgos, la Comisión Especial consigna en el presente Informe sus conclusiones y recomendaciones referentes a la puntuación mínima o nota de pase que se debe requerir para aprobar los exámenes de admisión a la profesión legal en nuestro País. De esta forma, expresamos haber cumplido con la tarea delegada por este Honorable Tribunal Supremo.[6]

---

de información y de datos de los documentos del Apéndice al cuerpo de este Informe conlleve algún error, prevalecerá la información que surja de los documentos en el Apéndice.

[6] Destacamos nuestro agradecimiento a la Lcda. Hedy I. Nieves Crespo, oficial jurídico del Tribunal Supremo de Puerto Rico, quien estuvo atenta a las necesidades de esta Comisión Especial y quien colaboró de formas diversas durante la gestión de recopilación, organización y análisis de información, así como en la elaboración del presente Informe.



## II. PRIMER INFORME PSICOMÉTRICO: *CONDUCTING A STANDARD SETTING STUDY FOR THE PUERTO RICO BAR EXAM AND NOTARY EXAM*

Ante la necesidad de determinar si, además de las medidas ya concretadas por el Poder Judicial para atender los efectos de la aplicación del Estándar de Acreditación 316 de la ABA en nuestra jurisdicción, era necesario disminuir o modificar la nota de pase de los exámenes de admisión al ejercicio de la profesión legal, en el 2020 la Oficina de Administración de los Tribunales (OAT) comisionó a la compañía ACS Ventures un análisis sobre este particular. Completado el estudio de rigor, el Dr. Chad W. Buckendahl, en representación de la precitada compañía, entregó un informe psicométrico titulado *Conducting a Standard Setting Study for the Puerto Rico Bar Exam and Notary Exam* (Informe Psicométrico). Véase Apéndice II del Informe, págs. 9-25.

Según explicó el doctor Buckendahl en su escrito, para realizar sus análisis psicométricos tomó como base los resultados de un estudio estandarizado —coordinado por la Junta Examinadora junto a los expertos de ACS Ventures—, el cual tuvo el propósito principal de evaluar la puntuación mínima o nota de pase para aprobar los mencionados exámenes. A grandes rasgos, el método utilizado para realizar el precitado estudio fue mediante la configuración de un panel de abogados y abogadas quienes ejercen la abogacía y la notaría en nuestra jurisdicción para que, durante 4 días, evaluaran una muestra representativa de:

(1) las contestaciones de la parte de discusión ofrecidas por las personas examinadas en las reválidas de derecho general y notarial de septiembre de 2019 y

(2) el contenido de todas las preguntas de selección múltiple administradas en esas reválidas.

En específico, el objetivo de ese estudio fue determinar: (1) cuál de las respuestas ofrecida por las personas examinadas en las preguntas de discusión representaba mejor la *capacidad mínima* que debe poseer toda persona que



aspire a ejercer la profesión legal en nuestra jurisdicción y (2) cuáles preguntas de selección múltiple debía contestar esta persona de forma correcta. Para efectos del estudio en cuestión, la persona aspirante mínimamente cualificada (the minimally competent candidate (MCC)) es aquella capaz de mostrar conocimientos, destrezas y habilidades de razonamiento legal, aun cuando cometa algunos errores de juicio y de hechos, así como quien ostente lo siguiente:

(1) Foundational knowledge of legal rules and principles in common practice areas. May need assistance to identify all elements or dimensions of rules.

(2) Ability to distinguish relevant from irrelevant information when assessing a legal rule and identify information that would be helpful in making the assessment.

(3) Ability to apply a legal rule or rules to a given set of facts but may miss some dimensions of the relationship between fact and law.

(4) Construct and communicate legal conclusions and reasoning given the context. Apéndice II del Informe, pág. 16.

Con los resultados de ese estudio, el doctor Buckendahl realizó su análisis psicométrico y emitió sus recomendaciones. En particular, tras realizar el análisis psicométrico de rigor, recomendó que la Junta Examinadora debía considerar disminuir la puntuación o nota mínima para aprobar la Reválida General dentro del rango de las puntuaciones de 575 y 569. Véase Apéndice II del Informe, pág. 21.

El doctor Buckendahl apoyó su recomendación en el hecho de que el grupo de panelistas del estudio de referencia pasó juicio sobre las respuestas y el contenido de las preguntas de selección múltiple y de discusión utilizando como punto de referencia el criterio de la *capacidad mínima* que una persona debe poseer para ejercer la abogacía en Puerto Rico, según definido. Al respecto, este añadió que, si se establece la puntuación mínima o nota de pase para aprobar la Reválida General entre el rango de puntuación de 569 a 575, esto tendría el



efecto de aumentar el porciento de pasantía, aproximadamente, a un 41.5% y hasta un 46.4%. Véase Apéndice II del Informe, pág. 21.

De forma similar, el doctor Buckendahl recomendó que la puntuación mínima para aprobar la Reválida Notarial debe fluctuar entre el rango de 591 a 599 puntos. Véase Apéndice II del Informe, pág. 21. Sobre el particular, expresó que, en el contexto bajo el cual realizó su análisis, el cambio producirá un porciento de pasantía en la Reválida Notarial de 43.0% a 47.6%. *Id.*

Ahora bien, el doctor Buckendahl explica que, para tomar una determinación final sobre la nota de pase, los rangos que sugiere como puntuación mínima para aprobar los mencionados exámenes deben considerarse junto a los factores de política pública que se persiguen en el País en lo relacionado al ejercicio de la profesión legal. Menciona que uno de los factores que debe considerarse es el nivel de tolerancia respecto a dos tipos de errores, a saber: (1) *Tipo I* - que representa a las personas que aprueban el examen pero que sus verdaderas habilidades están por debajo de la nota de pase; se les considera *falsos positivos,* y (2) *Tipo II* - que representa a las personas que desaprueban el examen, pero que sus verdaderas habilidades están por encima de la nota de pase; se les considera *falsos negativos*. Véase Apéndice II del Informe, pág. 21.

Sobre este particular, el doctor Buckendahl —a modo de ejemplo— expresa que para varias licencias y certificaciones en el área de la salud se tiene un mayor nivel de tolerancia para los errores de *Tipo II*, bajo el razonamiento de que el público estaría en mayores riegos de sufrir consecuencias adversas si es atendido por una persona no cualificada que haya aprobado determinado examen. Véase Apéndice II del Informe, pág. 21. En ese sentido sugiere que la determinación al final de si se debe o no modificar la nota de pase, podría depender de un asunto de política pública.

Es por esto que este Informe Psicométrico entregado por el doctor Buckendahl fue, a su vez, sometido a la consideración y evaluación de la Dra.



Sonia Santiago Becerra quien, por décadas, se desempeñó como psicómetra interna de la Junta Examinadora.[7] Luego de analizar el Informe Psicométrico de referencia, la doctora Santiago Becerra recomendó que, como parte de un informe completo de nota de pase, se debían evaluar otros factores que pudieran incidir sobre la determinación de la puntuación mínima o nota de pase para así aprobar las reválidas de derecho general y notarial. Entre esos factores, destacó las puntuaciones en los exámenes estandarizados que se requieren en el proceso de admisión a las escuelas de derecho, los promedios académicos de los aspirantes, la puntuación promedio en el examen de la Reválida General, los porcientos de aprobación y los índices de confiabilidad de los exámenes de admisión al ejercicio de la abogacía y la notaría. A juicio de la doctora Santiago Becerra, estos factores pudieran ayudar a atender la inquietud relacionada al perfil de los y las aspirantes de los exámenes de admisión a la profesión legal y su posible implicación en la baja del porciento de pasantía, mayormente, en la Reválida General de derecho.

Fue, pues, precisamente tomando como punto de partida lo señalado por los expertos en los precitados estudios psicométricos, que la Junta Examinadora comunicó al Tribunal Supremo de Puerto Rico la necesidad de recopilar más información al momento de evaluar la nota de pase de los exámenes de admisión al ejercicio de la abogacía y la notaría, razón por la cual se creó esta Comisión Especial encargada de rendir el presente Informe. Véase Apéndice I del Informe, pág. 6.

---

[7] La Dra. Sonia Santiago Becerra obtuvo un doctorado del Centro Caribeño de Estudios Posgraduados, Instituto Psicológico de la Universidad Albizu en Puerto Rico. Trabajó con la Junta Examinadora como Especialista en Medición desde 1990 hasta el 2011, luego de lo cual ha trabajado con la Junta Examinadora como Consultora Externa.



## III. Informe de la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía y la Notaría: sobre ajustes psicométricos, estudios de validación y desempeño de los y las aspirantes en el examen de admisión al ejercicio de la abogacía

Para completar los trabajos encomendados y como punto de partida para este Informe, la Comisión Especial acordó cursar una comunicación al director ejecutivo de la Junta Examinadora, Lcdo. Héctor Rodríguez (licenciado Rodríguez Mulet o Director Ejecutivo de la Junta Examinadora). Véase Apéndice III del Informe, págs. 27-29. Mediante esta comunicación, la Comisión Especial requirió a dicha división adscrita al Tribunal Supremo de Puerto Rico la información que nos pudiese brindar la mayor cantidad de datos y un mejor entendimiento de cómo se han trabajado los asuntos relacionados con la puntuación mínima o nota de pase requerida para aprobar los exámenes de admisión a la profesión legal.

Como sabemos, la Junta Examinadora tiene la función principal de colaborar con el Tribunal Supremo "en el descargo de su poder inherente para determinar quiénes son las personas idóneas que pueden ejercer la profesión de abogado[(a)] y notario[(a)] en el Estado Libre Asociado de Puerto Rico". Véase, *Reglamento para la Admisión de Aspirantes al Ejercicio de la Abogacía y la Notaría*, 4 LPRA Ap. XVII-B, R. 2(2.5.1). De ahí que esta dependencia — encargada de los procesos de confección, administración y corrección de los exámenes de admisión al ejercicio de la abogacía y la notaría— sea la designada para recomendar al Tribunal Supremo "la puntuación mínima que deberán obtener [las personas evaluadas] para aprobar los exámenes de reválida general y notarial", mediante una resolución. 4 LPRA Ap. XVII-B, R. 2(2.5.1)(e).

A continuación hacemos un resumen puntual de los principales hallazgos obtenidos de la información compartida por la Junta Examinadora.



*- Ajustes psicométricos realizados a las puntuaciones crudas de los exámenes de admisión al ejercicio de la abogacía: trasfondo sobre las razones que justifican estas operaciones.*

El Director Ejecutivo de la Junta Examinadora precisó que actualmente la puntuación mínima o nota de pase para aprobar los exámenes de admisión a la abogacía y la notaría —como hemos adelantado— es 596 puntos. Esta puntuación ajustada "es estática, es decir, no varía a través del tiempo hasta que otra cosa disponga el Tribunal Supremo de Puerto Rico". Apéndice III del Informe, pág. 30. De ahí la necesidad de que los exámenes de referencia tengan el mismo nivel de dificultad, sin importar la fecha en que se hayan administrado.

Para sostener el nivel de dificultad, el licenciado Rodríguez Mulet destacó que, en el ejercicio de sus funciones, esta dependencia realiza ajustes psicométricos que permiten reducir, en todo lo posible, las variables que puedan afectar este objetivo. Al respecto, en su informe, el Director Ejecutivo de la Junta Examinadora señaló que, al momento de administrar los exámenes de admisión al ejercicio de la abogacía y la notaría, la mencionada dependencia

> […] utiliza diversas versiones del examen a través del tiempo para evitar que los aspirantes memoricen las preguntas y puedan anticiparlas en reválidas futuras. Las preguntas de discusión son nuevas en todas las reválidas administradas. De otra parte, los [y las] miembros del Comité de Correctores cambian en cada reválida y, aun cuando se utilicen los mismos correctores [o las mismas correctoras], la adjudicación de los puntos en las preguntas de discusión se verá afectada por la severidad con que cada uno corrija, el nivel de calibración de los correctores [y las correctoras] que corrigen una misma pregunta y su nivel de agotamiento durante el proceso. Igualmente, los cambios en el nivel de competencia de los grupos evaluados pueden afectar el significado de la puntuación asignada.

> Esto significa que no habría forma de garantizar un mismo nivel de dificultad entre [un examen de admisión al ejercicio de la profesión legal y otro] si no se realizaran ajustes psicométricos a las puntuaciones crudas adjudicadas. Si la Junta [Examinadora] utilizara puntuaciones sin ajustes psicométricos para determinar quién aprueba el examen, el resultado estaría afectado por estos factores inherentes a la redacción y la corrección del



examen. Un[(a)] aspirante podría reprobar un examen por el solo hecho de que su versión de reválida fue más difícil que la anterior. No habría un significado común y estandarizado entre la nota de pase de [un examen de admisión al ejercicio de la profesión legal y los] demás. Entonces, la Junta [Examinadora] no podría asegurar que los [y las] aspirantes que aprobaron determinada reválida tienen los mismos conocimientos y las mismas destrezas que los [y las] demás aspirantes que han aprobado el examen anteriormente con la misma nota. Apéndice III del Informe, págs. 30-31.

Las justificaciones para que se ajusten las puntuaciones crudas de las reválidas consisten en la necesidad de que estas reflejen el nivel de desempeño de las personas examinadas sin que factores subjetivos, como los antes descritos, lo afecten.

El licenciado Rodríguez Mulet puntualizó en su informe la forma como se asignan y calibran las puntuaciones de las preguntas de selección múltiple. En ese sentido, explicó lo siguiente:

La **puntuación *cruda*** en la parte de *selección múltiple* representa el total de contestaciones correctas que un [o una] aspirante obtuvo en esta parte del examen. Como es de notar, esta puntuación no refleja ningún ajuste relacionado con la dificultad relativa de esta parte en comparación con pasadas administraciones de la reválida. Para garantizar que las puntuaciones no estén afectadas por estos cambios en niveles de dificultad entre una parte de selección múltiple y otra administrada anteriormente, se utiliza el proceso de calibración.

Los **calibradores** son preguntas [de selección múltiple que se han administrado en exámenes anteriores, los cuales] cubren todas las materias evaluadas en el examen y presentan las características psicométricas esperadas [...]. Aunque las versiones del examen sean distintas, estos calibradores constituyen un mini examen idéntico en las administraciones que utilicen el mismo grupo de calibradores. De esta forma, los [o las] psicómetras pueden evaluar las diferencias en desempeño entre los grupos de esas reválidas y determinar si se deben a la diferencia en la dificultad de una versión del examen versus la otra.

El proceso de evaluación de la información provista por los calibradores se describe así:


Poder Judicial de Puerto Rico

"If the two groups did equally well on the common items (and the common items are indeed a "mini test"), then any differences in the groups' average raw scores on the two forms should be due to differences in the difficulty levels of the two forms. For example, if the two groups did equally well on the common items and if Group A did better on Form A than Group B did on Form B, then Form A would be considered easier overall than Form B. If the group that took Form A did better on the common items than the group that took Form B, and if Group A did proportionally better on the test overall, it suggests that the two forms have the same difficulty. If Group A did better than would be expected on Form A relative to Group B's performance on Form B, then Form A would be determined to be easier overall than Form B and vice versa. The use of common items allows a comparison of the abilities of the two groups on identical items. Once the group factor is accounted for, the form difficulty difference can be determined, and the appropriate statistical adjustment to raw scores can be made to ensure that the reported scale scores for both forms are equivalent. Statistical equating procedures are designed to make these kinds of adjustments, so that the scale scores have the same meaning regardless of which test form an examinee took".[8]

El proceso de calibración utiliza la información estadística que se obtuvo de las preguntas comunes (calibradores) a ambos exámenes como medida de desempeño de cada grupo. Este desempeño es comparado con el desempeño demostrado en las restantes preguntas (no calibradores) para determinar si un examen de selección múltiple fue más difícil que otro.

A través de **métodos de ajuste lineal**, la puntuación cruda en la parte de selección múltiple es ajustada para atemperarla a los cambios en la dificultad de esta parte del examen. Luego de este ajuste, obtenemos la **puntuación *calibrada***. Debido al proceso, esta puntuación calibrada puede ser interpretada consistentemente a través de diversas administraciones de selección múltiple. Es decir, un [o una] aspirante que obtiene 500 puntos calibrados en esta parte del examen ha demostrado el mismo nivel de conocimiento y habilidad que otro [u otra] aspirante que tomó la reválida en otra ocasión y que obtuvo 500 puntos calibrados.[9] (Negrillas suplidas). Apéndice III del Informe, págs. 33-35.

---

[8] D. Harris, *Equating the Multistate Bar Examination*, 72 (Núm. 3) The Bar Examination 14 (2003), disponible en https://thebarexaminer.org/wp-content/uploads/PDFs/720303-harris.pdf.

[9] Para conocer los factores incluidos en la fórmula que se utiliza para realizar la mencionada calibración, véase Apéndice III del Informe, pág. 35.



Esta puntuación *cruda* y *calibrada* de las *preguntas de selección múltiple* está ubicada en la segunda tabla del Informe de Puntuación que notifica la Junta Examinadora.

|  | PUNTUACION CRUDA | PUNTUACION CALIBRADA | PESO | PUNTUACION CALIBRADA AJUSTADA | EQUIVALENCIA PORCENTUAL |
|---|---|---|---|---|---|
| EXAMEN DE DISCUSION* | 25.35 | 658.0 | .50 | 329 | 97.0 |
| SELECCION MULTIPLE | 73 | 636.0 | .50 | 318 | 94.4 |
| PUNTUACION CALIBRADA TOTAL | --- | ----- | ---- | 647 | 97.7 |

*LA PUNTUACION CRUDA DEL EXAMEN DE DISCUSION ES EL RESULTADO DE LA SUMA DE LAS PUNTUACIONES CONVERTIDAS.

Por otra parte, el Director Ejecutivo de la Junta Examinadora describió las formas como las puntuaciones de las preguntas de discusión se asignan, ajustan y calibran. A esos efectos, detalló:

> La **puntuación *asignada*** que recibe un aspirante en la parte de discusión representa la puntuación sin ajustar que fue otorgada por los dos correctores que corrigieron determinada pregunta de discusión. Debido a que la severidad de los correctores [y las correctoras,] y el nivel de dificultad de cada pregunta de discusión pueden variar dentro de un mismo examen, estas puntuaciones asignadas son convertidas a otra escala de puntos. Las puntuaciones adjudicadas [asignadas] por los correctores [y las correctoras] pueden ser otorgadas entre 0 y 40 puntos. La nueva escala *convierte* estos puntos asignados entre 0 y 10 puntos. En este proceso se ajusta la distribución de puntos de cada pregunta de tal forma que todas tengan un promedio común (5 puntos) y una desviación estándar común[10] (1 punto). El orden de los aspirantes, según su puntuación original asignada por los correctores [y las correctoras] a cada pregunta, queda inalterado en esta conversión. Véase la Tabla de Conversión para la reválida de Derecho General de septiembre de 2021 en el Anejo I.

---

[10] La *desviación estándar* mide la dispersión de una distribución de datos, por lo que mientras más dispersa está una distribución de datos, más grande es su desviación estándar.



Desde un punto de vista estadístico, este proceso asegura que ninguna pregunta sea considerada más difícil o más fácil que las demás[,] pues el promedio de puntuaciones asignadas en cada pregunta estará ubicado en 5 puntos convertidos en la nueva escala. Además, ninguna pregunta tendrá mayor peso que las demás[,] pues se ajusta la desviación estándar de las puntuaciones para que su distribución sea común en todas las preguntas.

Supongamos, por ejemplo, que el promedio de puntos asignados en la Pregunta Número 1 fue de 4 puntos y el promedio de puntos asignados en la Pregunta Número 2 fue de 12 puntos. Esto significa que la Pregunta Número 1 resultó ser más difícil para el grupo evaluado en comparación con la Pregunta Número 2. Al ubicar ambos promedios en la nueva escala de puntos convertidos, los 4 puntos asignados de la Pregunta Número 1 estarían ubicados al mismo nivel que los 12 puntos asignados de la Pregunta Número 2, o sea, en o alrededor de 5 puntos convertidos en la nueva escala. Este efecto también se vería en las demás puntuaciones dentro de la escala pues las puntuaciones en la pregunta poseerán una misma desviación estándar. Por tanto, se nivela el efecto de la disparidad en puntos causado por la dificultad relativa de una pregunta. Luego del proceso de ajuste, ninguna pregunta culmina con más valor que las demás. La Junta [Examinadora] no podría redactar preguntas más difíciles para que más aspirante[s] reprueben o viceversa.

Esta operación no se realiza en la parte de selección múltiple. Es preciso destacar que esta parte del examen es completamente objetiva, corregida mediante un lector óptico que contiene la clave de esta parte del examen, por lo que la severidad con la que se corrige no es un factor que incide sobre la corrección. Asimismo, [y como se discute en párrafos anteriores] esta parte del examen permite repetir en diferentes reválidas un número determinado de preguntas, las cuales se denominan calibradores. Los **calibradores**[, como ya mencionamos,] se utilizan para determinar los cambios en dificultad entre un examen y otro, ya que permiten evaluar si un grupo en una reválida se desempeña mejor que otro grupo en otra reválida.

En vista de que podemos utilizar calibradores en la parte de selección múltiple para determinar las diferencias en dificultad de esta parte en un examen y otro, no es necesario aplicar la conversión de puntos descrita que se aplica en la parte de discusión.

Las **puntuaciones *convertidas*** que un[(a)] aspirante obtiene en las *preguntas de discusión* se suman para obtener la puntuación convertida total



en esta parte del examen. Para propósitos del Informe de Puntuaciones, esta puntuación convertida total en la parte de discusión se denomina **puntuación cruda** pues, al igual que la puntuación cruda obtenida en la parte de selección múltiple, todavía no ha sido calibrada mediante la aplicación de la fórmula establecida por el psicómetra para cada una de las partes del examen.

Como [expresado] en el acápite anterior, la puntuación *convertida* tiene el propósito de ajustar las diferencias entre niveles de dificultad de las preguntas de discusión dentro de un mismo examen. Sin embargo, hasta ese momento, la puntuación no se ha ajustado en consideración a la diferencia en dificultad de diversos exámenes a través del tiempo. Esto se hace aplicando a la parte de discusión la información que se obtiene sobre los cambios en dificultad entre una reválida y otra en la parte de selección múltiple.

Como hemos adelantado, las puntuaciones de las preguntas de selección múltiple son ajustadas utilizando preguntas administradas en reválidas pasadas. Este proceso, por tanto, permite considerar la dificultad histórica en las reválidas pasadas. Este proceso de calibración en la parte de selección múltiple se "extrapola" a la parte de discusión, la cual carece de preguntas calibradoras, pues todas las preguntas son nuevas. Esto es necesario puesto que, aun cuando se ajuste la parte de selección múltiple para considerar la diferencia en dificultad entre diversas versiones del examen, no se ha hecho lo mismo con respecto a la parte de discusión. La ausencia de un proceso similar en la parte de discusión nos traería el siguiente problema:

"The difficulty of the questions/items, the proficiency of the group of examinees taking the exam, and the graders (and the stringency with which they grade) may also change. All three of these variables can affect the grades assigned by graders to examinees' responses to these written components of the exam and can have the potential to cause variation in the level of performance the grades represent across administrations".[11]

Para evitar esta variabilidad, se utiliza la información adquirida durante la calibración de la parte de selección múltiple —la cual produce una constancia en el significado de las puntuaciones a través del tiempo— para ajustar estadísticamente la puntuación convertida total de la parte de

---

[11] *The Testing Column: Q&A: NCBE Testing and Research Department Staff Members Answer Your Questions*, 86 (Núm. 4) The Bar Examiner (2017-2018), disponible en https://thebarexaminer.org/article/winter-2017-2018/the-testing-column-qa-ncbe-testing-and-research-department-staff-members-answer-your-questions/.



discusión. El ajuste estadístico se realiza para que, colectivamente, estas puntuaciones convertidas en la parte de discusión tengan el mismo promedio y desviación estándar que se utilizó cuando se ajustó la parte de selección múltiple. Así, se calibra la parte de discusión a través del cómputo realizado anteriormente con los calibradores en la parte de selección múltiple. Esto es posible porque ambas partes del examen evalúan el mismo contenido y guardan una correlación alta entre ellas.

La fórmula que se aplica a la puntuación convertida total de la parte de discusión (denominada puntuación cruda en el Informe de Puntuaciones) es la siguiente: **Puntuación Calibrada** = (Puntuación Convertida Total – promedio de la Puntuación Convertida Total) / (desviación estándar de la Puntuación Convertida Total) * (desviación estándar de la Puntuación Calibrada de Selección Múltiple) + (Promedio de la Puntuación Calibrada de Selección Múltiple). (Negrillas suplidas). Apéndice III del Informe, págs. 31-33.

Las puntuaciones *asignadas* y *convertidas*, descritas en los párrafos que anteceden, son las que se ubican en la primera tabla del Informe de Puntuación que recibe la persona examinada:

| TIPO DE PUNTUACION | PREGUNTA DE DISCUSION NUMERO | | | |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| ASIGNADA | 32 | 26 | 35 | 23 |
| CONVERTIDA | 6.23 | 6.17 | 6.58 | 6.37 |



Mientras, la puntuación *calibrada* de las *preguntas de discusión* se ubica en la segunda tabla del Informe de Puntuación que envía la Junta Examinadora a cada aspirante, a saber:

```
                      PREGUNTA DE DISCUSION NUMERO
TIPO DE
PUNTUACION            1      2      3      4
_____

ASIGNADA             32     26     35     23

CONVERTIDA          6.23   6.17   6.58   6.37
_____
```

|  | PUNTUACION CRUDA | PUNTUACION CALIBRADA | PESO | PUNTUACION CALIBRADA AJUSTADA | EQUIVALENCIA PORCENTUAL |
|---|---|---|---|---|---|
| EXAMEN DE DISCUSION* | 25.35 | 658.0 | .50 | 329 | 97.0 |
| SELECCION MULTIPLE | 73 | 636.0 | .50 | 318 | 94.4 |
| PUNTUACION CALIBRADA TOTAL | --- | ----- | ---- | 647 | 97.7 |

*LA PUNTUACION CRUDA DEL EXAMEN DE DISCUSION ES EL RESULTADO DE LA SUMA DE LAS PUNTUACIONES CONVERTIDAS.

SE REQUIERE UNA PUNTUACION CALIBRADA TOTAL MINIMA DE 596 PARA PASAR EL EXAMEN.

Aclarado lo antes expuesto, el licenciado Rodríguez Mulet precisó el proceso de suma y distribución de peso asignado a cada parte del examen para obtener la puntuación final reportada, que es la que debe ser igual o mayor a la puntuación mínima o nota de pase requerida para aprobar la Reválida General. A tales efectos, explicó:

> Al producirse una puntuación calibrada para cada parte del examen, la Junta [Examinadora] obtiene un beneficio adicional. Ahora las puntuaciones en cada parte del examen se encuentran en una misma escala de puntos. Esto nos permite asignarle el peso que cada parte va a tener en la nota final del aspirante sin tener que intervenir con ninguno de los cómputos hechos hasta el momento sobre las puntuaciones y sin tener que cambiar la nota de pase.



El peso que cada parte del examen tiene en la nota final del [(de la)] aspirante es un asunto de política pública. Sin embargo, esta decisión debe considerar algunos factores como, por ejemplo, cuál parte del examen tiene mayor confiabilidad, en qué parte se evalúan más conceptos, cuál de las destrezas evaluadas resulta ser más importante para ejercer la profesión y el número de partes que componen el examen, entre otros elementos. Al considerar lo anterior, una junta o un tribunal puede determinar si desea conceder más peso a una parte que a otras en el resultado final de la prueba.

En nuestro caso, la parte de selección múltiple es la parte más objetiva del examen y en la que se evalúan más conceptos. También resulta ser la parte con mayor confiabilidad. Ahora bien, la parte de discusión es la que mide la expresión escrita, una destreza muy importante para ejercer la abogacía. En vista de todo lo anterior, la Junta [Examinadora] decidió conceder igual peso a ambas partes del examen. Apéndice III del Informe, pág. 36.

De conformidad con lo anterior, el Director Ejecutivo de la Junta Examinadora indicó que para calcular la puntuación final del (de la) aspirante debe multiplicarse la puntuación calibrada obtenida en cada parte del examen por.50 para obtener entonces los puntos que cada parte va a aportar a esa nota final. Así, el resultado de estas dos multiplicaciones se suma y, con ello, se obtiene la puntuación calibrada ajustada o, lo que es lo mismo, la puntuación final en el examen.

Por último, el licenciado Rodríguez Mulet informó que estos procesos de calibración y conversión de puntos son ampliamente utilizados en otras reválidas profesionales para ajustar los puntos asignados. A modo de ejemplo, nos remite la lectura a una de las más recientes publicaciones del *National Conference of Bar Examiners, Bar Exam Fundamentals for Legal Educators*, páginas 14 a la 16, "en la cual se incluye una explicación sencilla de estos procesos, según utilizados para calibrar y ajustar los puntos de las reválidas de derecho administradas en



los Estados Unidos".[12] Apéndice III del Informe, págs. 37, 119-121. Añade que debe tenerse presente que, como norma general, la mayoría de las reválidas y certificaciones profesionales administradas en Estados Unidos pasan por algún proceso psicométrico para ajustar las diferencias en dificultad que presentan las distintas versiones del examen en diversas administraciones.[13]

Conviene mencionar que, en lo relacionado al examen que administra el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico, no se utilizan medidas psicométricas ni interviene un psicómetra en su corrección. Véase Apéndice VIII del Informe, págs. 648-652. Cabe entonces preguntarse si a ello responde el alto grado de fluctuación en el porciento de aprobación entre reválidas, que va desde un 58% en noviembre de 2013 y un 17% en noviembre de 2016, con un promedio de 35% en la serie de exámenes administrados entre los años 2010 y 2021. *Id.*, pág. 650.

*-Estudios de validación*

Por otra parte —y como adelantamos—, el licenciado Rodríguez Mulet puntualizó que la Junta Examinadora estudia cada reválida administrada en septiembre con el propósito de validar los resultados obtenidos en el examen de admisión al ejercicio de la abogacía mediante el análisis de información externa a este examen. Es decir, a través de estos estudios se busca determinar la relación, si alguna, entre las puntuaciones de los aspirantes en la reválida, el promedio académico en el *Juris Doctor* y las puntuaciones obtenidas en los

---

[12] Véanse, además, los artículos antes citados y Susan M. Case, *The Testing Column: Scaling, Revisited,* 89 (Núm. 1), The Bar Examination (2020), disponible en https://thebarexaminer.ncbex.org /article/fall-2020/the-testing-column-3/.

[13] "Equating is a statistical procedure used for most large-scale standardized tests to adjust examinee scores to compensate for differences in difficulty among test forms so that scores on the forms have the same meaning and are directly comparable". *The Testing Column: Q&A: NCBE Testing and Research Department Staff Members Answer Your Questions*, 86 (Núm. 4) The Bar Examiner (2017-2018).


Poder Judicial de Puerto Rico

exámenes de admisión a la Escuela de Derecho (entiéndase, el EXADEP y el LSAT). Véase Apéndice III del Informe, pág. 37.

Sobre el particular, resaltó el Director Ejecutivo de la Junta Examinadora que cada estudio de validación demuestra que las puntuaciones del examen guardan una relación mayor con los promedios académicos del grado de *Juris Doctor*. Véase Apéndice III del Informe, pág. 37. Añade que también se ha determinado que mientras mayor sea este índice académico, mayor es la probabilidad de que el (la) aspirante apruebe el examen. Suma a lo anterior que con los datos analizados en estos estudios se sostiene la validez del examen para medir los conocimientos adquiridos en la Escuela de Derecho. *Id.*, págs. 53-103.

*- Desempeño de los y las aspirantes en el examen de admisión al ejercicio de la abogacía*

De los porcientos de aprobación de aspirantes primerizos y primerizas en los exámenes de admisión al ejercicio de la abogacía ofrecidos en septiembre de 2010 a 2020 surge que las 3 escuelas de derecho han reducido significativamente esta proporción, según reportó la Junta Examinadora. Véase Apéndice III del Informe, págs. 45-50.

Tabla Núm. 1: Porciento de aprobación de los y las aspirantes que tomaron por primera vez la Reválida General de derecho en septiembre de 2010 a 2020 por Escuela de Derecho

| Año | Escuela de Derecho de la UPR | Facultad de Derecho de la UIPR | Escuela de Derecho de la PUCPR |
|---|---|---|---|
| 2010 | 75 % | 55 % | 42 % |
| 2011 | 62 % | 48 % | 27 % |
| 2012 | 60 % | 53 % | 33 % |
| 2013 | 55 % | 57 % | 35 % |
| 2014 | 56 % | 43 % | 40 % |
| 2015 | 57 % | 31 % | 34 % |
| 2016 | 50 % | 30 % | 34 % |
| 2017 | 54 % | 38 % | 37 % |



| | | | |
|---|---|---|---|
| 2018 | 47 % | 29 % | 38 % |
| 2019 | 50 % | 26 % | 25 % |
| 2020 | 42 % | 32 % | 32 % |

Se advierten los siguientes extremos por Escuela de Derecho: la Universidad de Puerto Rico (UPR), de un 75% de aprobación tuvo una reducción de hasta un 33% (42% de aprobación); la Universidad Interamericana de Puerto Rico (UIPR), de un 57% de aprobación se redujo en un 31% (26% de aprobación), y la Pontificia Universidad Católica de Puerto Rico (PUCPR), de un 42% redujo su proporción en un 17% (25% de aprobación). En ese sentido, la baja en el porciento de aprobación de quienes tomaron por primera vez los exámenes de admisión al ejercicio de la abogacía es una tendencia clara.[14]

De otro lado, el licenciado Rodríguez Mulet informó que la puntuación promedio total obtenida en la Reválida General de derecho administrada en septiembre desde el 2007 al 2020 fluctuó entre los 583.03 y 562.36 puntos ajustados. Véase Apéndice III del Informe, pág. 41. Por más de una década, las puntuaciones promedios reportadas en el examen han sido menor a la nota de pase fijada, es decir, a los 596 puntos ajustados.

---

[14] Sobre este particular, nos resultan reveladoras las cifras recogidas en el *Informe de la Comisión para el Estudio de la Reválida y la Educación Legal en Puerto Rico, supra,* págs. 25-27, donde se refleja que de 1969 a 1977 ocurrió una reducción en el porciento de aprobación del examen de admisión a la profesión legal —según administrado en esas fechas— similar a la que ocurre en la actualidad. Claro está, lo anterior consciente de que se trataba de un examen y contexto distintos. Para propósitos ilustrativos, trascribimos a continuación el porcentaje de estudiantes que aprobaron la reválida administrada en marzo de 1969 a septiembre de 1977.

| Año | Porciento que aprobó en marzo | Porciento que aprobó en septiembre |
|---|---|---|
| 1969 | 50.3 % | 65.6 % |
| 1970 | 37.7 % | 55.6 % |
| 1971 | 25.7 % | 56.9 % |
| 1972 | 41.7 % | 55.7 % |
| 1973 | 42.4 % | 62.8 % |
| 1974 | 66.3 % | 30.8 % |
| 1975 | 59.9 % | 50.2 % |
| 1976 | 31.6 % | 32.9 % |
| 1977 | 35.0 % | 36.7 % |



## Puntuación promedio en la Reválida General de derecho administrada en septiembre de 2007 a 2020



El Director Ejecutivo de la Junta Examinadora expresó que la gráfica que antecede "muestra la tendencia en declive de las puntuaciones promedio de las reválidas de septiembre administradas entre el 2007 y el 2020. En casi diez años, la puntuación promedio en estos exámenes se redujo más de 20 puntos ajustados (de 583.08 puntos en el 2010 a 562.36 en el 2019)". Véase Apéndice III del Informe, pág. 41. A ello añadió que "[f]ijar la nota de pase en alguna de las puntuaciones sugeridas [por el doctor Buckendahl de 575 a 569,] podría aumentar el porcentaje de aprobación en la reválida de Derecho General". *Id.*



## IV. Informe de las escuelas de derecho en Puerto Rico: radiografía del perfil de sus egresados y egresadas, y de la gestión académica-curricular

### A. Introducción

Como adelantamos, además de recibir y estudiar el *primer* Informe Psicométrico preparado por el doctor Buckendahl junto al informe del licenciado Rodríguez Mulet, los trabajos realizados por la Comisión Especial, en colaboración con las Escuelas de Derecho de la Universidad de Puerto Rico, la Universidad Interamericana de Puerto Rico y la Pontificia Universidad Católica de Puerto Rico,[15] se concentraron en recopilar, estudiar y depurar la información y los datos relacionados a:

(1) el perfil (objetivo-cuantitativo) de los egresados y las egresadas de las 3 escuelas de derecho en Puerto Rico a base de las puntuaciones que obtuvieron en los exámenes estandarizados requeridos, entiéndase, el Examen de Admisión a Estudios de Posgrado (EXADEP)[16] y el Law School Admission Test (LSAT), junto al índice académico general subgraduado (GPA, por sus siglas en inglés);

(2) los parámetros de reclutamiento y admisión utilizados por cada una de estas instituciones educativas;

(3) los cambios en los currículos académicos, si alguno (a saber, los cursos requisitos y electivos);

(4) las medidas empleadas durante los estudios conducentes al grado de *Juris Doctor* para evaluar el aprovechamiento académico;

---

[15] La Comisión Especial hace constar que el orden en el que se presenta la información correspondiente a las escuelas de derecho repite la secuencia que la Junta Examinadora ha utilizado para informar sus datos a esta Comisión Especial.

[16] De entrada, es necesario advertir que, como se reflejará en las secciones siguientes de este Informe, el examen estandarizado EXADEP se dejó de administrar en el 2020. Desde entonces, las escuelas de derecho no lo consideran ni exigen como requisito de admisión al programa del *Juris Doctor*.



(5) las medidas empleadas para la preparación de los y las aspirantes al ejercicio de la abogacía y la notaría, y

(6) toda aquella información que se estimara necesaria para realizar la encomienda delegada.

Esta fue la tarea que se encomendó a la Comisión Especial en la Resolución emitida por el Tribunal Supremo de Puerto Rico el 29 de mayo de 2021. Véase Apéndice I del Informe, pág. 7. En vista de ello, durante los meses de junio y julio de 2021, la Comisión Especial sostuvo varias reuniones para organizar los objetivos, las estrategias y el calendario de trabajo, así como el método y proceso de requerimiento de información y datos específicos que se le solicitaría a cada una de las instituciones educativas de referencia.

Tan pronto como el 17 de junio de 2021, la Comisión Especial se reunió con la Lcda. Vivian I. Neptune Rivera, decana de la Escuela de Derecho de la Universidad de Puerto Rico (Escuela de Derecho de la UPR), con el Lcdo. Julio E. Fontanet Maldonado, decano de la Facultad de Derecho de la Universidad Interamericana de Puerto Rico (Facultad de Derecho de la UIPR) y el Lcdo. Fernando Moreno Orama, decano de la Escuela de Derecho de la Pontificia Universidad Católica de Puerto Rico (Escuela de Derecho de la PUCPR), para informarles el alcance y los objetivos de los trabajos encomendados. En esa ocasión, se acordó que las 3 escuelas de derecho compartirían la información y los datos que se les solicitarían mediante un requerimiento formal para el periodo de los años académicos comprendidos entre 2007 y 2017 (a los cuales nos referiremos como periodo a ser evaluado, periodo de tiempo evaluado o periodo de tiempo bajo estudio). Con alta probabilidad, durante este periodo de tiempo evaluado, fue el estudiantado matriculado en las referidas facultades de derecho el que tomó el examen de admisión al ejercicio de la profesión legal que se administró durante los años 2010 y 2020. Además, durante esa década fue que se implementaron nuevos cambios en el formato de los aludidos exámenes y cuando se agudizaron las inquietudes con el porciento de aprobación. Por otro



lado, en dicha reunión se les comunicó a la Decana y a los Decanos que la Comisión Especial interesaba realizar una visita a cada una de las mencionadas facultades para recibir una presentación formal —posterior al recibo de la información y los datos requeridos— y así atender cualquier inquietud, duda o sugerencia, de parte de los comisionados o del personal administrativo de la Escuela de Derecho visitada.

El 1 de julio de 2021, la Comisión Especial cursó un *primer* requerimiento de información a la Decana y a los Decanos mediante el cual se les solicitó la información y los datos que se estimaron pertinentes para el periodo a ser evaluado. Véanse: Apéndices IV, V y VI del Informe, págs. 125-127, 284-286 y 407-409. En respuesta a lo acordado, durante los meses de julio a septiembre de 2021 la Comisión Especial recibió la información y los datos solicitados a la Decana y los Decanos.

Por otra parte, y según fue acordado, la Comisión Especial visitó las 3 escuelas de derecho del País y se reunió con el personal de mayor jerarquía de cada una de estas facultades.[17] Las visitas y reuniones imprimieron dinamismo y sentido a la información y a los datos sometidos por las escuelas de derecho.

---

[17] En específico, el 11 de agosto de 2021, la Comisión Especial visitó la Escuela de Derecho de la UPR y se reunió con la Decana Vivian I. Neptune Rivera; el Decano Auxiliar, Oscar Miranda Miller; la Decana Administrativa y Directora Ejecutiva del Fideicomiso de la Escuela de Derecho UPR, María de los Ángeles Garay; la Decana Auxiliar de Asuntos Estudiantiles, Keila Souss Freytes, y la egresada, Lcda. Verónica Vega (quien a esa fecha trabajaba con la Escuela de Derecho de la UPR).

Posteriormente, el 15 de septiembre de 2021, la Comisión Especial visitó la Escuela de Derecho de la PUCPR y se reunió con su Presidente, el Dr. Jorge Iván Vélez Arocho; el Decano Fernando Moreno Orama; la Decana Asociada, Vilmaris Quiñonez Cintrón; la Decana Auxiliar de Asuntos Estudiantiles, Luz A. Rodríguez Rosa; la Directora de la Oficina de Apoyo Académico y Avalúo, Yaira Ortiz Medina; la Directora de la Clínica de Asistencia Legal, Rosalba Fourquet López, y el Registrador Auxiliar de la Escuela de Derecho, Juan Rodríguez Laboy.

El 29 de septiembre de 2021, la Comisión Especial visitó la Facultad de Derecho de la UIPR y se reunió con su Presidente, el Lcdo. Manuel J. Fernós; el Decano Julio E. Fontanet Maldonado; la Decana de Asuntos Académicos, Yanira Reyes Gil; la Decana de Estudiantes, Iris M. Camacho Meléndez; la Directora de la Oficina de Apoyo Académico y Avalúo, Patricia Otón Olivieri; la Ayudante Ejecutiva de esa oficina, Edith C. Pabón Rodríguez, y el Estadístico de la Escuela de Derecho, Isaac Santiago.



Todo ello permitió, a su vez, que la Comisión Especial realizara una radiografía del perfil de los egresados y las egresadas, así como de la gestión académica-curricular empleada por las facultades de referencia durante el periodo de tiempo bajo estudio. Esta radiografía, sin duda, dotó a la Comisión Especial de la información y los datos necesarios para un análisis más abarcador, riguroso y certero a la hora de evaluar la puntuación mínima o nota de pase para aprobar los exámenes de admisión a la abogacía y la notaría.

Durante los siguientes meses, entiéndase, de octubre de 2021 a febrero de 2022, la Comisión Especial realizó un estudio detenido y ponderado de la información y los datos recibidos. Asimismo, cursó un *segundo* requerimiento de información a las escuelas de derecho, el cual estuvo dirigido mayormente a clarificar cualquier dato ofrecido antes. Oportunamente, las referidas facultades cursaron a la Comisión Especial la información y los datos adicionales solicitados en este *segundo* requerimiento. Entre tanto, la Comisionada y los Comisionados de la Comisión Especial sostuvieron varias reuniones para intercambiar impresiones sobre los hallazgos e iniciar la toma de decisiones, así como la redacción de este Informe.

A continuación, un resumen puntual e individualizado de los hallazgos en cada una de las escuelas de derecho del País y, finalmente, un análisis global para un mejor entendimiento de los hallazgos. Para facilitar la visualización de los datos compartidos por las mencionadas instituciones educativas, en las siguientes secciones se incluyen gráficas que ilustran parte de esta información. Hemos utilizado, a modo de leyenda, el color representativo de cada institución educativa para ilustrar los datos en las gráficas, a saber: el color vino para la Escuela de Derecho de la UPR, el color verde para la Facultad de Derecho de la UIPR y el azul claro para la Escuela de Derecho de la PUCPR.

.



## 1. Escuela de Derecho de la Universidad de Puerto Rico

### a. Perfil del estudiantado de nuevo ingreso matriculado

*- Número de estudiantes de nuevo ingreso por año académico*

Gráfica Núm. 1: Número de estudiantes de nuevo ingreso
de la UPR por año académico



De la Gráfica Núm. 1 surge que el número de estudiantes de nuevo ingreso que matriculó la Escuela de Derecho de la UPR fluctuó entre 213 y 161 estudiantes para los años académicos 2007 al 2017. Véase Apéndice IV del Informe, pág. 134. En los años 2007 y 2010, la población de nuevo ingreso superó los 200 estudiantes por cada año académico; en el 2011 se reflejó una baja a 192 estudiantes, la que se mantuvo relativamente constante del 2012 al 2015. Ahora bien, para el 2016 y 2017 la cifra de estudiantes de nuevo ingreso matriculados se redujo a 185 y 161, respectivamente. Esto representa 52 estudiantes menos si se compara con la cifra más alta reportada en el año académico 2007. *Id.*



En resumen, el número de estudiantes de nuevo ingreso que matriculó la Escuela de Derecho de la UPR se redujo significativamente en el periodo de tiempo bajo estudio. El personal administrativo de esta facultad informó que, actualmente, la matrícula de estudiantes de nuevo ingreso ronda en los 150 estudiantes.

*- Desempeño en el examen estandarizado EXADEP*

Gráfica Núm. 2: Desempeño del estudiantado de nuevo ingreso de la UPR en el examen estandarizado EXADEP por año académico



Como se puede apreciar en la Gráfica Núm. 2, las puntuaciones reportadas por la Escuela de Derecho de la UPR en el examen estandarizado EXADEP fluctuaron entre los 797 y 405 puntos para el periodo de tiempo bajo estudio. Véase Apéndice IV del Informe, págs. 140-205. Para los años académicos 2007 al 2011, las puntuaciones informadas para el EXADEP se mantuvieron



mayormente dentro de los 718 y 641 puntos. Sin embargo, a partir del año académico 2012 las puntuaciones que reflejaron mayor desempeño para este examen se ubicaron entre los 640 y 562 puntos.

Es decir, para el periodo de tiempo evaluado, en la medida en que se redujeron las puntuaciones entre los 797 y 641 puntos, aumentaron las puntuaciones entre los 640 y 484 puntos en el examen de referencia. Incluso, a partir del 2014 se comenzó a reportar puntuaciones aún más bajas, alcanzando los 483 y 405 puntos. Esto último se traduce a que a partir del 2007 y hasta el 2013, las puntuaciones en el examen estandarizado EXADEP de los estudiantes que matriculó esta institución fluctuaron entre los 797 y 484 puntos. No obstante, en el 2014 y años subsiguientes este número comenzó a fluctuar entre los 797 y 405 puntos.

Gráfica Núm. 3: Puntuación promedio del estudiantado de nuevo ingreso de la UPR en el examen estandarizado EXADEP por año académico



Tal y como se observa en la Gráfica Núm. 3, el promedio de las puntuaciones entregadas por la Escuela de Derecho de la UPR en el examen



estandarizado EXADEP fluctuó entre los 661 y 589 puntos para el periodo de tiempo bajo estudio.

En síntesis, la población de nuevo ingreso matriculada en esta facultad obtuvo una puntuación menor en el examen estandarizado EXADEP con el pasar del tiempo. Al presente, y desde el 2020, la Escuela de Derecho de la UPR no utiliza el EXADEP como parte de los requisitos de admisión. Véase Apéndice IV del Informe, pág. 131.

- *Desempeño en el examen estandarizado LSAT*

Gráfica Núm. 4: Puntuación promedio del estudiantado de nuevo ingreso de la UPR en el examen estandarizado LSAT por año académico



De la Gráfica Núm. 4 surge que la puntuación promedio reportada por el estudiantado de nuevo ingreso matriculado en la Escuela de Derecho de la UPR en el examen estandarizo LSAT fluctuó entre los 146 y 143 puntos para el periodo de tiempo bajo estudio. Véase Apéndice IV del Informe, págs. 140-205. La puntuación promedio más alta reportada en el examen de referencia fue de



146 puntos para los años 2010 y 2011, mientras que la puntuación promedio más baja fue de 143 puntos para el año 2016. No obstante, obsérvese que la puntuación promedio de este examen se concentró mayormente entre los 145 y 144 puntos.

En suma, la puntuación promedio informada por el estudiantado de nuevo ingreso matriculado en la Escuela de Derecho de la UPR en el examen estandarizado del LSAT, si bien con una baja mínima, se mantuvo relativamente constante para el periodo de tiempo evaluado en este Informe. Este examen sigue siendo uno de los criterios de admisión y, según fue informado por el personal administrativo de la Escuela de Derecho de la UPR, recientemente la puntuación promedio reportada alcanza los 148 puntos. Véase Apéndice IV del Informe, pág. 130.

*- Índice académico general subgraduado*

Gráfica Núm. 5: Puntuación promedio del índice académico general subgraduado del estudiantado de nuevo ingreso de la UPR por año académico





De la Gráfica Núm. 5 se infiere que la puntuación promedio del del índice académico general a nivel subgraduado que informó el estudiantado de nuevo ingreso matriculado en la Escuela de Derecho de la UPR, fluctuó entre 3.53 y 3.44 para los años académicos 2007 a 2017. Véase Apéndice IV del Informe, págs. 140-205. En específico, la puntuación promedio de 3.53 fue la más alta para el 2008 y la puntuación promedio de 3.44 fue la más baja para los años 2012, 2013 y 2016.

En resumen, la fluctuación en la puntuación promedio del índice académico general a nivel subgraduado, si bien experimentó una baja mínima, se mantuvo relativamente estable en la Escuela de Derecho de la UPR con el pasar del tiempo. El personal administrativo expresó que, actualmente, esta puntuación promedio ha ascendido hasta alcanzar los 3.72.

### b. Parámetros de reclutamiento y admisión

La Escuela de Derecho de la UPR admite estudiantes solo el primer semestre de cada año académico. Véase Apéndice IV del Informe, pág. 130. La solicitud de admisión debe completarse mediante un formulario oficial en línea que el o la estudiante interesado(a) encontrará en el Credential Assembly Service (CAS), ubicado en el portal del Law School Admission Council (LSAC).[18] *Id.*, pág. 131. La fecha límite para completar y someter la solicitud de admisión a la Escuela de Derecho de la UPR es el 30 de marzo del año para el cual se solicita la admisión; esta fecha podrá variar a discreción de la facultad de esta institución educativa. *Id.*

Para solicitar la admisión a la Escuela de Derecho de la UPR, el o la estudiante interesado(a), durante el periodo de tiempo bajo estudio y actualmente, debía o deberá acreditar la información o gestiones siguientes:

---

[18] Véase www.lsac.org.



(1) Tener un bachillerato conferido por una institución de enseñanza debidamente reconocida, para la fecha en que vaya a comenzar sus estudios en derecho, ello según requerido por la "American Bar Association" (ABA), agencia acreditadora de las escuelas de derecho.

(2) Tomar el "Law School Admission Test" (LSAT), ofrecido por el "Law School Admission Council" (LSAC) no más tarde del mes de marzo del año en el que interesa solicitar admisión. […] La Escuela acepta las versiones en el idioma español e inglés del examen. En caso de tomar el examen en más de una ocasión, la Escuela de Derecho considerará la puntuación más alta obtenida. La puntuación del examen tiene una vigencia de 5 años y debe estar vigente a la fecha límite para solicitar admisión.

(3) Tomar el Examen de Admisión a Estudios de Posgrado (EXADEP), que ofrece "Educational Testing Service" no más tarde del mes de marzo del año para el cual interesa solicitar admisión. [Quien solicite] es responsable de hacer los trámites para tomar el examen dentro de la fecha establecida y asegurarse que los resultados sean recibidos en la Escuela de Derecho. (Nota: Educational Testing Service cesó de ofrecer este examen en el año 2020 por la pandemia del COVID. Desde agosto 2020 no se requiere el EXADEP para admisión en la Escuela de Derecho de la UPR y solo se requiere el LSAT y el GPA).

(4) Visitar el portal www.lsac.org y suscribirse al "Credential Assembly Service" (CAS), un servicio de recopilación de información ofrecido por el "Law School Admission Council" (LSAC). La suscripción al CAS y el pago de dicho servicio es un requisito indispensable de admisión. Si el o la solicitante no se suscribe al CAS, la Escuela de Derecho no considerará su solicitud de admisión. Luego, deberá completar y someter la solicitud de admisión por medio de esta plataforma dentro de la fecha. La fecha límite pudiese variar a discreción de la Facultad.

(5) Enviar una transcripción de créditos oficial al LSAC por cada institución universitaria que haya estudiado. [Esta] no tiene que ser con grado conferido al momento de enviarlas al LSAC. La transcripción de créditos debe estar acompañada del documento titulado "Transcript Request Form" que se encuentra en la página de "Active Applications" bajo la sección de "Credentials". Según dispuesto por la ABA, no se toma en consideración el promedio obtenido en estudios graduados, solamente el de bachillerato. La Escuela de Derecho no calcula el índice académico general acumulativo de ningún solicitante. Conforme a la ABA, el "Law School Data Assembly Service" (Law School Admission Council) es quien realiza dicho cálculo, tomando en consideración todas las calificaciones que obtuvo en los cursos conducentes al grado de bachillerato. Entiéndase, [se tomarán en cuenta las] calificaciones obtenidas tras repetir cursos, calificaciones



obtenidas en todas las instituciones en las que estudió cursos a nivel su[bg]raduado, etc.

(6) Preparar y anejar a la solicitud una declaración personal o ensayo de presentación en un máximo de 2 páginas […]. La declaración personal del solicitante debe establecer cualquier información adicional que se estime debe ser considerada por el Comité de Admisiones a la hora de evaluar su solicitud. El solicitante debe resaltar cualquier experiencia de vida que le permita aportar a la clase entrante perspectivas únicas y diversas. La declaración personal puede ser tanto en el idioma español como inglés.

(7) Anejar a su solicitud un trabajo escrito que haya preparado durante sus estudios universitarios, ya sea en el idioma español o en el idioma inglés, que demuestre sus destrezas de redacción y capacidad para desarrollar una idea. De no tener un trabajo universitario, podrá hacer un ensayo de tema libre.

(8) Anejar su resumé o [*curriculum vitae*] a la solicitud.

(9) Adjuntar a la solicitud los siguientes documentos: Hoja de Cotejo, Acreditación de Lectura y "Certification Letter".

(10) Hacer llegar a la Oficina de Admisiones de la Escuela de Derecho un giro postal por la cantidad de $20.00 a nombre de la Universidad de Puerto Rico. Apéndice IV del Informe, págs. 130-131, 262.

La determinación de admitir a la Escuela de Derecho de la UPR se toma a base de lo que esta denomina como "índice de admisión de excelencia académica calculado", mediante el cual dicha institución educativa considera los resultados de las pruebas estandarizadas requeridas y el índice académico general acumulativo del promedio de bachillerato o subgraduado, según computado por el CAS. Véase Apéndice IV del Informe, pág. 132. En esa dirección, y además de los y las estudiantes que se admiten bajo el cálculo antes aludido, de entre las siguientes posiciones conforme al índice de admisión de excelencia académica calculado, la Escuela de Derecho de la UPR concede admisión a una cantidad adicional de estudiantes tras la recomendación de un Comité de Admisiones. *Id.*

Según informó el personal administrativo de la Escuela de Derecho de la UPR, antes del 2016 admitían hasta 215 estudiantes, de los cuales 200 entraban automáticamente por tener los índices de admisión más altos y el Comité de Admisiones seleccionaba 15. Véase Apéndice IV del Informe, págs. 262-263. Sin



embargo, en el 2016 la clase de estudiantes de nuevo ingreso se redujo a 200, entiéndase, 185 estudiantes admitidos de forma automática y 15 seleccionados por el Comité de Admisiones. *Id.* No obstante, desde el 2019 al presente, la clase de nuevo ingreso se ha mantenido en 150 estudiantes, a saber, 135 admitidos de forma automática y 15 seleccionados por el Comité de Admisiones. *Id.*

El mencionado comité evalúa 60 personas candidatas que se encuentran en las siguientes posiciones al estudiantado admitido de forma automática, conforme al orden del índice de admisión de excelencia académica, y selecciona a 15 solicitantes. Véase Apéndice IV del Informe, pág. 263. Para ello toma en consideración la declaración personal o el ensayo de presentación, el trabajo escrito presentado y el resumé. *Id.* Así también el comité examina los elementos relacionados a las "desventajas socioeconómicas del solicitante, características del solicitante que aportarán a la diversidad del estudiantado, su aprovechamiento académico, estudios graduados completados en otra disciplina, tendencias de progreso académico, talentos, publicaciones, actividades extracurriculares y otras características que demuestren la aptitud de esos solicitantes para el estudio del Derecho". *Id.*, pág. 132.

Según se le explicó a la Comisión Especial, lo anterior responde a la política pública de la ABA referente a los aspectos de diversidad. Al respecto, la Decana Neptune Rivera comunicó que, aun cuando la meta es reducir el número de estudiantes reclutados(as) y admitidos(as), estos 15 puestos se mantendrán tal y como lo ha requerido la ABA.

Por último, cabe mencionar que la Escuela de Derecho de la UPR expresó que, a diferencia de otras facultades, no descartan puntuaciones mínimas, por lo que no divulgan un promedio general de bachillerato o subgraduado esperado o una puntuación promedio esperada del examen estandarizado LSAT. Véase Apéndice IV del Informe, pág. 263. Es decir, la posibilidad de ser admitido(a) a la facultad de derecho de la UPR depende de la cantidad de solicitudes recibidas y las puntuaciones reportadas por ese grupo.



## c. Currículos académicos: cursos requisitos y electivos

No todas las materias de reválida fueron requisito para obtener el grado de *Juris Doctor* en la Escuela de Derecho de la UPR durante los años académicos 2007 al 2017. Hoy tampoco lo son. Ahora bien, el personal administrativo de esta facultad advirtió que la gran mayoría de sus estudiantes se gradúan habiendo cursado todas las materias de reválida.

Aclarado lo anterior, las materias de reválida que son requisitos para el grado de *Juris Doctor* en la Escuela de Derecho de la UPR son las siguientes: derecho constitucional, derecho procesal civil, teoría de las obligaciones y los contratos, responsabilidad civil extracontractual, derecho de la persona y la familia, derechos reales, derecho penal y derecho de la prueba y la evidencia. Es decir, que de las 13 materias examinadas en la Reválida General, solo 8 son requisitos en esta institución.[19]

Sobre este particular advertimos que las materias de derecho administrativo, derecho de sucesiones, derecho hipotecario y registral, ética y responsabilidad profesional y procedimiento criminal son materias de reválida que se ofrecen todos los semestres como cursos electivos. La institución educativa de referencia informó que el currículo o secuencia curricular no sufrió mayores cambios para el periodo de tiempo bajo estudio. Véase Apéndice IV del Informe, págs. 137; 263. Es decir, que por la pasada década la secuencia curricular ha sido similar.

En síntesis, para obtener el grado de *Juris Doctor* en la Escuela de Derecho de la UPR, el o la estudiante debe aprobar un mínimo de 92 créditos, de los cuales 49 créditos son requisitos y 43 son electivos.[20] De 49 créditos que son

---

[19] Los siguientes cursos también son requisitos de graduación: investigación y redacción jurídica, profesión jurídica, teoría del Derecho, derecho internacional público, y sociedad y corporaciones, así como la Clínica de Asistencia Legal.

[20] Para ver la actual secuencia curricular de la Escuela de Derecho de la UPR, acceda a https://derecho.uprrp.edu/estudiantes/programa-academico/juris-doctor/.



requisitos, 27 son en materias de reválida. Asimismo, el o la estudiante matriculado o matriculada en el programa de *Juris Doctor* debe mantener un índice académico mayor a 2.00. Además, y como parte de los cursos electivos, deberá completar 2 seminarios de 2 créditos cada uno.

El programa diurno puede ser completado en un mínimo de 3 años, mientras que el programa nocturno en un mínimo de 4 años. La Escuela de Derecho de la UPR ofrece, además, sesiones de verano e invierno.

### d. Medidas empleadas durante los estudios conducentes al grado de *Juris Doctor* para evaluar el aprovechamiento académico de los egresados y las egresadas

La Escuela de Derecho de la UPR tiene una *regla de retención*, mediante la cual se dispone que el o la estudiante que posea un índice académico general inferior a 2.00 al final de cualquiera de los años lectivos, será suspendido(a). Véase Apéndice IV del Informe, págs. 135. El o la estudiante de *Juris Doctor* a quien se haya suspendido por deficiencia en su desempeño académico podrá, sin embargo, solicitar la readmisión por un periodo probatorio de un año, siempre y cuando tuviera previo a su suspensión un índice académico general mayor a 1.75 y acredite que el fracaso académico fue motivado por circunstancias extraordinarias. *Id.*

Ahora bien, deben haber trascurrido 2 años desde la suspensión por deficiencia académica para que la persona suspendida solicite la readmisión a la institución educativa. Véase Apéndice IV del Informe, pág. 136. Para ese entonces, además de los requisitos antes mencionados, el o la estudiante que solicite la readmisión al grado de *Juris Doctor* en la Escuela de Derecho de la UPR deberá suscribir una carta dirigida a la Decana(o) o al Decano(a) Auxiliar de Asuntos Estudiantiles, en la cual "explique las gestiones o ajustes hechos para superar las circunstancias que le llevaron a caer en tal deficiencia y [...] demuestre que podrá terminar los estudios en Derecho dentro del tiempo reglamentario". *Id.* La Decana(o) o el Decano(a) Auxiliar de Asuntos Estudiantiles



y el Comité de Admisiones de esa facultad, una vez reciba la referida misiva, evalúan la aptitud del o de la estudiante para retomar y culminar los estudios en Derecho. *Id.* Si la determinación es para readmitir al o a la estudiante, este o esta, junto a la Decana(o) o al Decano(a) de Asuntos Estudiantiles, prepararán un Plan de Estudio que le servirá de guía. *Id.* Empero, si la deficiencia académica —según las políticas fijadas por esta institución— se repite, la suspensión será definitiva. No obstante, luego de esa suspensión definitiva de la Escuela de Derecho de la UPR, el o la estudiante podrá regresar a esta institución únicamente si solicita según el proceso de admisión de nuevo ingreso y luego que trascurra un período de 5 años*. Id.*

Por otra parte, el o la estudiante que se haya matriculado en los estudios conducentes al grado de *Juris Doctor* en la Escuela de Derecho de la UPR, debe mantener un ritmo de aprobación del 50% de los créditos intentados en casos de estudio a tiempo completo, y el 57% de los créditos en casos de estudio a tiempo parcial. Véase Apéndice IV del Informe, pág. 136. Si estos porcientos de aprobación se reducen, la escuela notifica al o a la estudiante que tiene 1 año de Probatoria Administrativa para recuperar su desempeño académico. *Id.* Según informado por la institución educativa de referencia, incumplir con lo anterior podría conllevar una suspensión administrativa de 1 año. Al igual que en los casos de suspensión por deficiencia en el índice académico, se podrá solicitar la readmisión mediante un proceso similar al descrito.

En cuanto a la cantidad de estudiantes a quienes se les ha suspendido por no cumplir con los parámetros de aprovechamiento académico en proporción a los estudiantes activos durante ese año académico, se infiere de la Tabla Núm. 2 que este número fluctuó entre 4 a 18 suspensiones, de una población global ascendente a 608 y hasta 782 estudiantes activos(as) por año académico, según los datos reportados para el periodo de tiempo bajo estudio. Véase Apéndice IV del Informe, págs. 137-138. El mayor número de suspensiones fue de 18 estudiantes de un total de 762 estudiantes activos para el año académico



iniciado en el 2008, lo que representó un 2.36% de la población global para ese entonces. *Id.*

Tabla Núm. 2: Número de estudiantes suspendidos con relación a estudiantes activos en la Escuela de Derecho de la UPR por año académico

| Año académico | Suspensiones por deficiencia académica | Estudiantes activos | Porciento de suspensiones |
|---|---|---|---|
| 2006-2007 | 17 | 726 | 2.34 % |
| 2007-2008 | 17 | 782 | 2.17 % |
| 2008-2009 | 18 | 762 | 2.36 % |
| 2009-2010 | 10 | 721 | 1.39 % |
| 2010-2011 | 9 | 673 | 1.34 % |
| 2011-2012 | 13 | 702 | 1.85 % |
| 2012-2013 | 9 | 677 | 1.33 % |
| 2013-2014 | 5 | 695 | 0.72 % |
| 2014-2015 | 11 | 682 | 1.61 % |
| 2015-2016 | 4 | 651 | 0.61 % |
| 2016-2017 | 9 | 608 | 1.48 % |

**e. Medidas empleadas para la preparación de los y las aspirantes al ejercicio de la abogacía y la notaría**

En lo relacionado a este acápite del Informe, y según nos informó el personal administrativo, la Escuela de Derecho de la UPR volvió recientemente a ofrecer los cursos de repaso para los exámenes de admisión al ejercicio de la abogacía y la notaría —ahora en línea—, los cuales se ofrecen a través de los servicios del Fidecomiso de esa institución con un costo de $1,000 y $250, respectivamente.[21] Estos repasos se ofrecen para ambas sesiones de la reválida, esto es, marzo y septiembre.

---

[21] Véase Repaso de Reválida Estatal en Línea (uprrp.edu).



El repaso para la Revalida General incluye: sesiones sincronizadas con el profesorado, materiales escritos, sesiones pregrabadas por profesoras y profesores, acceso ilimitado a materiales y sesiones grabadas hasta la fecha de la revalida, talleres enfocados en tecnicas de estudios, tecnicas para contestar las preguntas de seleccion multiple y de discusion, tecnicas de relajacion, balance emocional, nutricion, salud y manejo del tiempo. La facultad que es parte de los recursos de este repaso son: la profesora Aleida Varona Mendez (derecho de familia), la profesora Mayte Rivera Rodriguez (etica), el profesor Oscar Miranda Miller (derecho penal y procedimiento penal), la profesora Vivian I. Neptune Rivera (evidencia), el profesor Eugene Hestres Velez (derecho extracontractual y procedimiento civil), el profesor William Vazquez Irizarry (derecho constitucional y administrativo), la profesora Lourdes I. Quintana Llorens (derecho hipotecario), la profesora Erika Fontanez Torres (derecho real) y el profesor Felix Figueroa Caban (obligaciones y contratos, y contratos especiales). En cuanto al repaso para la Revalida Notarial, tambien se proveen sesiones sincronizadas y *miniclips*, ofrecidos actualmente por la recurso principal profesora Lourdes I. Quintana Llorens.

Aparte de lo anterior, pero con igual finalidad, la Escuela de Derecho de la UPR ha gestionado varias acciones dirigidas a encaminar a los y las estudiantes de *Juris Doctor* a los examenes de admision al ejercicio de la profesion legal. En particular, la administracion de esta facultad comunico, a modo de ejemplo, las acciones siguientes: evaluacion del desempeno academico del estudiantado de primer ano; apoyo e intervencion temprana; reduccion en el numero de la clase de nuevo ingreso; incorporacion a la oferta academica de todos los semestres de cursos de revalida (incluso algunos se ofrecen en las sesiones de verano); apoyo al programa de tutoria de las materias de revalida, y creacion de talleres para el manejo de tiempo y emociones.

Del mismo modo, por requerimientos de la ABA, la Escuela de Derecho de la UPR creo una nueva Oficina de Consejeria y Asesoria Academica que, entre



otras gestiones, promueve la preparación de sus estudiantes para enfrentar los exámenes de admisión al ejercicio de la abogacía y la notaría. Así también se han desarrollado simulaciones cortas (llamadas Baby Bar); secciones de prácticas, como "los martes de reválida"; grupos focales, y cuestionarios a egresados y egresadas que tomaron los exámenes de admisión a la abogacía y la notaría para conocer sus procesos de estudio.[22] De forma similar, esta facultad señaló que, ante la realidad económica que atraviesa el País, han creado becas para el repaso de reválida que ofrece el Fideicomiso, al cual hemos hecho referencia en párrafos anteriores. Además, han abordado con el profesorado de esta Escuela de Derecho los retos de la enseñanza a las nuevas generaciones, cómo aprenden distinto y las realidades de las inteligencias múltiples. Véase Apéndice IV del Informe, págs. 268-282.

En particular, de las acciones antes mencionadas, llama la atención el programa de Mentoría Académica de Pares. Este programa es organizado por el estudiantado de la Escuela de Derecho de la UPR en coordinación con la Oficina de Consejería y Asesoría Académica, con el objetivo de ofrecer una serie de charlas y dinámicas para repasar y analizar las figuras jurídicas y controversias principales de los cursos que son materia de reválida.

### f. Otros hallazgos de interés

El sistema de calificación en la Escuela de Derecho de la UPR es como sigue: "A = Sobresaliente, B = Bueno, C = Satisfactorio, D = Aprobado, F = Fracasado, P = Aprobado, NP = Reprobado, W = Baja autorizada, F*= Abandono de curso, I = Incompleto". Apéndice IV del Informe, pág. 137. Debe tenerse presente que las asignaturas o cursos que tiene una calificación de P, NP, W e I no se consideran al calcular el índice académico. *Id.* Sobre este particular, la

---

[22] Véase Consejería y Asesoría Académica (uprrp.edu).



referida institución educativa expresó que durante el periodo de tiempo bajo estudio no hubo cambios significativos en la escala utilizada para reportar notas o calificaciones. *Id.*, pág. 263. En otras palabras, el método para evaluar y asignar calificaciones para los años académicos bajo estudio, y hasta la fecha, no ha sufrido cambios.

La Escuela de Derecho de la UPR informó también la cantidad de estudiantes que se gradúan con honores por clase graduada desde el 2010 al 2020. Véase Apéndice IV del Informe, pág. 264. La Tabla Núm. 3 ilustra el otorgamiento de honores en la Escuela de Derecho de la UPR, los que se conceden según el índice alcanzado.

Tabla Núm. 3: Honores otorgados por la Escuela de Derecho de la UPR
a las clases graduadas de 2010 a 2020

| Clase graduada | *Summa Cum Laude* 3.96 - 4.00 | *Magna Cum Laude* 3.50 - 3.95 | *Cum Laude* 3.33 - 3.49 | Total de honores |
|---|---|---|---|---|
| 2010 | 0 | 41 | 31 | 72 |
| 2011 | 1 | 56 | 40 | 97 |
| 2012 | 4 | 56 | 27 | 87 |
| 2013 | 0 | 53 | 32 | 85 |
| 2014 | 1 | 73 | 21 | 95 |
| 2015 | 1 | 47 | 27 | 75 |
| 2016 | 4 | 46 | 21 | 71 |
| 2017 | 0 | 51 | 30 | 81 |
| 2018 | 0 | 55 | 32 | 87 |
| 2019 | 1 | 46 | 30 | 77 |
| 2020 | 3 | 58 | 25 | 86 |

La Escuela de Derecho de la UPR anejó el número de profesores(as) catedráticos(as) y por contrato que impartieron los cursos de las materias de reválida para cada año académico durante el periodo de tiempo bajo estudio. Véase Apéndice IV del Informe, págs. 266-267. Para los años académicos 2007 al 2017, la mayoría de los profesores y las profesoras que impartieron los cursos en materias de reválida en esta facultad fueron catedráticos(as).



Por otra parte, la Escuela de Derecho de la UPR notificó el número de estudiantes matriculados(as) a tiempo completo o a tiempo parcial por cada clase de nuevo ingreso durante el periodo de tiempo evaluado. Véase Apéndice IV del Informe, pág. 135. Específicamente, y según se muestra en la Tabla Núm. 4, un gran número de la población estudiantil de esta facultad se matricula a tiempo completo.

Tabla Núm. 4: Distribución de la población estudiantil según la carga académica de la Escuela de Derecho de la UPR por año académico

| Año de ingreso | Estudiantes a tiempo completo | Estudiantes a tiempo parcial | Total |
|---|---|---|---|
| 2007 | 147 (69 %) | 66 (31 %) | 213 |
| 2008 | 152 (72 %) | 59 (28 %) | 211 |
| 2009 | 145 (70 %) | 63 (30 %) | 208 |
| 2010 | 151 (75 %) | 50 (25 %) | 201 |
| 2011 | 139 (72 %) | 53 (28 %) | 192 |
| 2012 | 137 (70 %) | 59 (30 %) | 196 |
| 2013 | 132 (67 %) | 64 (33 %) | 196 |
| 2014 | 146 (75 %) | 49 (25 %) | 195 |
| 2015 | 138 (70 %) | 58 (30 %) | 196 |
| 2016 | 132 (71 %) | 53 (29 %) | 185 |
| 2017 | 122 (76 %) | 39 (24 %) | 161 |

De forma similar, la aludida institución educativa también reportó los resultados de los egresados y las egresaron que solicitaron por primera vez la reválida en Estados Unidos para el periodo de tiempo evaluado. Véase Apéndice IV del Informe, pág. 138. Según se muestra en la Tabla Núm. 5, de los 13 estudiantes reportados, solo 2 aprobaron el examen tomado en otra jurisdicción.



Tabla Núm. 5: Desempeño de los egresados y las egresadas de la Escuela de Derecho de la UPR que solicitaron la reválida en Estados Unidos como su primer intento para el periodo de tiempo bajo estudio

| | Género | Resultado | Fecha aprobación | Intentos | Fecha-Graduación (MY) | Comentarios |
|---|---|---|---|---|---|---|
| 1 | F | PASS | Jul-20 | 1 | 20-Jul | JULY 2020 WASHINGTON DC |
| 2 | M | FAIL | | 1 | 20-May | OCT 2020 California |
| 3 | M | FAIL | | 1 | 18-May | Feb 2020 NY |
| 4 | F | FAIL | | 1 | 2017 | July 2018 NY |
| 5 | F | FAIL | | 1 | 2017 | July 2018 NY |
| 6 | F | FAIL | | 1 | 18-May | July 2019 Illinois |
| 7 | F | FAIL | | 1 | 2011-May | Feb 2018 MN |
| 8 | F | FAIL | | 1 | 2015 | Feb 2017 NY |
| 9 | F | PASS | 17-Feb | 1 | 2008 | FEB 2017 NY |
| 10 | F | FAIL | | 1 | 2015 | July 2016 MN |
| 11 | F | FAIL | | 1 | 2014 | FEB 2015 NY |
| 12 | M | FAIL | | 1 | 2011 | JULY 2015 MA |
| 13 | M | FAIL | | 1 | 2012 | JULY 2014 NY |

La Escuela de Derecho de la UPR indicó que no cuenta con la información relacionada al número de estudiantes por año académico que trabajaban y estudiaban durante el periodo evaluado en este Informe.

Por último, la mencionada facultad compartió un estudio intitulado *Econometric Analysis of the Admissions Policy in the UPR Law School*. Véase Apéndice IV del Informe, págs. 206-258. Este estudio tuvo el propósito de evaluar los cambios en las características o perfil del estudiantado de nuevo ingreso matriculado, definido por los requisitos de admisión—que son: las puntuaciones obtenidas en los exámenes estandarizados del EXADEP y el LSAT, y en el índice general académico a nivel subgraduado—, y su relación, si alguna, con el porciento de aprobación de la Reválida General de derecho.



## 2. Facultad de Derecho de la Universidad Interamericana de Puerto Rico

### a. Perfil del estudiantado de nuevo ingreso matriculado

*- Número de estudiantes de nuevo ingreso por año académico*

Gráfica Núm. 6: Número de estudiantes de nuevo ingreso
de la UIPR por año académico



De la Gráfica Núm. 6 surge que el número de estudiantes de nuevo ingreso que matriculó la Facultad de Derecho de la UIPR fluctuó entre 266 y 128 estudiantes para el periodo de tiempo evaluado en este Informe. Véase Apéndice V del Informe, pág. 292. Es decir, desde el 2007 hasta el 2011 esta institución educativa matriculó sobre 238 estudiantes por cada año académico. Sin embargo, tras la drástica baja reportada para el 2012, el número de estudiantes de nuevo ingreso matriculados se redujo hasta mantenerse en poco más de 150 estudiantes para los años académicos de 2016 y 2017.

En suma, la Facultad de Derecho de la UIPR ha reducido significativamente el número de estudiantes de nuevo ingreso que matricula en el programa de *Juris Doctor*. Según informó el personal administrativo de esta



facultad, actualmente el número de estudiantes de nuevo ingreso matriculados por año académico es de aproximadamente 170 a 195. Véase Apéndice V del Informe, pág. 389.

*- Desempeño en el examen estandarizado EXADEP*

Gráfica Núm. 7: Desempeño del estudiantado de nuevo ingreso de la UIPR en el examen estandarizado EXADEP por año académico



Como se muestra en la Gráfica Núm. 7, las puntuaciones reportadas por la Facultad de Derecho de la UIPR en el examen estandarizado EXADEP fluctuaron entre los 757 y 491 puntos para el periodo de tiempo bajo estudio. Véase Apéndice V del Informe, págs. 318-325. Para los años académicos de 2007 al 2011, las puntuaciones informadas para el EXADEP se mantuvieron mayormente dentro de los 650 y 598 puntos. No obstante, desde el año académico 2013, las puntuaciones mayores reportadas en este examen se ubicaron entre los 597 y 491 puntos.



En otras palabras, para el periodo de tiempo evaluado, en la medida en que se redujeron las puntuaciones entre los 757 y 598 puntos, aumentaron las puntuaciones entre los 597 y 545 puntos en el examen de referencia. Incluso desde el 2013 se comenzó a reportar puntuaciones aún más bajas, alcanzando los 544 y 491 puntos. Esto último se traduce a que, desde el 2007 al 2012, las puntuaciones en el examen estandarizado EXADEP de los estudiantes que matriculó esta facultad fluctuaban entre los 757 y 545 puntos, mientras que en el 2013 este número fluctuó entre los 757 y 491 puntos.

Gráfica Núm. 8: Puntuación promedio del estudiantado de nuevo ingreso de la UIPR en el examen estandarizado EXADEP por año académico



Tal y como se observa en la Gráfica Núm. 8, el promedio de las puntuaciones informado por la Facultad de Derecho de la UIPR en el examen estandarizado EXADEP fluctuó entre los 617 y 550 puntos para los años académicos 2007 a 2017.

En resumen, la población de nuevo ingreso matriculada en esta institución educativa obtuvo una puntuación promedio menor en el examen estandarizado EXADEP con el pasar del tiempo. A la fecha, este examen ya no se considera



como requisito de admisión en dicha facultad. Véase Apéndice V del Informe, pág. 387.

- *Desempeño en el examen estandarizado LSAT*

Gráfica Núm. 9: Puntuación promedio del estudiantado de nuevo ingreso de la UIPR en el examen estandarizado LSAT por año académico



Se desprende de la Gráfica Núm. 9 que la puntuación promedio reportada por el estudiantado de nuevo ingreso matriculado en la Facultad de Derecho de la UIPR en el examen estandarizo LSAT fluctuó entre los 139 y 137 puntos para los años académicos 2007 a 2017. Véase Apéndice V del Informe, págs. 318-325. La puntuación promedio más alta reportada fue de 139 para los años 2007 a 2012 y, posteriormente, para el 2017. Mientras, la puntuación promedio más baja fue de 137 puntos reflejada en el 2016. Sin embargo, nótese que la puntuación promedio informada para el examen del LSAT fue de 139 puntos en 7 de los 11 años informados.



Esta institución educativa reportó una puntuación promedio en el LSAT que, si bien con una baja mínima, se mantuvo relativamente similar con el pasar del tiempo. De la información comunicada por la Facultad de Derecho de la UIPR no se deduce si el estudiantado de nuevo ingreso que se matricula actualmente ha reportado una puntuación promedio mayor o menor en el LSAT a la informada para el periodo de tiempo evaluado en este Informe.

*- Índice académico general subgraduado*

Gráfica Núm. 10: Puntuación promedio del índice académico general subgraduado del estudiantado de nuevo ingreso de la UIPR por año académico



De la Gráfica Núm. 10 surge que la puntuación promedio del índice académico general a nivel subgraduado que informó el estudiantado de nuevo ingreso matriculado en la Facultad de Derecho de la UIPR, fluctuó entre 3.32 y 3.18 para el periodo de tiempo bajo estudio. Véase Apéndice V del Informe, págs. 326-336. Particularmente, la puntuación promedio de 3.32 fue la más alta para



el 2010 y la puntuación promedio de 3.18 fue la más baja para los años 2012 y 2015.

En suma, el promedio del índice general académico subgraduado reportado por la Facultad de Derecho de la UIPR, si bien con ciertas bajas, se mantuvo relativamente constante para el periodo de tiempo bajo estudio. Ahora bien, el personal administrativo de esta institución sostuvo que, en años más recientes, ha matriculado un promedio de estudiante con un índice general académico subgraduado mayor a los 3.60.

### b. Parámetros de reclutamiento y admisión

Desde el 2013 la Facultad de Derecho de la UIPR admite y matricula estudiantes en agosto y en enero. Véase Apéndice V del Informe, pág. 387. No obstante, para propósito de este Informe, la cantidad de estudiantes matriculados en esta institución por año académico o por cada semestre se sumaron para cada uno de los años académicos bajo estudio.

Dicho esto, la aludida facultad notificó que, para los años académicos que comprenden el periodo de 2007 a 2013, los parámetros o criterios que se sopesaban para la admisión de estudiantes eran los siguientes: resultados de los exámenes estandarizados LSAT y EXADEP, y el promedio del índice académico general del grado de bachillerato. Estos parámetros "recibían una distribución en peso en la fórmula de admisión de la siguiente manera: GPA 30%, LSAT 20% y EXADEP 50%. De acuerdo con el rango percentil de los candidatos eran considerados y competían para los espacios proyectados". Véase Apéndice V del Informe, pág. 291.

Ahora bien, en el 2013, la política de admisión de la Facultad de Derecho de la UIPR cambió. Desde entonces, la fórmula mediante la cual se le otorga cierto peso a los parámetros o criterios de admisión se igualó a un 33.33% para cada uno de estos. Véase Apéndice V del Informe, pág. 291. Según se informó, esta fórmula estuvo apoyada en un estudio de proyección el cual reflejó que el



EXADEP era el predictor menos confiable en cuanto al desempeño del estudiante en los estudios de *Juris Doctor* y, posteriormente, en la reválida. Véase Apéndice V del Informe, pág. 291.

Actualmente, y tras la eliminación del examen estandarizado EXADEP, los parámetros de reclutamiento y admisión distribuye el peso entre el GPA subgraduado y el LSAT. Véase Apéndice V del Informe, págs. 291, 387.

### c. Currículos académicos: cursos requisitos y electivos

Según se informó en el catálogo de 2005-2007 de la Facultad de Derecho de la UIPR, el grado de *Juris Doctor* requería la aprobación de 92 créditos. Véase Apéndice V del Informe, págs. 338-340. Además, desde 1999, todas las materias que son evaluadas en el examen de admisión al ejercicio de la abogacía son cursos requisitos de graduación en esta facultad. *Id.*, pág. 398.

Asimismo, de la información entregada surge que, para el 2015 se introdujo un cambio en la secuencia curricular a los fines de cumplir con ciertas especificaciones de la ABA. Desde entonces, se requieren 6 créditos en educación experiencial (*experiential learning*). Véase Apéndice V del Informe, pág. 300. Sobre este particular, la administración de la Facultad de Derecho de la UIPR comentó que la secuencia curricular ya incluía el curso Teoría, Doctrina y Práctica de la Litigación —que cuenta por 3 créditos—, por lo que se modificó para exigir 3 créditos adicionales en el ámbito de la práctica forense. *Id.*

Por otro lado, en la Facultad de Derecho de la UIPR también se introdujo desde el 2014 la exigencia de examen de reválida simulado como requisito de graduación. Véase Apéndice V del Informe, pág. 398. Esta exigencia se modificó en el 2020 y ahora se exigen 2 exámenes de reválida simulados como requisitos de graduación. *Id.*

Actualmente, para el grado de *Juris Doctor*, esta institución continúa requiriendo la aprobación de 92 créditos. Véase Apéndice V del Informe, pág. 400. Todas las materias de reválida continúan como cursos requisitos de



graduación. También se requiere que, dentro de los cursos electivos, el o la estudiante realice un trabajo investigativo individual como parte de los cursos de seminario. Como adelantamos, cada estudiante deberá aprobar un mínimo de 6 créditos en cursos de aprendizaje experiencial o práctica forense. Igualmente, continúa vigente la política de que cada estudiante deberá completar 2 exámenes de reválida simulados como requisitos de graduación. La carga regular del estudiante matriculado en el programa diurno es de 15 créditos, con excepción del segundo semestre del primer año y el primer semestre del tercer año, que será de 16 créditos. Por otro lado, la carga regular del estudiante nocturnos es de 12 créditos, excepto el primer semestre del primer año, que será de 13 créditos, y el segundo semestre del segundo año, así como del tercer y cuarto años, que será de 11 créditos. *Id.*, págs. 399-400.

**d. Medidas empleadas durante los estudios conducentes al grado de *Juris Doctor* para evaluar el aprovechamiento académico de los egresados y las egresadas**

En el catálogo de 2005-2007 de la Facultad de Derecho de la UIPR se establecía la *Norma de Progreso Académico*: todo estudiante debe mantener un índice académico mínimo de 2.00, en una escala de 4.00, al finalizar cada semestre académico. Véase Apéndice V del Informe, pág. 295. Ahora bien, en el caso de los estudiantes de primer año se requería el índice académico de 2.00 al final del segundo semestre. *Id.* Para ese entonces, todo y toda estudiante tenía el derecho a repetir un curso cuando la calificación no le satisficiera. Todos los cursos requisitos debían aprobarse con una calificación mínima de C. *Id.*

Para ese grupo de años, todas las calificaciones y los créditos contaban para el cómputo del índice académico. Cuando un(a) estudiante repetía un curso, se consideraban todas las calificaciones obtenidas previamente para determinar el índice académico general. Véase Apéndice V del Informe, pág. 295. En el caso de que el curso se hubiera eliminado, el o la estudiante podía sustituirlo por el nuevo curso creado en la revisión curricular o por un curso



equivalente tras las correspondientes aprobaciones. Esto se mantuvo hasta el 2016 cuando entró en vigor una modificación a la *Norma de Progreso Académico*, la cual incluyó un componente de ritmo de aprobación de cursos. *Id.*

En conformidad con lo expuesto, y a partir del 2016, todo estudiante en el programa de *Juris Doctor* de esta institución debía demostrar un progreso académico satisfactorio mientras cursara su programa de estudios, según se surge del progreso académico señalado en el catálogo de 2016-2018. Véase Apéndice V del Informe, págs. 295, 353-354. Esto último, con la advertencia de que la elegibilidad para recibir ayudas económicas federales, estatales e institucionales dependería de dicho progreso académico.

Los requisitos para alcanzar el progreso académico satisfactorio se organizaban en dos componentes: cualitativo y cuantitativo. En esa dirección, todo estudiante debía mantener un índice académico mínimo de 2.00 en una escala de 4.00. Véase Apéndice V del Informe, págs. 295-396. El o la estudiante que no cumpliese con el referido índice se daría de baja por deficiencia académica. Esta norma se aplicaba al final de cada semestre académico. Así, por ejemplo, a un estudiante de primer año se le requerirá el índice de 2.00 al final del segundo semestre o de la sesión de verano, según aplicara. *Id.*

Existía también un requisito de créditos aprobados, mediante el cual todo estudiante debía aprobar el 50% de los créditos intentados en los cursos en que se haya matriculado en el primer año de estudios. A partir del primer año, se exigiría la aprobación de un 66.67% de los créditos intentados por año hasta completar el grado. Véase Apéndice V del Informe, pág. 296. Cónsono con lo anterior, la Facultad de Derecho de la UIPR estableció un requisito de período máximo o término de caducidad para completar el grado. En este término, todo estudiante admitido al programa debía completar los requisitos del grado en 7 años o, lo que es igual, 84 meses a partir de la fecha en que hubiese comenzado a tomar su primer curso. *Id.* Si el o la estudiante no termina dentro de ese



periodo, todos los créditos que hubiese acumulado caducarían. Dicho de otro modo, no podía considerársele para completar el grado en caso de readmisión.

En cuanto a la repetición de cursos, se disponía que todo curso requisito debía aprobarse con una calificación mínima de C. Véase Apéndice V del Informe, pág. 296. Así, pues, los y las estudiantes tendrían el derecho a repetir un curso cuando la calificación no sea satisfactoria. En caso de que se hubiese eliminado el curso en cuestión de la oferta académica, el o la estudiante podía sustituirlo por un curso equivalente, sujeto a la aprobación del (de la) Decano(a) de la Facultad de Derecho y en consulta con la Vicepresidencia de Asuntos Académicos. En ese sentido, cuando un(a) estudiante repetía un curso, prevalecía la calificación más alta y las calificaciones inferiores se sustituían por la codificación R (curso repetido); esto es distinto a como se calculaba anteriormente. *Id.* Según explicó la Facultad de Derecho de la UIPR, las anotaciones de R y los créditos correspondientes no se consideraban para determinar si el estudiante ha satisfecho los requisitos de graduación.

En esta línea, la Facultad de Derecho de la UIPR reportó el número de estudiantes que fueron suspendidos por no cumplir con los parámetros de aprovechamiento académico y la proporción que ese número significa en comparación con el número de estudiantes activos para los años académicos 2011 a 2017.[23] Véase Apéndice V del Informe, pág. 301. Según se muestra en la Tabla Núm. 6, las suspensiones fluctuaron entre 6 y 20 estudiantes de una población global ascendente a 764 y hasta 866 estudiantes activos por año académico, según los datos reportados para el periodo de tiempo bajo estudio. Es decir, el mayor número de estudiantes suspendidos fue de 20 en el año académico iniciado en el 2017 frente a una matrícula total de 748, lo que representó 2.67% de la población total activa para ese entonces.

---

[23] Los datos correspondientes a los años académicos 2007 a 2010 no se incluyeron en la información que entregó esta facultad.



Tabla Núm. 6: Número de estudiantes suspendidos con relación a estudiantes activos en la Facultad de Derecho de la UIPR por año académico

| Año académico | Suspensiones por deficiencia académica | Estudiantes activos | Porciento de suspensiones |
|---|---|---|---|
| 2011-2012 | 12 | 866 | 1.39 % |
| 2012-2013 | 17 | 856 | 1.99 % |
| 2013-2014 | 12 | 764 | 1.57 % |
| 2014-2015 | 14 | 777 | 1.80 % |
| 2015-2016 | 11 | 769 | 1.43 % |
| 2016-2017 | 6 | 766 | 0.78 % |
| 2017-2018 | 20 | 748 | 2.67 % |

De otro lado, y aunque fuera del período de tiempo que cubre el presente Informe, la Facultad de Derecho de la UIPR notificó que en el 2020 aprobó una nueva modificación a la forma de evaluar el promedio de retención y norma de progreso académico a la que hemos aludido. Véase Apéndice V del Informe, pág. 296. Esta modificación establece el esquema de evaluación de progreso académico siguiente:

Tabla Núm. 7: Índice académico general requerido en la Facultad de Derecho de la UIPR por año

| Estudiantes diurnos (3 años) | Estudiantes nocturnos (4 años) |
|---|---|
| 1er año → 2.25 | 1er año → 2.25 |
| 2do año → 2.50 | 2do año → 2.50 |
| 3er año → 2.75 | 3er año → 2.50 |
| | 4to año → 2.75 |

A modo de ejemplo, actualmente, en la Facultad de Derecho de la UIPR el o la estudiante de primer año debe obtener un índice académico acumulativo de 2.25 al final del segundo semestre o de la sesión de verano para poder continuar en el programa de *Juris Doctor*. Lo anterior representa .25 más si se compara con lo exigido en este renglón en el catálogo de 2016-2018.



### e. Medidas empleadas para la preparación de los y las aspirantes al ejercicio de la abogacía y la notaría

Entre las múltiples medidas informadas por la Facultad de Derecho de la UIPR para apoyar a su estudiantado en la preparación de los estudios conducentes a las revalidas de derecho, llaman la atención las siguientes:

1. Creación de la Oficina de Apoyo Académico en el 2013.

2. Creación del curso Introducción al Examen de Reválida.

3. Utilización de métodos de avalúo del aprendizaje en todos los cursos.

4. Creación de un examen simulado de reválida inicialmente de carácter voluntario, posteriormente como requisito y, más recientemente —desde el 2014 al presente—, se estableció que tenía que ser tomado y aprobado como requisito de graduación. Véase Apéndice V del Informe, pág. 297.

### f. Otros hallazgos de interés

Desde el 2016, en la Facultad de Derecho de la UIPR todos los cursos —incluso los electivos— deben ser aprobados con una calificación mínima de C. Véase Apéndice V del Informe, pág. 299. La normativa vigente en materia de calificaciones es la siguiente: (A) por calidad excelente de trabajo: 4.00 por crédito; (B+) por calidad sobresaliente de trabajo: 3.50 por crédito; (B) por calidad superior de trabajo: 3.00 por crédito; (C+) por calidad satisfactoria de trabajo: 2.50 por crédito; (C) por calidad promedio de trabajo: 2.00 por crédito; (D+) calificación deficiente de trabajo: 1.50 por crédito; (D) calificación deficiente pasable mínima: 1.00 por crédito; (F) fracaso, 0.00 por crédito; (W) baja de curso; (AU) oyente; (I) incompleto; (P) aprobado; (NIP) desaprobado; (UW) baja no oficial; (AW) nunca asistió. *Id.*

La Facultad de Derecho de la UIPR informó también la cantidad de estudiantes que recibieron honores por clase graduanda desde el 2010 al 2020. Véase Apéndice V del Informe, págs. 394-397. En dicha institución estos honores se otorgaron en la forma siguiente: *Summa Cum Laude* a quienes obtuvieron un



índice académico general de 3.75 a 4.00; *Magna Cum Laude* a quienes alcanzaron un índice académico general de 3.50 a 3.74, y *Cum Laude* a quienes obtuvieron un índice académico general de 3.25 a 3.49.

Tabla Núm. 8: Honores otorgados por la Facultad de Derecho de la UIPR
a las clases graduadas de 2010 a 2020

| Clase graduada | *Summa Cum Laude* 3.75 - 4.00 | *Magna Cum Laude* 3.50 - 3.74 | *Cum Laude* 3.25 - 3.49 | Total de honores |
|---|---|---|---|---|
| 2010 | 10 | 21 | 39 | 70 |
| 2011 | 8 | 32 | 47 | 58 |
| 2012 | 14 | 17 | 61 | 92 |
| 2013 | 6 | 30 | 38 | 74 |
| 2014 | 7 | 21 | 35 | 63 |
| 2015 | 9 | 13 | 33 | 55 |
| 2016 | 11 | 18 | 42 | 71 |
| 2017 | 14 | 27 | 43 | 84 |
| 2018 | 10 | 11 | 48 | 69 |
| 2019 | 14 | 20 | 46 | 80 |
| 2020 | 8 | 30 | 34 | 72 |

Igualmente, la mencionada Escuela de Derecho anejó el número de profesores(as) catedráticos(as) y por contrato que impartieron los cursos de las materias de reválida durante el periodo de tiempo bajo estudio. Según se consigna en el mencionado anejo, para los años académicos 2007 a 2017, los cursos en materias de reválida en su mayoría se impartieron por de los profesores y las profesoras a tiempo completo o, lo que es igual, por los catedráticos y las catedráticas. Véase Apéndice V del Informe, págs. 390-393.

La Facultad de Derecho de la UIPR también reportó el número de estudiantes que tuvo carga académica a tiempo completo (diurno) o a tiempo parcial (nocturno) por cada clase de nuevo ingreso durante el periodo de tiempo bajo estudio. Véase Apéndice V del Informe, pág. 294. En particular, surge de la Tabla Núm. 9 que la población estudiantil de esta facultad mayormente se matricula a tiempo completo.



Tabla Núm. 9: Distribución de la población estudiantil según la carga académica de la Facultad de Derecho de la UIPR por año académico

| Año de ingreso | Estudiantes a tiempo completo | Estudiantes a tiempo parcial | Total |
|---|---|---|---|
| 2007 | 129 (52 %) | 119 (48 %) | 248 |
| 2008 | 139 (52%) | 127 (48 %) | 266 |
| 2009 | 127 (53 %) | 111 (47 %) | 238 |
| 2010 | 155 (62 %) | 94 (38 %) | 249 |
| 2011 | 139 (57 %) | 107 (43 %) | 246 |
| 2012 | 70 (55 %) | 58 (45 %) | 128 |
| 2013 | 107 (54 %) | 93 (46 %) | 200 |
| 2014 | 125 (62 %) | 77 (38 %) | 202 |
| 2015 | 97 (57 %) | 73 (43 %) | 170 |
| 2016 | 91 (60 %) | 60 (40 %) | 151 |
| 2017 | 90 (59 %) | 63 (41 %) | 153 |

Por último, la institución educativa de referencia informó que no archiva el número de aspirantes primerizos que solicitó la admisión a alguna reválida de derecho en Estados Unidos ni cuántos aprobaron dicho examen dentro del periodo de tiempo evaluado aquí. Véase Apéndice V del Informe, pág. 302. De forma similar, esta facultad indicó que tampoco posee el número de estudiantes por año académico que mantenía un trabajo mientras estudiaba. *Id.*, pág. 303.



### 3. Escuela de Derecho de la Pontificia Universidad Católica de Puerto Rico

**a. Perfil del estudiantado de nuevo ingreso matriculado**

*- Número de estudiantes de nuevo ingreso por año académico*

Gráfica Núm. 11: Número de estudiantes de nuevo ingreso
de la PUCPR por año académico



De la Gráfica Núm. 11 se desprende que el número de estudiantes de nuevo ingreso que matriculó la Escuela de Derecho de la PUCPR fluctuó entre 310 y 117 estudiantes para los años académicos 2007 al2017. Véase Apéndice VI del Informe, págs. 483-572. Durante los años 2007 a 2012, el número de estudiantes de nuevo ingreso que matriculó esta facultad se mantuvo sobre los 220 estudiantes. No obstante, a partir del año académico 2013 esta cifra se redujo constantemente hasta llegar a los 117 estudiantes en el 2017.

En resumen, el número de estudiantes de nuevo ingreso que matriculó la Escuela de Derecho de la PUCPR se redujo drásticamente en el periodo de tiempo bajo estudio. A la fecha, y aunque con una clara reducción en el número de estudiantes de nuevo ingreso, la administración de esta facultad aclaró que no



establece cuota de estudiantes ni meta de reclutamiento, por lo que no calcula una proyección de estudiantes a admitirse por términos. Por eso, de los datos reportados para el año académico 2019-2020, el número de estudiantes de nuevo ingreso matriculados(as) apenas superó los 75, mientras para el año académico 2020-2021 esta cifra aumentó a unos 180 estudiantes. Véase Apéndice VI del Informe, pág. 624.

- *Desempeño en el examen estandarizado EXADEP*

Gráfica Núm. 12: Desempeño del estudiantado de nuevo ingreso de la PUCPR en el examen estandarizado EXADEP por año académico



Como se puede apreciar en la Gráfica Núm. 12, las puntuaciones reportadas por la Escuela de Derecho de la PUCPR en el examen estandarizado EXADEP fluctuaron entre los 768 y 375 puntos para el periodo de tiempo bajo estudio. Véase Apéndice VI del Informe, págs. 483-572. En este renglón, y para los años académicos 2007 a 2013, las puntuaciones informadas para el EXADEP



en esta facultad se mantuvieron mayormente dentro de los 610 y 533 puntos. Sin embargo, desde el año académico 2014 las puntuaciones que más se reportaron en este examen fueron entre los 532 y 454 puntos.

En la medida en que se redujeron las puntuaciones entre los 768 y 533 puntos, aumentaron las puntuaciones entre los 532 y 375 puntos en el examen de referencia durante el periodo de tiempo evaluado. Incluso, desde el 2013 se comenzaron a reportar puntuaciones aún más bajas, esto es, entre los 453 y 375 puntos, lo que se traduce a que, desde el 2007 hasta el 2012, las puntuaciones en el examen estandarizado EXADEP de los estudiantes que matriculó la Escuela de Derecho de la PUCPR fluctuaron entre los 768 y 454 puntos. No obstante, en el 2014 y años subsiguientes, este número comenzó a fluctuar entre los 768 y 375 puntos.

Gráfica Núm. 13: Puntuación promedio del estudiantado de nuevo ingreso de la PUCPR en el examen estandarizado EXADEP por año académico



De la Gráfica Núm. 13 surge que el promedio de las puntuaciones informadas por la Escuela de Derecho de la PUCPR en el examen estandarizado



EXADEP fluctuó entre los 510 y 569 puntos para el periodo de tiempo bajo estudio.

En suma, la población de nuevo ingreso matriculada en esta facultad obtuvo una puntuación menor en el examen estandarizado EXADEP con el pasar del tiempo. Desde el 2020, el EXADEP no se utiliza como parte de los requisitos de admisión en la Escuela de Derecho de la PUCPR.

*- Desempeño en el examen estandarizado LSAT*

Gráfica Núm. 14: Puntuación promedio del estudiantado de nuevo ingreso de la PUCPR en el examen estandarizado LSAT por año académico



De la Gráfica Núm. 14 surge que la puntuación promedio reportada por el estudiantado de nuevo ingreso matriculado en la Escuela de Derecho de la PUCPR en el examen estandarizo LSAT se mantuvo entre los 136 y 135 puntos para el periodo de tiempo bajo estudio. Véase Apéndice VI del Informe, págs. 483-572. La puntuación promedio más alta fue de 136 puntos para los años 2008, 2009, 2012 y 2014, mientras que la puntuación promedio más baja fue



de 134 puntos para los años 2015 y 2017. Es decir, la puntuación promedio que reportó el estudiantado de nuevo ingreso matriculado en la Escuela de Derecho de la PUCPR en el examen estandarizo LSAT, para el periodo de los años académicos evaluados, se mantuvo entre los 136 y 135 puntos, con excepción de los años 2015 y 2017, en los cuales el promedio reportado fue de 134 puntos.

En síntesis, la puntuación promedio reportada por el estudiantado de nuevo ingreso matriculado en la Escuela de Derecho de la PUCPR, si bien con una baja mínima, fue constante con el pasar del tiempo. A la fecha, el examen estandarizado LSAT continúa siendo uno de los criterios de admisión. Surge del documento titulado *Law School Admission Policy* (revisado en febrero de 2021) que la puntuación deseada por esta facultad para dicho examen es de 135 puntos o más. Véase Apéndice VI del Informe, pág. 463.

*- Índice académico general subgraduado*

Gráfica Núm. 15: Puntuación promedio del índice académico general subgraduado del estudiantado de nuevo ingreso de la PUCPR por año académico





De la Gráfica Núm. 15 se infiere que la puntuación promedio del índice académico general (GPA) a nivel subgraduado que informó el estudiantado de nuevo ingreso matriculado en la Escuela de Derecho de la PUCPR fluctuó entre los 3.41 y 3.22 para los años académicos 2007 a 2017. Véase Apéndice VI del Informe, págs. 483-572. Específicamente, la puntuación promedio de 3.41 fue la más alta para el 2016, mientras que la puntuación promedio de 3.22 fue la más baja para el 2010.

Ahora bien, de las puntuaciones promedios reportadas se destaca que, si bien para los años académicos 2007 a 2012 el referido índice se mantuvo sobre los 3.22 y 3.27, desde el año académico 2013 hasta el 2016 este aumentó de manera consecutiva, a saber: 3.31 en el 2013; 3.34 en el 2014; 3.35 en el 2015, y 3.41 en el 2016. En el año académico 2017 esta puntuación promedio se redujo levemente a 3.36.

En resumen, la puntuación promedio del índice académico a nivel subgraduado que informó el estudiantado de nuevo ingreso matriculado en la Escuela de Derecho de la PUCPR aumentó durante el periodo de tiempo evaluado en este Informe. Actualmente, el índice académico general deseado por esta institución es de 3.00 o más, según se desprende del documento titulado *Law School Admission Policy* (revisado en febrero de 2021). Véase Apéndice VI del Informe, pág. 463.

### b. Parámetros de reclutamiento y admisión

La Escuela de Derecho de la PUCPR admite y matricula estudiantes en agosto y en enero. Véase Apéndice VI del Informe, pág. 410. No obstante, señalamos que, para los propósitos de este Informe, la cantidad de estudiantes matriculados por cada semestre se sumaron por año académico.

Para el periodo de tiempo bajo estudio, los criterios de reclutamiento y admisión para el programa de *Juris Doctor* en esta institución educativa eran la puntuación obtenida en los exámenes estandarizados EXADEP y LSAT, además



del índice académico general subgraduado. Así también, al (a la) solicitante o candidato(a) se le realizaba una entrevista.

Actualmente, el proceso de admisión al programa de *Juris Doctor* en esta facultad está dividido en 2 fases. Véase Apéndice VI del Informe, pág. 463. En la primera fase, denominada *fase de evaluación*, se consideran los siguientes criterios de admisión: puntuación recibida en el examen estandarizado LSAT y el índice académico general subgraduado. Como adelantamos, la puntuación mínima requerida o deseada es de 135 puntos en el LSAT y 3.00 en el índice académico general subgraduado.[24] *Id.* Si la persona que solicita reporta estos números automáticamente pasa a la segunda fase.

En la segunda fase del proceso de admisión, cada uno de los y las candidatos(as) al programa de *Juris Doctor* completa una *entrevista* con un Comité de Admisiones, compuesto por miembros de la facultad y el Decano(a), la Decana(o) Asociada o la Decana(o) Auxiliar de Asuntos Estudiantiles. Véase Apéndice VI del Informe, pág. 464. Durante la entrevista se evalúan factores tales como: historial académico del (de la) candidato(a); desempeño académico a nivel subgraduado; servicio comunitario y participación en organizaciones estudiantiles; experiencias de trabajo; destrezas de escritura, comunicación, análisis y razonamiento; potenciales causas para una puntuación baja en el LSAT o en el índice académico general subgraduado; acciones implementadas por el candidato o la candidata para superar situaciones que hayan interferido con su desempeño académico, entre otros factores. *Id.*

Por otra parte, en ciertos casos también se admiten, de forma condicionada, estudiantes que reportaron una puntuación en el LSAT de entre 130 y 134 puntos, y con un índice académico general subgraduado menor a los 3.00, en consideración a la evaluación de la totalidad del expediente, lo que incluye las

---

[24] Esta fórmula o puntuaciones mínimas deseadas fue originalmente recomendada por el Dr. Julio Quintana en el 2013 y, posteriormente, revisada por el Dr. José Caraballo en marzo de 2017 y octubre de 2020. Véase Apéndice VI del Informe, págs. 574-593.



respuestas ofrecidas en la entrevista. Véase Apéndice VI del Informe, págs. 419, 464. En los casos de admisiones condicionadas, la Escuela de Derecho de la PUCPR requiere que los y las estudiantes terminen el primer año de estudios de *Juris Doctor* con un índice académico general de 3.00 o más y que participen del programa de apoyo académico, y en determinados casos, incluye una restricción de la cantidad de créditos que pueden tomar por semestre. *Id.* Anteriormente, y según surge de la política académica vigente hasta el 2016 en esta institución educativa, los estudiantes admitidos de forma condicionada debían mantener un índice académico general de 2.00 o más, juntos a otras condiciones que la Oficina del Decano(a) impusiera dirigida a que el o la estudiante en cuestión superara cualquier deficiencia académica. *Id.*

### c. Currículos académicos: cursos requisitos y electivos

Hasta el 2013, la política académica de la Escuela de Derecho de la PUCPR requería que los y las estudiantes admitidos(as) al programa diurno de *Juris Doctor* aprobaran 94 créditos de los cuales 79 eran cursos requisitos y 15 cursos electivos. Véase Apéndice VI del Informe, pág. 412. Los (Las) admitidos(as) al programa nocturno debían completar, por igual, 94 créditos de los cuales 77 eran cursos requisitos y 17 cursos electivos. *Id.* Entre los cursos electivos, el o la estudiante de ambas secciones —diurna y nocturna— debía aprobar un seminario en el cual prepararía un trabajo escrito. Para la sesión diurna se podían matricular con un máximo de 16 créditos y un mínimo de 10 créditos, mientras que para la sesión nocturna se podían tomar un máximo de 12 créditos y un mínimo de 8 créditos. *Id.*

Estos requisitos de graduación se tenían que aprobar con un índice académico general de 2.00 o más. Véase Apéndice VI del Informe, pág. 412. Los estudios debían completarse en un plazo máximo de 5 años para los de la sesión diurna y 6 para la nocturna. Los honores se otorgaban como sigue: *Summa Cum Laude* a quienes obtuvieron un índice académico general de 3.70 a 4.00; *Magna*



*Cum Laude* a quienes alcanzaron un índice académico general de 3.40 a 3.69, y *Cum Laude* a quienes obtuvieron un índice académico general de 3.20 a 3.39. *Id.*

Posteriormente, entre 2015 y 2016, en la Escuela de Derecho de la PUCPR se llevó a cabo una revisión curricular que se implementó en agosto de 2017. El personal administrativo de esta institución nos comunicó que esta revisión redujo la carga académica del primer semestre a 14 créditos para los y las estudiantes de la sesión diurna y 10 créditos para la sesión nocturna. Para ello se consolidaron algunos cursos, mientras que se dividieron o añadieron créditos a otros. Sin embargo, el balance de créditos requisitos y electivos se mantuvo en un total de 94 créditos requeridos para completar el grado.

Según surge de las secuencias curriculares de los años académicos bajo estudio, todas las materias de reválida siempre han sido cursos requisitos. Véase Apéndice VI del Informe, págs. 469-480. Esto sigue siendo así. Según se observa en las secuencias curriculares entregadas y anejadas en este Informe, desde el 2009 esta institución educativa exige como curso requisito de graduación 2 créditos en un taller de repaso o preparación para los exámenes de admisión al ejercicio de la profesión legal, tanto para el estudiantado de la sesión diurna como el de la nocturna. *Id.*, págs. 471-480.

Así, la Política Académica aprobada en el 2018 y revisada en 2019-2020 dispone que el grado de *Juris Doctor* en la Escuela de Derecho de la PUCPR se confiere a estudiantes que hayan aprobado un mínimo de 94 créditos, con un índice académico general de 2.00 o más. Véase Apéndice VI del Informe, pág. 436. Los 94 créditos incluyen 76 créditos en cursos requisitos y 18 créditos en cursos electivos para los estudiantes de la sesión diurna. *Id.* En cuanto a los y las estudiantes de la sesión nocturna, se requieren 74 créditos en cursos requisitos y 20 créditos en cursos electivos. *Id.*

El estudiantado de la sesión diurna podrá matricularse en un máximo de 16 créditos y un mínimo de 10 créditos por semestre, mientras que el de la sesión



nocturna se puede tomar un máximo de 12 créditos y un mínimo de 8 créditos por semestre. *Véase* Apéndice VI del Informe, pág. 436. Además, el o la estudiante de la sesión nocturna podrá solicitar un permiso del (de la) Decano(a) para tomar hasta 13 créditos en su último semestre. *Id.* El máximo de créditos que se pueden tomar durante las sesiones de verano que ofrece esta facultad es de 7 créditos. *Id.* Aunque los créditos en los cursos electivos aumentaron desde entonces, todas las materias de reválida siguen siendo parte de los cursos requisitos exigidos por esta facultad. Al igual que las anteriores políticas académicas, entre los cursos electivos, el o la estudiante deberá aprobar un seminario en el que redactará una monografía. Destaca esta institución que "el propósito de esta norma es [promover] el desarrollo de destrezas de investigación y redacción entre los [y las] estudiantes". *Id.*

Por otra parte, para tomar el curso de la Clínica de Asistencia Legal se requiere al estudiantado haber aprobado 62 créditos en cursos, entre ellos: Derecho Penal, Derecho Probatorio, Procedimiento Criminal I y II, Procedimiento Civil y Ética y Responsabilidad de la Profesión Jurídica. *Véase* Apéndice VI del Informe, pág. 441. El curso de la Clínica de Asistencia Legal está dividido en 2 programas, a saber: Programa Interno y Programa Externo. *Id.* El Programa Interno tiene una sesión diurna y una nocturna. En este programa, los estudiantes practican un semestre en el área civil y un semestre en el área penal, y si cualifican, podrán realizar un semestre externo y otro semestre interno. *Id.* El Programa Externo, por su parte, se divide en: (1) Oficiales Jurídicos y Administrativos en el Tribunal Supremo, Tribunal de Apelaciones, Tribunal de Primera Instancia, Tribunal Federal y Departamento de Asuntos al Consumidor, y (2) Litigio en la Sociedad para la Asistencia Legal, la Corporación de Servicios Legales de Puerto Rico, el Departamento de Justicia y abogados(as) en la práctica privada. *Id.* Asimismo, y para poder participar del Programa Externo, el o la estudiante debe tener un índice académico general de 3.50 o más. El estudiantado que participe de estos programas estará bajo la supervisión directa



del (de la) abogado(a) que se asigne en su centro de trabajo y bajo la supervisión directa del (de la) Director(a) de la Clínica de esta facultad. *Id.*

Para graduarse, el estudiantado diurno tiene que estar un mínimo de 3 años y un máximo de 7. Véase Apéndice VI del Informe, pág. 436. De forma similar, el estudiantado nocturno tiene que estar 4 años mínimo y 7 años máximo. *Id.* Lo anterior, como parte de los estándares impuestos por la ABA. *Id.*

**d. Medidas empleadas durante los estudios conducentes al grado de *Juris Doctor* para evaluar el aprovechamiento académico de los egresados y las egresadas**

Según se indica en la Política Académica de la Escuela de Derecho de la PUCPR para los años académicos 2013 a 2015, el o la estudiante matriculado(a) en el programa de *Juris Doctor* debía mantener un índice académico general de 2.00 o más por semestre. Véase Apéndice VI del Informe, pág. 415. Lo contrario activaba medidas, tales como colocar al estudiante en probatoria o suspensión. Como ejemplo, el o la estudiante que obtenía un índice académico general menor a 2.00 pero mayor a 1.75, era clasificado(a) bajo probatoria de forma automática. *Id.* En tales casos, y entre otras condiciones, el o la estudiante debía aprobar el próximo semestre con un índice académico general y acumulativo de 2.00, respectivamente, para poder continuar en el referido programa. En igual dirección, un(a) estudiante podía recibir una alerta académica y ser referido(a) al Programa de Apoyo Académico y Preparación para la Reválida si durante un semestre lograba entre 2.00 y 2.49 en el índice académico acumulativo. *Id.*

Para los años académicos antes mencionados, si un(a) estudiante era dado(a) de baja académica automática —por tener un índice académico acumulativo menor de 1.75 en su primer semestre o de 2.00 a partir de su segundo semestre—, no podía solicitar la readmisión. Según expone la institución educativa de referencia, para esta época el o la estudiante que se encontrara en esa situación tenía que esperar 2 años y solicitar la admisión como estudiante de nuevo ingreso. Véase Apéndice VI del Informe, pág. 422.



La actual política en el programa de *Juris Doctor* de la Escuela de Derecho de la PUCPR, en cuanto a los estándares académicos y normas de progreso académico, posee 4 clasificaciones, a saber: (1) satisfactorio o *good standing*; (2) alerta académica; (3) probatoria académica, y (4) baja académica. Véase Apéndice VI del Informe, págs. 449-451. El o la estudiante que mantenga un índice académico acumulativo de 3.00 o más cumple con la clasificación de satisfactorio. *Id.* Es decir, el o la estudiante que obtenga un índice académico acumulativo de 3.00 o más y que no se encuentre bajo las disposiciones de probatoria por semestre, se considera en estatus satisfactorio o de *good standing*. *Id.* No obstante, y cuando esta puntuación disminuya a 2.99 o menos, el o la estudiante se sujetará a una alerta académica, probatoria académica o baja académica, según sea el caso. *Id.*

Una *alerta académica* se recibe cuando el índice académico acumulativo es de 2.50 a 2.99 al completar un semestre —en sesión diurna o nocturna—o en cualquier momento. Véase Apéndice VI del Informe, págs. 449-451. Se le notificará por carta al estudiante que tiene que participar de los servicios del Programa de Apoyo Académico y Preparación para la Reválida y cumplir con todos los requisitos o condiciones que dicho programa estime pertinente, por ejemplo, "la restricción o limitación de créditos de doce (12) a catorce (14) créditos que podrán ser matriculados el próximo semestre". *Id.*, pág. 449. Según la información recibida, "el aviso de alerta académica es automático una vez se registre la última nota del estudiante en el registro oficial de notas de dicho semestre". *Id.*, pág. 450. Esta alerta cumple el propósito de concienciar al estudiante de su situación académica e informarle de los recursos que tiene disponibles para ayudarle a mejorar su desempeño académico. En estos escenarios, el Programa de Apoyo Académico y Preparación para la Reválida prepara un plan encaminado a mejorar el rendimiento académico y el programa de clases del próximo semestre, el cual estará sujeto a varias condiciones.



Según se informa en los documentos entregados a esta Comisión Especial, cuando un estudiante obtenga un índice académico acumulativo de 2.00 a 2.49 en cualquier semestre, se considera automáticamente en periodo de *probatoria académica* en el siguiente semestre. Véase Apéndice VI del Informe, pág. 450. Se referirá al o a la estudiante al Programa de Apoyo Académico que hemos mencionado. El aviso se da de manera automática tras el registro de la última nota del estudiante en el registro oficial de notas del semestre. El o la estudiante en probatoria académica debe obtener un promedio de 2.50 o más durante el próximo semestre para poder continuar sus estudios de *Juris Doctor* en esta institución. *Id.* Además, el o la estudiante se sujetará a las normas, los requisitos o las condiciones razonables que el Comité de Admisiones considere pertinentes para mejorar las deficiencias académicas. *Id.* El estudiantado en probatoria académica no podrá matricularse en la sesión de verano. En esta facultad, el o la estudiante tendrá derecho a 2 probatorias en la carrera de *Juris Doctor*. *Id.*

Ahora bien, si el o la estudiante obtiene un índice académico acumulativo de 1.99 o menos en cualquier semestre, será dado(a) de baja de forma automática de la Escuela de Derecho de la PUCPR. Véase Apéndice VI del Informe, pág. 450. Igualmente, se clasificará con una baja académica al o a la estudiante que no haya cumplido el 50% de pases de créditos en un semestre. *Id.*

A tenor de lo anterior, el o la estudiante que sufra una baja académica y haya agotado su derecho a 2 probatorias, y que en su tercer intento su índice académico esté por debajo de 1.99, será inelegible para solicitar readmisión. Véase Apéndice VI del Informe, págs. 450-451. En la información sometida por la Escuela de Derecho de la PUCPR se indica que un(a) estudiante podrá solicitar readmisión cuando: (1) se acogió a una baja total voluntariamente por razones de salud, servicio militar, razones económicas y otras estipuladas en la sección de Calificaciones de la Política Académica; (2) esté clasificado(a) como que no completó el semestre anterior, o (3) la baja académica fue a consecuencia de no



cumplir con el 50% de los créditos intentados y cumple con el índice académico general 2.00 o más.[25] *Id.*

Por último, en la Tabla Núm. 10 se muestra que el número de estudiantes reportados con la clasificación de baja académica fluctuó entre 2 y 20 de una población global ascendente a los 502 y hasta 850 estudiantes activos durante los semestres académicos del periodo de tiempo evaluado en este Informe. Véase Apéndice VI del Informe, pág. 482. Como se observa, el mayor número de estudiantes con la clasificación de baja académica fue de 20 en el semestre académico iniciado en enero de 2012 frente a una matrícula total de 849, lo que representó 2.36 % cuando se compara con la población global activa para ese entonces.

Tabla Núm. 10: Número de estudiantes con clasificación de baja académica en relación con estudiantes activos en la Escuela de Derecho de la PUCPR por año académico

| Año académico | Bajas académicas | Estudiantes activos | Porciento de bajas académicas |
|---|---|---|---|
| 2007-2008 agosto-diciembre | 5 | 585 | 0.85 % |
| 2007-2008 enero-mayo | 7 | 605 | 1.16 % |
| 2008-2009 agosto-diciembre | 4 | 621 | 0.64 % |
| 2008-2009 enero-mayo | 4 | 625 | 0.64 % |
| 2009-2010 agosto-diciembre | 5 | 696 | 0.72 % |
| 2009-2010 enero-mayo | 14 | 723 | 1.94 % |

---

[25] Para conocer en detalle el proceso de readmisión en la precitada Escuela de Derecho de la PUCPR, véase Apéndice V del Informe, págs. 450-453.



| | | | |
|---|---|---|---|
| 2010-2011 agosto-diciembre | 8 | 784 | 1.02 % |
| 2010-2011 enero-mayo | 11 | 817 | 1.35% |
| 2011-2012 agosto-diciembre | 9 | 850 | 1.06 % |
| 2011-2012 enero-mayo | 20 | 849 | 2.36 % |
| 2012-2013 agosto-diciembre | 11 | 816 | 1.35 % |
| 2012-2013 enero-mayo | 10 | 777 | 1.29 % |
| 2013-2014 agosto-diciembre | 10 | 706 | 1.42 % |
| 2013-2014 enero-mayo | 7 | 653 | 1.07 % |
| 2014-2015 agosto-diciembre | 5 | 585 | 0.85 % |
| 2014-2015 enero-mayo | 3 | 548 | 0.55 % |
| 2015-2016 agosto-diciembre | 7 | 560 | 1.25 % |
| 2015-2016 enero-mayo | 2 | 519 | 0.39 % |
| 2016-2017 agosto-diciembre | 5 | 515 | 0.97 % |
| 2016-2017 enero-mayo | 0 | 502 | 0.00 % |



### e. Medidas empleadas para la preparación de los y las aspirantes al ejercicio de la abogacía y la notaría

Entre las medidas que ha implementado la Escuela de Derecho de la PUCPR en los pasados años en el renglón bajo estudio se destaca el Programa de Apoyo Académico y Preparación para la Reválida el cual se reorganizó desde el año académico 2013 para ofrecer servicios como: consejería académica; supervisión, organización y colaboración de los programas de tutorías; mentoría; ofrecimiento de exámenes compresivos; desarrollo y actualización del Taller de Preparación para la Reválida —taller que, como adelantamos, es un requisito para graduación—, entre otros. Por igual, y según nos detalló el personal administrativo de esta institución educativa, este programa también organiza y ofrece las pruebas de reválida simuladas que llaman "Baby Bar I" y "Baby Bar II".

El Baby Bar I se toma luego de haber aprobado de forma satisfactoria los cursos de derecho de familia, derecho de penal, reales, ética y derecho constitucional. Este examen simulado tiene un fin diagnóstico y persigue medir las destrezas de los y las estudiantes contestando preguntas de selección múltiple, así como la estructura implementada para responder preguntas de discusión. El *Baby Bar I* contiene 78 preguntas de selección múltiple y 1 pregunta de discusión.

El Baby Bar II se ofrece como parte del Taller de Preparación para la Reválida en el último semestre de estudios. Esta prueba simulada contiene 86 preguntas de selección múltiple y 1 pregunta de discusión. Ambos exámenes simulados son evaluados en cuanto a su coeficiente de confiabilidad mediante la técnica del "re-test" y los ejercicios utilizados son revisados cada noviembre.

### f. Otros hallazgos de interés

El sistema de calificación de la Escuela de Derecho de la PUCPR durante el tiempo bajo estudio y hasta la fecha ha sido el siguiente: A = 90-100% o 4.0; B+



= 85–89% o 3.5; B = 80-84% o 3.0; C+ = 75-79% o 2.5; C = 70-74% o 2.0; D = 65-69% o 1.0; F = 0-64% o 0.0. Véase Apéndice VI del Informe, pág. 442. Otras calificaciones o anotaciones utilizadas en esta institución educativa son: P = aprobado; NP = no aprobado; W = baja voluntaria; W1 = baja por servicio militar; W2 = baja por enfermedad; W3 = baja administrativa; W4 = baja por disciplina; W5= baja por muerte; W7 = baja por problemas de trabajo; W9 = transferencia a otra institución; WU = baja por dejar de asistir a clases; I = incompleto; E = extensión; AU = oyente. *Id.*, pág. 443.

En la Política de Admisión vigente en el 2016 en la Escuela de Derecho de la PUCPR se señala que en esta facultad "la calificación mínima para aprobar un curso es C". Apéndice VI del Informe, pág. 418. En la Política Académica vigente desde el 2018 se expresa que el o la estudiante que obtenga una clasificación de D o F tendrá que repetir el curso hasta obtener una nota satisfactoria. *Id.*, pág. 454.

En esa dirección, se indica que un curso se considera aprobado cuando se obtiene una calificación de A, B+, B, C+ y C; calificaciones finales que, por lo tanto, no pueden repetirse. Véase Apéndice VI del Informe, págs. 444, 454. Ahora bien, en lo relacionado a las calificaciones de cursos repetidos —con excepción de la calificación más alta—, se eliminarán en el cómputo para progreso académico y para índice de graduación. En igual dirección,

> [e]n el expediente académico se colocará una anotación especial "E" a cada curso repetido y excluido del promedio general. El estudiante tiene derecho a tomar un curso requisito en tres ocasiones, si al tercer intento el estudiante no obtiene una nota satisfactoria queda automáticamente dado de baja aun teniendo promedio académico requerido. *Id.*, pág. 454.

Acorde con lo anterior, la aludida institución educativa también informó la cantidad de estudiantes que se gradúan con honores por clase graduada desde el 2010 hasta el 2019. Véase Apéndice VI del Informe, pág. 623. Aunque con



ciertas variaciones, la cantidad total de honores que otorgó esta institución a las clases graduadas se mantuvo entre los 59 y los 83 honores.

Tabla Núm. 11: Honores otorgados por la Escuela de Derecho de PUCPR a las clases graduadas de 2010 al 2019

| Clase graduada | *Summa Cum Laude* 3.70 - 4.00 | *Magna Cum Laude* 3.40- 3.69 | *Cum Laude* 3.20- 3.39 | Total de honores |
|---|---|---|---|---|
| 2010 | 6 | 31 | 33 | 70 |
| 2011 | 5 | 36 | 35 | 76 |
| 2012 | 4 | 34 | 39 | 77 |
| 2013 | 9 | 28 | 37 | 74 |
| 2014 | 4 | 28 | 34 | 66 |
| 2015 | 9 | 23 | 34 | 66 |
| 2016 | 7 | 24 | 42 | 73 |
| 2017 | 15 | 25 | 32 | 72 |
| 2018 | 4 | 24 | 31 | 59 |
| 2019 | 5 | 34 | 44 | 83 |

La puntuación del índice académico general para recibir honores en esta facultad aumentó desde diciembre de 2020 y actualmente se otorgan de la forma siguiente: *Summa Cum Laude* a quienes obtuvieron un índice académico general de 3.80 a 4.00; *Magna Cum Laude* a quienes alcanzaron un índice académico general de 3.50 a 3.79, y *Cum Laude* a quienes obtuvieron un índice académico general de 3.30 a 3.49. Véase Apéndice VI del Informe, págs. 437, 621.

Asimismo, la Escuela de Derecho de la PUCPR anejó el número de profesores y profesoras a tiempo completo y a tiempo parcial que impartieron los cursos de reválida por cada año académico bajo estudio. Véase Apéndice VI del Informe, págs. 628-631. Sobre este particular, la facultad explicó que los profesores a tiempo completo son quienes ostentan los rangos de Catedrático Auxiliar, Catedrático Asociado o Catedrático, de acuerdo con los estándares de ascenso en rangos de esa institución educativa. *Id.* Por otro lado, indicó que los profesores adjuntos o a tiempo parcial son a quienes contratan, típicamente, por semestre académico y que no ostentan rango alguno dentro de la institución. De



un examen de los datos reportados en este renglón surge que son los profesores y las profesoras a tiempo completo quienes imparten la gran mayoría de los cursos en materia de reválida. *Id.*

Por otro lado, esta facultad informó que no lleva un registro del número de aspirantes que solicitaron por primera vez la admisión a alguna reválida de derecho en Estados Unidos ni cuántos de estos aprobaron dicho examen dentro del periodo de tiempo bajo estudio. Véase Apéndice VI del Informe, pág. 411. Expresó que tampoco registran el número de estudiantes por año académico que mantenían un trabajo mientras estudiaban. *Id.*

Resaltamos que esta facultad entregó los siguientes estudios o informes estadísticos, los cuales se anejan en este Informe:

1. Estudio sobre los criterios y fórmulas para la admisión a la Escuela de Derecho PUCPR (marzo de 2013). Véase Apéndice VI del Informe, págs. 574-583.

2. Revision of the PUCPR's Law School Admission's Formula (marzo de 2017, revisado en octubre de 2020). Véase Apéndice VI del Informe, págs. 584-593.

3. Estudio de la relación entre la aprobación de los cursos de leyes con puntuaciones de B o más y el resultado del examen de reválida: Egresados 2015-2018 (febrero de 2019). Véase Apéndice VI del Informe, págs. 594-613.

4. Predictors of Bar Exam Performance of Students in the Juris Doctor Program at the PUCPR (agosto de 2019). Véase Apéndice VI del Informe, págs.614-618.

La Escuela de Derecho de la PUCPR tiene un presupuesto anual de $5.1 millones de dólares. Recientemente, y según se le informó a la Comisión Especial, la Junta de Síndicos de esta institución educativa asignó unos $6.2 millones de dólares para la remodelación del edificio sede de su Escuela de Derecho.

Destaca que su población estudiantil es mayormente de las regiones sur, central y oeste de la Isla (equivalente al 61% de su población de estudiantes),



cifra que representa, según el personal administrativo de la institución, un importante aspecto geográfico de acceso al estudio del Derecho en Puerto Rico. Véase Apéndice VI del Informe, pág. 632.

Mapa de la distribución del estudiantado admitido a la Escuela
de Derecho de la PUCPR en agosto de 2021 por pueblo de procedencia





## C. Hallazgos globales y primeras impresiones: la suma de las tres escuelas de derecho

### a. Perfil del estudiantado de nuevo ingreso

*- Número global de estudiantes de nuevo ingreso por año académico*

Gráfica Núm. 16: Número de estudiantes de nuevo ingreso matriculados en las escuelas de derecho de Puerto Rico por año académico



De la Gráfica Núm. 16 surge que el número de estudiantes de nuevo ingreso que matricularon las escuelas de derecho en Puerto Rico, miradas como un todo, fluctuó entre el amplio margen de los 310 y 117 estudiantes para los años académicos 2007 a 2017. En específico, la cifra más alta de 310 estudiantes fue reportada para el año 2011 por la Escuela de Derecho de la PUCPR, mientras que la más baja de 117 fue para el año 2017, reportada por esa misma facultad.

Si bien se observa que la Escuela de Derecho de la UPR, en este renglón, redujo la población de nuevo ingreso que matricula, la reducción fue más dramática en la matrícula de nuevo ingreso en las escuelas de derecho de la UIPR y de la PUCPR. Nótese, además, que la reducción en la población de nuevo ingreso matriculada en las escuelas de derecho de la UIPR y de la PUCPR se comenzó a reflejar particularmente en el 2012. Asimismo, de los datos informados por las referidas facultades surge que, para el año académico 2016, todas redujeron el número de estudiantes de nuevo ingreso que matricularon.

En síntesis, el número de estudiantes de nuevo ingreso matriculados en las 3 escuelas de derecho del País se redujo dramáticamente durante el periodo de tiempo evaluado en este Informe. Lo anterior es cónsono con el interés comunicado por las referidas facultades de reclutar y matricular estudiantes con mejores perfiles, en términos de las puntuaciones obtenidas en los parámetros de admisión requeridos, aunque también responde a una reducción en el número de solicitudes. En el caso específico de la Escuela de Derecho de la UPR, su personal administrativo informó que han mantenido una política de reclutamiento con un máximo de estudiantes por año académico, el cual al presente —como ya mencionamos— se encuentra fijado en 150.

Actualmente, el número de estudiantes de nuevo ingreso por año académico que matricula las 3 facultades mencionadas, fluctúa entre los 190 y 150 estudiantes. Se advierte que no necesariamente todas las escuelas de derecho en Puerto Rico tienen fijada una cuota de estudiantes o meta de reclutamiento.



*- Desempeño promedio en el examen estandarizado EXADEP global*

Gráfica Núm. 17: Puntuación promedio del estudiantado de nuevo ingreso de las escuelas de derecho de Puerto Rico en el examen estandarizado EXADEP por año académico



Según se observa en la Gráfica Núm. 17, las puntuaciones promedio reportadas en el examen estandarizado EXADEP por el estudiantado de nuevo ingreso matriculado en las 3 escuelas de derecho del País, tras evaluarlas conjuntamente, fluctuaron entre los 661 y 510 puntos para el periodo de tiempo bajo estudio. En particular, la puntuación promedio más alta informada para este examen fue de 661 puntos para el 2010 en la Escuela de Derecho de la UPR, en contraste con la puntuación promedio más baja de 510 para el 2017 reportada por la Escuela de Derecho de la PUCPR.

En ese sentido, notamos que la Escuela de Derecho de la UPR siempre informó puntuaciones promedio más altas para el examen EXADEP, seguida por la Facultad de Derecho de la UIPR y, finalmente, por la Escuela de Derecho de la PUCPR. Ahora bien, también surge que para los años académicos 2010 en



adelante las puntuaciones promedios reportadas por las 3 instituciones educativas de referencia comenzaron a reducirse, respetivamente. Desde esas fechas, y mirado como un todo, el promedio de la puntuación reportada en el EXADEP apenas superó los 625 puntos.

Cuando se le preguntó al personal administrativo de las aludidas escuelas de derecho sobre la marcada y continua reducción en las puntuaciones del EXADEP, todos coincidieron en que la compañía Educational Testing Service había reportado ciertos problemas con la administración del aludido examen. En particular, señalaron que el margen de error del examen, según reportado, había aumentado. En apoyo a lo antes señalado, la Escuela de Derecho de la UIPR compartió una guía publicada por la compañía que ofrecía el EXADEP, en donde se expone el margen del error en esta prueba. Véase Apéndice V del Informe, págs. 359-383.

Algunas de estas instituciones también mencionaron que requerían el EXADEP para contrarrestar el hecho de que el LSAT solo se ofrecía en inglés. No obstante, ante las inquietudes con el EXADEP junto a la nueva versión del LSAT en español, así como el aumento en la confiabilidad de la traducción de este último, las facultades expresaron que ya habían comenzado a contemplar la posibilidad de desistir del EXADEP como requisito de admisión.

En suma, para los años académicos 2007 a 2017 se registró una reducción significativa en la puntuación promedio del examen estandarizado EXADEP para los(as) estudiantes admitidos(as) en las 3 escuelas de derecho. A la fecha, el EXADEP no es un requisito de admisión en las Facultades de Derecho de Puerto Rico. Desde el 2020, la compañía Educational Testing Service dejó de ofrecer el mencionado examen.



*- Desempeño promedio en el examen estandarizado LSAT global*

Gráfica Núm. 18: Puntuación promedio del estudiantado de nuevo
ingreso de las escuelas de derecho de Puerto Rico
en el examen estandarizado LSAT por año académico



Como se observa en la Gráfica Núm. 18, las puntuaciones promedio que reportaron las 3 facultades de derecho en el examen estandarizado LSAT, analizadas conjuntamente, fluctuaron entre los 146 y 134 puntos. La puntuación promedio más alta en este examen fue de 146 puntos para los años 2010 y 2011 en la Escuela de Derecho de la UPR, mientras que la puntuación promedio más baja fue de 134 puntos para los años 2015 y 2017 en la Escuela de Derecho de la PUCPR.

Es decir, nuevamente la Escuela de Derecho de la UPR informó puntuaciones más altas, seguida por la Facultad de Derecho de la UIPR y, luego, por la Escuela de Derecho de la PUCPR. Según se desprende de los datos revisados por la Comisión Especial, la Escuela de Derecho de la UPR se mantuvo en las puntuaciones promedios de los 146 y 143 puntos, mientras que la Facultad de Derecho de la UIPR reportó puntuaciones promedio entre los 139 y



137 puntos, y la Escuela de Derecho de la PUCPR informó puntuaciones promedio entre los 136 y 134 puntos.

En resumen, las 3 escuelas de derecho del País, si bien con una baja mínima, reportaron puntuaciones promedio relativamente constantes en el examen estandarizado LSAT para el periodo de tiempo bajo estudio. Así también, las referidas facultades expresaron que actualmente la puntuación promedio reportada por el estudiantado de nuevo ingreso que matriculan, en cierta forma, ha aumentado o, al menos, a ello aspiran. Así, por ejemplo, la Escuela de Derecho de la UPR informó que en años recientes la puntuación promedio para el LSAT reportada ronda los 148 puntos. Asimismo, la Escuela de Derecho de la PUCPR sostuvo que sigue aspirando a que, como mínimo, se informe una puntuación de 135.

*- Promedio del índice académico general subgraduado global*

Gráfica Núm. 19: Puntuación promedio del índice académico general subgraduado del estudiantado de nuevo ingreso de las escuelas de derecho de Puerto Rico por año académico





De la Gráfica Núm. 19 surge que el promedio del índice académico general a nivel subgraduado que reportaron las 3 escuelas de derecho fluctuó entre los 3.53 y 3.18 para los años académicos 2007 a 2017. Específicamente, la puntuación promedio de 3.53 fue la más alta para el año 2008 en la Escuela de Derecho de la UPR, mientras que la puntuación promedio de 3.18 fue la más baja para los años 2012 y 2015 en la Facultad de Derecho de la UIPR.

En síntesis, el promedio del índice académico general a nivel subgraduado, si bien con una baja mínima, se mantuvo relativamente estable en las escuelas de derecho de la UPR y la UIPR, mientras que, para la Escuela de Derecho de la PUCPR aumentó en el periodo de tiempo evaluado en este Informe. Actualmente, las 3 instituciones educativas de referencia comunicaron su interés en aumentar este promedio, toda vez que reconocen su potencial relación con el porciento de aprobación del examen de admisión al ejercicio de la abogacía.

## c. Parámetros de reclutamiento y admisión

Al examinar la suma de las Facultades de Derecho en Puerto Rico, observamos que la Escuela de Derecho de la UPR admite y matricula estudiantes únicamente para el primer semestre de cada año académico, mientras que las Facultades de Derecho de la UIPR y la PUCPR realizan dicho proceso en agosto y enero de cada año. Ahora bien, para el periodo de tiempo bajo estudio, estas instituciones educativas utilizaron y requirieron criterios similares de admisión, como las puntuaciones obtenidas en los exámenes estandarizados EXADEP y LSAT junto a la puntuación del índice académico general subgraduado. Estos parámetros, descritos como objetivos, en ocasiones —y bajo circunstancias particulares según delimitadas y definidas por cada facultad—, podían combinarse con otros factores a la hora de considerar la admisión de un(a) candidato(a).

En esa línea, llama la atención que 2 de las 3 escuelas de derecho —la UPR y la UIPR— admitieron y admiten estudiantes automáticamente a base de un



cálculo mediante el cual les otorgan determinado peso a las puntuaciones reportadas en los mencionados requisitos objetivos. Por otro lado, la Escuela de Derecho de la PUCPR lleva a cabo un proceso de 2 fases para determinar si admite o no a un(a) candidato(a), a saber, la fase de evaluación de las puntuaciones y la fase de entrevista.

Cabe señalar que todas las escuelas de derecho consideran otros factores para admitir un grupo adicional de estudiantes, lo que en ocasiones denominan admisión condicionada. Es decir, las facultades de referencia admiten estudiantes no solo a base de las puntuaciones objetivas reportadas, sino que también, y en determinadas ocasiones, en consideración a otros factores, a saber: extracurriculares, económicos, sociales y culturales. Esto responde, en muchas instancias, a políticas y estándares de inclusión, diversidad y acceso al estudio del Derecho.

En suma, las 3 escuelas de derecho en Puerto Rico admitieron estudiantes en consideración a las puntuaciones obtenidas en ciertos requisitos objetivos (entiéndase, puntuaciones en el EXADEP, LSAT Y GPA subgraduado), así como en consideración a otros factores (diversos aspectos extracurriculares y sociales) para los años académicos 2007 a 2017. Las aludidas facultades informaron que para el proceso de admisión cuentan con cierto comité, el cual atiende dicho trámite, entre otros asuntos, de carácter académico-curricular.

Actualmente, las escuelas de derecho del País requieren que el candidato o la candidata reporte la puntuación obtenida en el examen estandarizado del LSAT, así como el índice académico subgraduado, junto a otros documentos, como cartas de presentación, ejemplos de escritos, entrevistas, entre otros. Empero, como hemos adelantado, el examen estandarizado EXADEP fue eliminado del listado de requisitos para la admisión a una Escuela de Derecho en el País. Dicho esto, debe también mencionarse que las 3 instituciones expresaron que no divulgan ni excluyen una puntuación mínima o exigen una en particular en el proceso de admisión.



### d.  Currículos académicos: cursos requisitos y electivos

En cuanto a este renglón, y al analizar la información entregada por las facultades antes aludidas, llama la atención que la Escuela de Derecho de la UPR no incluye en su secuencia curricular todos los cursos de materias de reválida como requisito de graduación, lo que es distinto a las escuelas de derecho de la UIPR y de la PUCPR. Ahora bien, según informó la Escuela de Derecho de la UPR, la mayoría de su estudiantado se gradúa habiendo cursado todas las materias de reválida.

Por otro lado, de la información recopilada surge que todas las escuelas de derecho en Puerto Rico requieren que su estudiantado tome determinados créditos en cursos de seminarios para así procurar su desarrollo en la redacción e investigación jurídicas. Igualmente, todas las secuencias curriculares que presentaron las instituciones educativas de referencias contienen cursos prácticos o clínicas de asistencia legal. Las 3 escuelas de derecho en nuestra jurisdicción exigen cierta puntuación mínima —usualmente igual o mayor a 2.00— en el índice académico general como norma de progreso y condición para continuar los estudios conducentes al grado de *Juris Doctor*.

Por último, observamos también que las secuencias curriculares de las mencionadas facultades están estructuradas en dos programas como mínimo, a saber: el diurno y el nocturno.[26] Según el programa y, consecuentemente, la secuencia curricular, el estudiante deberá completar su grado de *Juris Doctor* en determinada cantidad de años, nunca mayor a 7 años según exigido por los estándares de la ABA. Como norma general, los y las estudiantes que se matriculan en el programa diurno deben completar el grado en un mínimo de 3 años, mientras que la matrícula del programa nocturno deberá hacerlo en un mínimo de 4 años.

---

[26] Debe mencionarse que, dado a que algunas facultades de derecho admiten estudiantes en agosto y enero, la secuencia curricular también se ajusta a ese particular.



En resumen, aunque 1 de las 3 escuelas de derecho no exige todas las materias de reválida como requisito de graduación, lo cierto es que la mayoría del estudiantado se gradúa habiendo completado estos cursos. A la fecha, las facultades de referencia informaron que sus secuencias curriculares no han sufrido grandes cambios.

**e. Medidas empleadas durante los estudios conducentes al grado de *Juris Doctor* para evaluar el aprovechamiento académico de los egresados y las egresadas**

De la información provista por las escuelas de derecho en Puerto Rico, y en lo relacionado a las medidas que estas han utilizado para evaluar el aprovechamiento académico de sus egresados y egresadas, se infiere que todas han implantado algún tipo de política o norma de retención o de progreso académico. Por esto poseen también distintas medidas o alertas disciplinarias, según el indicé académico general que un(a) estudiante va acumulando a lo largo del grado de *Juris Doctor*. Cuando un(a) estudiante entra, por ejemplo, en un estatus o clasificación de alerta, probatoria o suspensión por deficiencia académica, cada una de estas instituciones activa determinados reglamentos y protocolos a esos fines. La suspensión por deficiencia académica puede ser evaluada en distintas etapas, según la Escuela de Derecho en cuestión. En ocasiones, el o la estudiante suspendido(a) podrá ser readmitido(a) bajo criterios específicos que, aunque bastante similares, pueden varían por institución educativa. De ser readmitido en cualquiera de las facultades de derecho, la institución le prepara un plan al (a la) estudiante dirigido a encaminar el progreso académico deseado dentro de determinado periodo probatorio.

A tales efectos, las escuelas de derecho en el País cuentan con programas, oficinas u oficiales administrativos que apoyan a sus estudiantes en la gestión de procurar un progreso académico satisfactorio. Incluso, esta planificación curricular y de progreso académico es, en ocasiones, un requisito para mantenerse como estudiante activo(a) en el programa de *Juris Doctor*.



A los fines de ilustrar algunas de estas medidas para evaluar el aprovechamiento académico de los y las estudiantes, la Facultad de Derecho de la UIPR al igual que la PUCPR exigen que los cursos requisitos sean aprobados con una calificación de C o más. Del mismo modo, la Facultad de Derecho de la UIPR recientemente implementó la norma de progreso académico que exige que la puntuación mínima en el índice académico acumulativo de *Juris Doctor* sea progresivo, comenzado en 2.25 el primer año, 2.50 en el segundo año, 2.75 en el tercer año si el estudiante es parte del programa diurno, o 2.50 si es del nocturno, y 2.75 en el cuarto año. Por su parte, la Escuela de Derecho de la PUCPR tiene una política de progreso académico organizada en 4 clasificaciones, a saber: (1) satisfactorio o *good standing*; (2) alerta académica; (3) probatoria académica, y (4) baja académica.

Por último, destacamos que el número de estudiantes suspendidos o clasificados con una baja académica, por año académico, en comparación con la población total de estudiantes activos(as) para ese año, es relativamente bajo. Véanse las tablas Núms. 2, 6 y 10 de este Informe, que reflejan por Escuela de Derecho la cantidad de estudiantes suspendidos(as) o dados(as) de baja por deficiencia académica.

Puede concluirse que las 3 escuelas de derecho en Puerto Rico implementaron o agudizaron las medidas empleadas para evaluar el aprovechamiento académico del estudiantado matriculado en el programa de *Juris Doctor* durante el periodo de tiempo bajo estudio. Actualmente, como hemos dicho, muchas de estas políticas se han revisado, actualizado o continuado.

### f. Medidas empleadas para la preparación de los y las aspirantes al ejercicio de la abogacía y la notaría

Entre las medidas dirigidas al proceso de preparación de los egresados y las egresadas para los exámenes de admisión a la profesión legal, implantadas



por las 3 escuelas de derecho en Puerto Rico, se destaca que todas han creado un programa u oficina para, entre otras cosas, realizar esta gestión de apoyo. Estos programas u oficinas son: la Oficina de Asesoría Académica y Consejería de la UPR, la Oficina de Apoyo Académico de la UIPR y el Programa de Apoyo Académico y Preparación para la Reválida de la PUCPR.

Así también, las 3 facultades de referencia informaron que realizan exámenes simulados, también conocidos como los Baby Bar. Tanto así, que las Escuelas de Derecho de la UIPR y de la PUCPR administran estos exámenes simulados como parte de un curso requisito de graduación enfocado únicamente en la preparación de los exámenes de admisión a la profesión legal. Por ejemplo, desde el 2013, la Escuela de Derecho de la PUCPR requiere que el estudiante matriculado en el programa de *Juris Doctor* complete el Taller para la Preparación de la Reválida durante su último semestre y, más recientemente, exige también que, como parte de ese taller, el y la estudiante apruebe de manera satisfactoria un segundo examen simulado o Baby Bar II. De forma similar, la Facultad de Derecho de UIPR también ofrece un curso obligatorio de preparación del Examen de Reválida, así como un examen simulado.

Por otro lado, la Escuela de Derecho de la UPR ofrece los exámenes simulados de manera voluntaria. Como hemos indicado, recientemente esta institución educativa volvió a ofrecer el servicio de repasos tanto para la Reválida General como la Notarial. A su vez, la Facultad de Derecho de UIPR informó que, además de implementar las medidas a las que hemos hecho referencia, han desarrollado un sistema de avalúo del aprendizaje en todos sus cursos, tras un esfuerzo conjunto de la administración, su profesorado y los recursos externos expertos en la materia de la enseñanza.

Por último, y relacionado con este asunto, debe señalarse que las medidas y políticas de progreso académico adoptadas por las instituciones educativas de referencia, y las cuales abordamos en el acápite anterior, también se han continuado ajustando para procurar un desempeño y aprovechamiento



académico máximo que redunde en una mejor puntuación o nota de pase en los exámenes de admisión a la abogacía y notaría que se ofrecen en nuestra jurisdicción.

En fin, durante el periodo de tiempo evaluado en este Informe, las 3 escuelas de derecho crearon o continuaron desarrollando algún tipo de oficina o programa dirigido, principalmente, a apoyar su estudiantado no solo en las gestiones que procuran su mayor aprovechamiento académico, sino en la preparación para los exámenes de admisión a la profesión legal. Actualmente, y según expresaron las mencionadas facultades, estas medidas de apoyo a los egresados y a las egresadas se continúan implementado. No obstante, es preciso mencionar que los resultados de dichos esfuerzos —por ejemplo, de ofrecer y fortalecer los exámenes simulados—, no son objeto de estudio en el este Informe, por lo que sus efectos se podrán observar, en los próximos exámenes de admisión al ejercicio de la abogacía que se administren.

### g. Otros hallazgos de interés

De la información presentada por las escuelas de derecho surge que estas implantan un sistema de calificación bastante similar dentro de una escala de 4.00 por crédito aprobado durante el periodo de tiempo evaluado en este Informe. Por igual, surge que este sistema de calificación se mantiene en el presente.

En cuanto a la otorgación de honores por clase graduada, las 3 Facultades de Derecho informaron un sistema bastante similar, aunque con puntuaciones distintas, para el periodo de tiempo bajo estudio. Así, por ejemplo, fueron *Summa Cum Laude* en la Escuela de Derecho de UPR quienes obtuvieron un índice académico general de 3.96 a 4.00; en la Facultad de Derecho de la UIPR lo fueron quienes alcanzaron entre 3.75 a 4.00, y en la Escuela de Derecho de la PUCPR, quienes reportaron entre 3.70 a 4.00.

De forma similar sucede con quienes obtuvieron el grado de *Magna Cum Laude.* En la Escuela de Derecho de UPR fueron *Magna Cum Laude* los y las



estudiantes que obtuvieron un índice académico general de 3.50 a 3.95. En la Facultad de Derecho de UIPR lo fueron quienes reportaron puntuaciones entre 3.50 a 3.74. En la Escuela de Derecho de PUCPR lo fueron quienes obtuvieron puntuaciones entre 3.40 a 3.69.

Se distinguieron con la calificación de *Cum Laude* en la Escuela de Derecho de UPR quienes lograron un índice académico general de 3.33 a 3.49. Por su parte, en la Facultad de Derecho de UIPR, recibieron este honor quienes reportaron un índice entre los 3.25 a 3.40, y en la Escuela de Derecho de PUCPR, quienes obtuvieron puntuaciones entre 3.20 a 3.39. La Escuela de Derecho de la PUCPR subrayó que, desde finales de 2020, aumentaron la puntuación para otorgar estos honores, mientras que las otras dos Facultades de Derecho han mantenido las puntuaciones antes aludidas.

Por otra parte, también surge que las materias de reválida se ofrecen mayormente por profesores y profesoras a tiempo completo o catedráticos(as) en todas las Facultades de Derecho a las que hemos hecho referencia. Por igual, las Escuelas de Derecho de la UPR y de la PUCPR compartieron varios estudios e informes estadísticos que han realizado para revisar sus criterios o parámetros de admisión, el desempeño de sus egresados y egresadas en el *Juris Doctor*, y las puntuaciones que estos y estas reciben en el examen de admisión al ejercicio de la abogacía, entre otros relacionados. Copia de estos estudios se incluyen en el Apéndice de este Informe. Véanse: Apéndice IV del Informe, págs. 206-258; Apéndice VI del Informe, págs. 574-618.

La Escuela de Derecho de la PUCPR, distinto a las otras 2 escuelas de derecho, destacó que tiene la particularidad geográfica de recibir un porciento significativo de estudiantes provenientes de los pueblos ubicado en el suroeste de la Isla, lo que promueve el acceso al estudio del Derecho en nuestra jurisdicción. Véase Apéndice VI del Informe, pág. 632.

Finalmente, de la información recibida por esta Comisión Especial surge que ninguna de las escuelas de derecho de Puerto Rico registró datos



relacionados al número de estudiante que trabajó mientras cursaba el grado de *Juris Doctor* durante el periodo de tiempo bajo estudio. Similarmente, las Escuelas de Derecho de la UIPR y de la PUCPR expresaron que no poseen el número de aspirantes primerizos(as) que solicitó admisión a alguna reválida de derecho en Estados Unidos ni cuántos de estos o estas aprobaron dicho examen. Sobre esto último, llama la atención que de los 13 estudiantes que sí reportó la Escuela de Derecho de la UPR, solo 2 aprobaron una reválida en otra jurisdicción durante el periodo de tiempo para el cual se requirió la información.



## V. Segundo informe psicométrico: *Puerto Rico Bar Examination Applicant Comparability Evaluation 2010-2020*

Como parte de los esfuerzos realizados por el Tribunal Supremo de Puerto Rico para atender la inquietud relacionada a la baja que ha experimentado el porciento de aprobación de la Reválida General —utilizando para ello la información y los datos recopilados por la Junta Examinadora y esta Comisión Especial—, se le solicitó a la compañía ACS Venture, LLC que trabajara un segundo informe psicométrico en el que se evaluara de manera empírica el desempeño de los y las aspirantes en el periodo de tiempo comprendido entre los años 2010 a 2020.[27] En respuesta el 9 de noviembre de 2021 la mencionada compañía entregó un informe titulado *Puerto Rico Bar Examination Applicant Comparability Evaluation 2010-2020.* Véase Apéndice VII del Informe, págs. 633-647.

El análisis en el aludido informe procura responder 3 interrogantes: (1) ¿cuál es la relación entre los indicadores de admisión EXADEP y LSAT, el índice académico de *Juris Doctor* (*law school* GPA) y el desempeño de los y las aspirantes que toman el examen de admisión al ejercicio de la abogacía en Puerto Rico?; (2) ¿cuál es el patrón de desempeño en los criterios de admisión, el índice académico de *Juris Doctor* (*law school* GPA) y el examen de admisión al ejercicio de la abogacía que puedan contribuir a la interpretación de los resultados?; (3) ¿cuál ha sido la ejecución respecto a las preguntas comunes del examen de admisión al ejercicio de la abogacía que se han repetido en dos o más ocasiones en el examen para los años pares desde el 2010 al 2020? Véase Apéndice VII del Informe, pág. 635.

---

[27] Estas fechas son en las que, de ordinario, se graduarían y tomarían los exámenes de admisión al ejercicio de la abogacía y notaría quienes fueron admitidos en los años académicos 2007 a 2017 en alguna Escuela de Derecho, y que es el periodo de tiempo bajo estudio en este Informe de la Comisión Especial.



Para responder estas preguntas, el doctor Buckendahl, en representación de ACS Venture, LLC, realizó una serie de análisis estadísticos enfocados en las características de las personas que tomaron el examen de admisión al ejercicio de la abogacía en los años 2010, 2012, 2014, 2016, 2018 y 2020. En particular, utilizó los datos que recopiló la Junta Examinadora y la Comisión Especial, específicamente los siguientes: la puntuación obtenida en el examen EXADEP y LSAT; el índice académico obtenido en el *Juris Doctor*; la Escuela de Derecho de procedencia; el estatus de primerizo(a); la puntuación total recibida en el examen de admisión al ejercicio de la abogacía, y la puntuación obtenida en las preguntas de selección múltiple y en las preguntas de discusión o ensayo.

En resumen, en lo relacionado a las primeras dos preguntas de investigación, el doctor Buckendahl señala que tras examinar y comparar los datos empíricos relacionados a los exámenes EXADEP y LSAT, y el índice académico general de *Juris Doctor* reportado por las personas examinadas en los años pares de 2010 a 2020, no surge un patrón claro que explique el declive en el porciento de aprobación observado en el examen de admisión al ejercicio de la abogacía. Sobre ello comenta que, si bien la puntuación reportada para el EXADEP ha experimentado un descenso, al igual que el porcentaje de aprobación del examen de admisión al ejercicio de la abogacía, la puntuación en el LSAT y el índice académico general de *Juris Doctor* se mantiene estable con el pasar del tiempo. Lo que se refleja, más dramáticamente, cuando se analizan los datos reportados por las personas examinadas por primera vez o primerizas (*first-time applicants*). En consecuencia, concluye que no aparenta haber una relación directa o fuerte entre la reducción en el porciento de aprobación de la Reválida General y los indicadores antes mencionados.

Por otro lado, señala que la intención de la tercera pregunta era determinar si las personas examinadas recientemente se prepearon del mismo modo para enfrentar el examen de admisión al ejercicio de la abogacía, si se comparan con aquellas examinadas en años anteriores. Para ese análisis se tomó en



consideración un grupo de preguntas de selección múltiple del examen de Reválida General denominadas como calibradores *(anchor multiple-choice items)*[28] utilizados en los años bajo estudio.

En esencia, el doctor Buckendahl explica que los valores que resultaron de sus análisis apoyan la hipótesis de que, a través de los años evaluados, las personas examinadas en el examen de admisión al ejercicio de la abogacía no se prepararon tan bien como las examinadas en años anteriores. Aclara que cualquier conclusión apoyada en el análisis que realizó es limitada, ya que la muestra examinada —14 calibradores— no necesariamente es suficiente. Al respecto, explica que estos fueron los únicos calibradores que coincidieron en las reválidas administradas en los años cubiertos en este estudio psicométrico. Sostiene que el promedio del nivel de dificultad de los calibradores examinados puede variar por razones distintas a la preparación de la persona examinada para enfrentar el examen. A modo de ejemplo, comenta el doctor Buckendahl que el contenido de una pregunta de selección múltiple, diseñada como calibrador, pudo haber sido extensamente discutido o enseñado a una persona examinada en un año —por haber sido considerada importante en ese entonces— mientras que otra de otro año no.

Establecido lo anterior, reitera que, aunque con algunas limitaciones, los datos examinados y los valores obtenidos apoyan empíricamente la hipótesis de que las personas examinadas en el 2020 no se prepararon tan bien para el examen si se compara con la población de personas examinadas anteriormente. Dicho de otro modo: "[t]he hypothesis that the steady decline in overall pass rate

---

[28] "On the Puerto Rico Bar Examination, the anchor items are a set of common multiple-choice items that are administered across multiple administrations to support the scaling and equating of the examinations. By using anchor items, test forms can be adjusted to account for any variability in the empirical difficulty of test forms and shifts in overall applicant ability. The statistical process of equating is an important step to ensure the overall consistency and meaning of the passing score for licensing examinations and helps to ensure the fairness of the exam across time". Apéndice VII del Informe, pág. 639.



on the Puerto Rico Bar Examination is a result of applicants being less prepared for the examination is supported by the decline in performance on the 14 anchor items administered on every test administration". Apéndice VII del Informe, pág. 643.



## VI. Conclusiones y recomendaciones

Luego de evaluada detenida y cuidadosamente la información y los datos recibidos por la Comisión Especial de los expertos en psicometría, de la Junta Examinadora, de la Escuela de Derecho de la UPR, de la Facultad de Derecho de la UIPR y de la Escuela de Derecho de la PUCPR, concluimos lo siguiente:

1.  El perfil de los egresados y las egresadas de las 3 escuelas de derecho en el País, mirado conjuntamente, si bien con una reducción mínima se mantuvo relativamente similar, excepto el desempeño de egresados y egresadas en el examen estandarizado EXADEP, el cual disminuyó drásticamente.

2.  No ocurrieron cambios significativos en las secuencias curriculares de las 3 escuelas de derecho durante el periodo de tiempo evaluado en este Informe. Según la información recopilada por esta Comisión Especial, la mayoría de los y las estudiantes que se gradúan de *Juris Doctor* en nuestra jurisdicción completan todas las materias que se examinan en la Reválida General.

3.  Los parámetros de reclutamiento y admisión utilizados por las referidas facultades de derecho en los años académicos bajo estudio fueron bastante similares. Las 3 escuelas de derecho utilizaron principalmente la puntuación obtenida en el EXADEP, LSAT y GPA subgraduado.

4.  Las medidas empleadas durante los estudios conducentes al grado de *Juris Doctor* para evaluar el aprovechamiento académico en las 3 instituciones educativas de referencia se han mantenido y, en ocasiones, ajustado o agudizado para procurar un mejor desempeño del estudiantado.

5.  Las medidas empleadas para la preparación de los y las aspirantes al ejercicio de la profesión legal se han intensificado en años recientes ante la reducción en el porciento de aprobación. Así, por ejemplo, en los últimos años todas las escuelas de derecho realizan algún tipo de esfuerzo, entre ellos: crear oficinas de apoyo, brindar repasos o talleres en preparación del examen y administrar exámenes de simulación. Estas iniciativas son de



reciente creación, por lo que en estos momentos no se puede evaluar su efectividad.

6. El doctor Buckendahl recomendó la disminución de la puntuación o nota mínima para aprobar la Reválida General dentro del rango de puntuaciones de 569 y 575 puntos ajustados. También recomendó que la puntuación mínima para aprobar la Reválida Notarial debe quedar entre el rango de 591 a 599 puntos ajustados. En ambos casos, según éste, la puntuación final que se fije debe también responder a factores de política pública, como, por ejemplo, los niveles de tolerancia en torno a la tipificación de errores de clasificación.

7. Asimismo, luego de examinar los datos que obran en la Junta Examinadora y los obtenidos por esta Comisión Especial, el doctor Buckendahl informó que llegaba a la conclusión de que las personas examinadas recientemente no se prepararon tan bien para el examen si se comparan con la población de personas examinadas en años anteriores.

8. En atención a todo esto, habiendo realizado un detenido y cuidadoso análisis de la totalidad de las circunstancias, y ante la ausencia de cualquier otro factor que pueda explicar claramente el descenso en el desempeño de los y las aspirantes al ejercicio de la abogacía en reválidas recientes, sugerimos adoptar la puntuación más baja dentro del rango recomendado por el doctor Buckendahl en su *primer* Informe Psicométrico, entiéndase, 569 puntos ajustados.

9. Respecto al examen de admisión al ejercicio de la notaría, recomendamos que la puntuación mínima o nota de pase para aprobarlo se mantenga en 596 puntos ajustados.

10. La encomienda de la Comisión Especial se limitó a la revisión de la nota de pase. No obstante, en el proceso se identificaron varios reclamos de la comunidad universitaria en el ámbito legal, así como de otras figuras, sobre



la deseabilidad de revisar, para avalar o variar, distintos componentes de la reválida, a saber:

a. La estructura y el contenido de los exámenes de admisión al ejercicio de la abogacía (como, por ejemplo, una sesión privada con miembros de la comunidad universitaria donde puedan estudiar el contenido de una muestra de las preguntas de selección múltiple y otra sesión privada en donde los psicómetras seleccionados por cada Escuela de Derecho puedan reunirse con el psicómetra de la Junta Examinadora para compartir impresiones sobre estos exámenes),

b. el valor relativo que se le da a las secciones de selección múltiple y de preguntas de discusión,

c. los cambios en la práctica de la profesión legal en general,

d. el proceso de aprendizaje, la tecnología y su efecto.

Sobre el particular, sugerimos que se considere implementar una estructura similar a la que adoptó la *Comisión para el estudio de la Reválida y la Educación Legal en Puerto Rico*, creada el 15 de mayo de 1978.

11. Recomendamos, además, que un ejercicio similar al aquí presentado se realice cada 10 años, no solo para actualizar la información recopilada, sino también para monitorear el efecto de estas recomendaciones.



ÍNDICE DEL APÉNDICE

TOMO II

**Apéndice I** - *In re: Comisión Especial para evaluar la nota de pase de las reválidas de derecho general y derecho notarial*, 207 DPR 248 (2021) ...................... 2-8

**Apéndice II** - *Conducting a Standard Setting Study for the Puerto Rico Bar Exam and Notary Exam* ............................. 9-25

**Apéndice III** - Informe de la Junta Examinadora de Aspirantes al Ejercicio de la Abogacía y la Notaría .................................. 26

Carta al Director Ejecutivo de la Junta Examinadora, Lcdo. Héctor Rodríguez Mulet .......................................................... 27- 29

Carta de la Junta Examinadora .......................................... 30-42

Anejo I - Resolución del Tribunal Supremo de 21 de enero de 1994 .............. 43

Anejo II - Tabla de Conversión de Puntos Asignados – septiembre 2021 .......... 44

Anejo III - Desempeño de primerizos por Escuela de Derecho ................... 45-50

Anejo IV - Resolución de 19 de diciembre de 2011 .................................. 51-52

Anejo V - Informes de validez ............................................................ 53-103

Anejo VI - Bar Exam Fundamentals for Legal Educators ....................... 104-123

**Apéndice IV** - Informe de la Escuela de Derecho de la Universidad de Puerto Rico ........................................ 124

Carta a la Decana Vivian Neptune Rivera – *primer* requerimiento de información .............................................. 125-127

Carta de la Escuela de Derecho de la UPR de 13 de julio de 2021 .......... 128-129

Anejo A - Información para la Comisión Especial para Evaluar la Nota de Pase de las Reválidas de Derecho General y Derecho Notarial ................................................................ 130-139

Anejo B - Puntuaciones nuevo ingreso 2007-2017 (Excel) ..................... 140-205



Anejo C - *Econometric Analysis of the Admissions Policy
in the University of Puerto Rico Law School* ............... ............. 206-258

Carta a la Decana Vivian Neptune Rivera
– *segundo* requerimiento de información ............................................. 259-261

Carta de la Escuela de Derecho de la UPR
de 13 de diciembre de 2021 ......................................................... 262-265

Anejo 1 - Informe cursos de reválida 2007 al 2017 .............................. 266-267

Anejo 2 - Taller a facultad ...................................................... 268-282

## TOMO III

**Apéndice V** - Informe de la Facultad de Derecho
de la Universidad Interamericana de Puerto Rico ................... 283

Carta al Decano Julio Fontanet Maldonado
– *primer* requerimiento de información ............................................. 284-286

Carta de la Facultad de Derecho de la UIPR
de 20 de agosto de 2021 ............................................................. 287-305

Anejo 1 - Catálogo 2005-2007 ......................................................... 306-309

Anejo 2 - Catálogo 2014-2016 & 2016-2018 ...................................... 310-316

Anejo 3 - Puntuaciones nuevo ingreso 2007-2017 (Excel) ..................... 317-336

Anejo 4 - Catálogo 2005-2007, 2008-2010, 2011-2012,
2012-2013, 2014-2016 .................................................... 337-349

Anejo 5 - Catálogo 2016-2018 ........................................................ 350-355

Anejo 6 - Catalogue 2019-2021 ...................................................... 356-358

Anejo 7 - *Guía para el uso y la interpretación de los resultados
del EXADEP* ................................................................ 359-383

Carta al Decano Julio Fontanet Maldonado
– *segundo* requerimiento de información ............................................. 384-386

Carta de la Facultad de Derecho de la UIPR
de 4 de febrero de 2022 .............................................................. 387-388



Anejo 1 - Reclutados admitidos años 2007-2021 ....................................... 389

Anejo 2 - Profesores a tiempo completo (catedráticos)
y Profesores adjuntos (por contrato) ...................................... 390-393

Anejo 3 - Estudiantes graduados con honores por clase graduanda ....... 394-397

Carta de la Facultad de Derecho de la UIPR
de 1 de marzo de 2022 ........................................................................ 398

Anejo 1 – Oferta Académica ............................................................. 399-405

**Apéndice VI** - Informe de la Escuela de Derecho
de la Pontificia Universidad Católica de Puerto Rico ............... 406

Carta al Decano Fernando Moreno Orama
– *primer* requerimiento de información ............................................. 407-409

Carta de la Escuela de Derecho de la PUCPR
de 19 de agosto de 2021 .................................................................. 410-411

Anejo 1 - Política Académica ............................................................ 412-461

Anejo 2 - Law School Admission Policy ............................................. 462-468

Anejo 3 - Programa – Currículos ....................................................... 469-480

Anejo 4 - Puntuaciones nuevo ingreso 2007-2017 (Excel) ..................... 481-572

Anejo 5 - Estudios e Informes estadísticos ......................................... 573-618

Carta al Decano Fernando Moreno Orama
– *segundo* requerimiento de información ........................................... 619-620

Carta de la Escuela de Derecho de la PUCPR
de 26 de enero de 2022 ................................................................... 621-622

Anejo 1 - Honores; Estudiantes admitidos y matriculados
por semestre (agosto 2017 – agosto 2021);
Puntuaciones nuevo ingreso 2017-2018 (Excel);
Composición de profesores por cursos de reválida ................ 623-631

Anejo 2 - Mapa – matriculados(as) por pueblo o lugar
de procedencia (agosto 2021) ................................................... 632



**Apéndice VII** - *Puerto Rico Bar Examination Applicant Comparability Evaluation 2010-2020* .......................... 633-647

**Apéndice VIII** - Comunicación del Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico ........... 648-652



# Apéndice

Para obtener los apéndices del Informe de la Comisión Especial, favor de referirse al enlace siguiente:

https://poderjudicial.pr/index.php/tribunal-supremo/junta/informe-de-la-comision-especial-para-evaluar-la-nota-de-pase/